## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## MEMPHIS DIVISION

|  |  |
|---|---|
| IN RE REGIONS MORGAN KEEGAN SECURITIES, DERIVATIVE and ERISA LITIGATION )<br><br>This Document Relates to:<br>*Landers* v. *Morgan Asset Management, Inc.,*<br>No. 2:08-cv-02260-SMH-dvk | MDL Docket No. 2009<br><br>Judge Samuel H. Mays, Jr.<br><br>Magistrate Judge Diane K. Vescovo<br><br>ORAL ARGUMENT REQUESTED |

## DERIVATIVE PLAINTIFFS' CONSOLIDATED MEMORANDUM IN OPPOSITION TO MOTIONS TO DISMISS BY NOMINAL DEFENDANT FUNDS AND ALL DEFENDANTS OTHER THAN PRICEWATERHOUSECOOPERS

**HEAD, SEIFERT & VANDER WEIDE, P.A.**

Vernon J. Vander Weide
Thomas V. Seifert
333 South Seventh Street, Suite 1140
Minneapolis, MN 55402-2422
Telephone: 612-339-1601
Fax: 612-339-3372
vvanderweide@hsvwlaw.com

**ZIMMERMAN REED, P.L.L.P.**

Carolyn G. Anderson
Timothy J. Becker
Kirsten D. Hedberg
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
Telephone:  612-341-0400
Fax: 612-341-0844
cga@zimmreed.com

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**

Richard A. Lockridge
Gregg M. Fishbein
100 Washington Avenue South, Suite 2200
Minneapolis, MN  55401
Tel:  (612) 339-6900
Fax:  (612) 339-0981
gmfishbein@locklaw.com

**APPERSON, CRUMP & MAXWELL, PLC**

Jerome A. Broadhurst, TN BPR 12529
Charles D. Reaves, TN BPR 22550
6000 Poplar Avenue, Suite 400
Memphis, TN 38119-3972
(901) 260-5133 direct
(901) 435-5133 fax
jbroadhurst@appersoncrump.com

*Attorneys for Derivative Plaintiffs*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ................................................................................... 6

I.  FACTS RELATING TO DEMAND ............................................................. 6

    A.  Delay in Making a Demand Risked Irreparable Harm. ................................... 7

    B.  The Defendant Directors' Conduct during 2006 - 2008 Is Not Entitled to the Protection of the Business Judgment Rule. ...................................... 7

        1.  On repeated occasions, the Defendant directors failed to address their and the other MK Defendants' mismanagement of the Funds. ............... 7

        2.  The Defendant directors had actual knowledge in 2006 of the Funds' substantial investments in illiquid securities whose value was highly uncertain in violation of the Funds' investment objectives, policies and restrictions. ........................................................................ 12

        3.  There was no decision to which the business judgment rule applied. .... 14

    C.  Plaintiffs' Efforts to Obtain Action by the Funds' Defendant and New Directors. ........................................................................... 16

    D.  The Funds' Conflicted Board. ................................................... 18

        1.  The entire board was disabled by its conflicting interests. .................... 18

        2.  A majority of directors was conflicted in March 2008. ......................... 21

II.  FACTS RELATING TO FAILURE TO STATE A CLAIM ............................. 22

    A.  The Derivative Claims against the Defendant Directors and Officers Are Supported by Detailed Factual Allegations. ................................... 22

    B.  The Derivative Claims against the MK Defendants Are Permitted by the Funds' Articles of Incorporation and Advisory Agreement. ............. 25

ARGUMENT ......................................................................................... 25

I.  PLAINTIFFS WERE EXCUSED FROM MAKING A DEMAND ........................... 25

    A.  Purpose and Use of the Derivative Action ........................................ 25

    B.  Applicable Law regarding Derivative Actions ................................... 27

    C.  Demand Is Excused as Futile. ..................................................... 29

        1.  The allegations and evidence demonstrate Defendant directors could not reasonably  have been expected to respond to a demand in good faith and within the ambit of the business judgment rule. .............................. 29

2.    The Defendant directors' efforts to quit the Funds' board and refusal to include proxy statement disclosures about the derivative action is evidence of demand futility. .................................................................. 32

3.    The Funds' board in March 2008 lacked a majority of directors who were not directly conflicted. ................................................................. 33

    a.    The entire board was personally and directly conflicted. ............ 33

    b.    A majority of Defendant directors was personally and directly conflicted ..................................................................................... 36

4.    Demand is excused because there was no decision that required business judgment as a mutual fund offers no choice to which the business judgment rule applies in view of the identity of interests of a fund and its shareholders. ..................................................................................... 39

5.    Demand is not required where the challenged conduct is *ultra vires*.... 42

D.    Demand Is Excused because Delay in Bringing This Action Would Have Resulted in Irreparable Harm........................................................................ 44

E.    The Demand Issue Is Moot: The New Directors' Motion Contradicts Their Representations to the Funds' Shareholders, and the Defendant Directors and New Directors Are Estopped from Asserting Demand Was Not Excused. .... 45

1.    Demand was made on the New Directors. .............................................. 46

2.    The demand issue is moot because the New Directors have represented to Fund shareholders their intention to pursue the derivative claims on their merits. ............................................................................................. 47

3.    The New Directors' representations to the Funds' shareholders and the Defendant directors' and New Directors' inequitable conduct estop them from asserting demand was not excused. ............................................... 49

F.    Demand on the Funds' Shareholders Was Excused. ....................................... 52

II.   **PLAINTIFFS STATE CLAIMS ON WHICH RELIEF CAN BE GRANTED.**........................ 54

A.    The Exculpatory Provisions of the Funds' Articles of Incorporation and Advisory Agreement Do Not Bar Plaintiffs' Claims........................................ 54

1.    The MAM Advisory Agreement exculpatory provision does not apply to breach of contract claims. ...................................................................... 54

2.    The Company's Articles of Incorporation and Advisory and Underwriting Agreements do not bar Plaintiffs' gross negligence claims against the MK Defendants. ................................................................... 56

3.    The Advisory Agreement exculpatory provision is invalid. ................. 57

        4.     Plaintiffs' negligence claim against MK is not barred by any exculpatory provision. ........................................................................... 59

    B.    Adequacy of Allegations regarding MK Holding and MK. ........................... 60

III.    **PLAINTIFFS' COMPLAINT WAS VERIFIED.** ................................................................ 60

CONCLUSION ........................................................................................................................ 60

## TABLE OF AUTHORITIES

**Cases**

*Allison v. General Motors Corp.*, 604 F. Supp. 1106 (D. Del. 1985). .................................. 46

*Aronson v. Lewis*, 473 A.2d 805 (Del. 1984) ........................................... 27, 28, 34

*Beam v. Stewart*, 845 A.2d 1040 (Del. 2004)........................................ 37

*Bender v. Schwartz*, 917 A.2d 142 (Md. Ct. App. 2007) ......................................... 26, 46, 50

*Beneville v. York*, 769 A.2d 80 (Del. Ch. 2000) ..................................... 36

*Block v. Fischbach*, 1997 WL 198005 (N.Y. Sup. Ct. Mar. 10, 1997) ................................ 33

*Brinckerhoff v. JAC Holding Corp.*, 263 A.D.2d 352 N.Y.S.2d 381 (N.Y. App. Div. 1999)50

*Cal. Pub. Emples. Ret. Sys. v. Coulter*, 2002 Del. Ch. LEXIS 144 (Del. Ch. Dec. 18, 2002) ................................................................................................................... 43

*Champion Home Builders Co. v. ADT Security Servs. Inc.,* 179 F. Supp. 2d 16 (N.D.N.Y. 2001) ........................................................................................................ 55

*Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949)................................ 26

*CompuSpa, Inc. v. I.B.M. Corp.,* 228 F. Supp. 2d 613 (D.Md. 2002).................................. 55

*Conrad v. Black*, 940 A.2d 28 (Del. Ch. 2007) ...................................... 31

*Danielewicz v. Arnold*, 769 A.2d 274 (Md. Ct. App. 2001)................................. 29

*Davis v. Gemmell*, 17 A. 259 (Md. 1889)................................................... 40

*Dousman v. Kobus*, 2002 Del. Ch. LEXIS 67 (Del. Ch. June 6, 2002)................................ 51

*Edge Partners, L.P. v. Dockser*, 944 F. Supp. 438 (D. Md. 1996)................................. 33, 53

*Eichenholtz v. Brennan*, 1989 U.S. Dist. LEXIS 8778 (D.N.J. July 27, 1989).................... 37

*Eisler v. Eastern States Corp.*, 35 A.2d 118 (Md. Ct. App. 1943)........................................ 52

*Felker v. Anderson*, 2005 WL 602974 (W.D. Mo. Feb. 11, 2005)................................ 28, 33

*Gallus v. Ameriprise Fin., Inc*., 561 F.3d 816 (8th Cir. 2009) ............................................. 59

*Gearhart Industries, Inc. v. Smith International*, 741 F.2d 707 (5th Cir. 1984) ................... 42

*Greenfield v. Prof'l Care, Inc.*, 677 F. Supp. 110 (E.D.N.Y. 1987) ..................................... 35

*Grill v. Hoblitzell*, 771 F. Supp. 709 (D. Md. 1991). ........................................................ 28

*Harhen v. Brown*, 730 N.E.2d 859 (Mass. Sup. Ct. 2000) .................................................. 53

*Harris v. Carter*, 582 A.2d 222 (Del. Ch. 1990) ................................................................ 46

*Harvest Corp. v. Ernst & Whinney*, 610 S.W.2d 727 (Tenn. App. Ct. 1980) ...................... 55

*In re Abbott Labs. Derivative Shareholders Litig.*, 325 F.3d 795 (7th Cir. 2003); ......... 31, 34

*In re Caremark Int'l, Inc.,* 698 A.2d 959 (Del. Ch. 1996) ..................................................... 31

*In re Cendant Corp. Derivative Action Litig.*, 189 F.R.D. 117 (D.N.J. 1999) ...................... 34

*In re Franklin Mutual Fund Fee Litig.*, 388 F. Supp. 2d 451 (D.N.J. 2005) ........................ 42

*In re Infosonics Corp. Derivative Litig.*, 2007 WL 2572276 (S.D. Cal. Sept. 4, 2007)........ 26

*In re InfoUSA, Inc. Shareholders Litig.*, 953 A.2d 963 (Del. Ch. 2007)................................ 31

*In re Key Energy Services, Inc. Derivative Litig.*, 2006 WL 5979882 (W.D. Tex. July 10, 2006) ...................................................................................................................................... 45

*In re Lernout & Hauspie Sec. Litig.*, 286 B.R. 33 (D. Mass. 2002) ...................................... 35

*In re Mut. Funds Inv. Litig.*, 384 F. Supp. 2d 873 (D. Md. 2005)................................... 31, 34

*In re Mutual Funds Investment Litig.*, 384 F. Supp. 2d 873 (D. Md. 2005) ......................... 34

*In re New Valley Corp.*, No. 17649, 2001 WL 50212 (Del. Ch. Jan. 11, 2001) ................... 37

*In re Nuveen Fund Litig.,* 1996 U.S. Dist. LEXIS 8062 (N.D. Ill. June 11, 1996) .............. 43

*In re Oracle Corp. Derivative Litig.*, 824 A.2d 917 (Del. Ch. 2003)............................... 37, 38

*In re Oxford Health Plans, Inc.*, 192 F.R.D. 111 (S.D.N.Y. 2000)........................................ 31

*In re SFBC International, Inc. Securities & Derivative Litig.*, 495 F. Supp. 2d 477 (D.N.J. 2007) ...................................................................................................................................... 34

*In re The Limited, Inc. Shareholders Litig.,* 2002 WL 537692 (Del. Ch. Mar. 27, 2002) ... 36, 39

*In re The Student Loan Corp. Derivative Litig.*, 2002 WL 75479 (Del. Ch. Jan. 8, 2002)... 37

*In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267 (S.D.N.Y. 2006)................. 31

*In re Walt Disney Co. Derivative Litig.,* 731 A.2d 342 (Del. Ch. 1998).............................. 37

*In Re: UnitedHealth Group Incorporated Shareholder Derivative Litig.*, United States District Court, District of Minnesota, Master File No. 06-1216 JMR/FLN .................... 19

*International Equity Capital Growth Fund, L.P. v. Clegg*, 1997 Del. Ch. LEXIS 59 (Del. Ch. Apr. 21, 1997) ............................................................................................................... 39

*Kamen v. Kemper Fin. Servs.*, 500 U.S. 90 (1991) ....................................................... 25, 53

*Knill v. Knill*, 510 A.2d 546 (Md. 1986) .............................................................................. 50

*Krantz v. Prudential Inv. Fund Management LLC*, 305 F. Supp. 2d 150 (D. Mass 2000) ... 38

*Levitt v. Johnson*, 334 F.2d 815 (1st Cir. 1964) .................................................................... 53

*Lewis v. Hett*, 1984 Del. Ch. LEXIS 546 (Del. Ch. September 4, 1984) ............................. 43

*Lewis v. Sporck*, 646 F. Supp. 574 (N. D. Cal. 1986)...................................................... 46, 47

*McCall v. Scott*, 239 F.3d 808 (6th Cir. 2001) ............................................................... 31, 34

*Meltzer v. Atlantic Research Corp.*, 330 F.2d 946 (2nd Cir. 1964) ........................................ 53

*Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321 (4th Cir. 2001) ............................. 38

*Moran v. Household Int'l, Inc.*, 500 A.2d 1346 (Del. 1985) .................................................. 42

*Murray-Baumgartner Surgical Instr. Co. v. Requardt*, 23 A.2d 697 (1942) ........................ 42

*New Crawford Valley, Ltd. v. Benedict*, 847 P.2d 642 (Colo. Ct. App. 1993) ...................... 53

*Olesh v. Dreyfus Corp.*, 1995 WL 500491 (E.D.N.Y. Aug. 8, 1995) .................................... 38

*Onvoy, Inc. v. SHAL, L.L.C.*, 669 N.W.2d 344 (Minn. 2003) ............................................... 42

*Parish v. Maryland and Virginia Milk Producers Association*, 242 A.2d 512 (Md. Ct. App. 1968) ..................................................................................................................................... 52

*Post v. Bregman*, 707 A.2d 806 (Md. 1998) ......................................................................... 51

*Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993). ................................................ 30, 31, 34

*Reschini v First Federal Sav and Loan Ass'n of Indiana,* 46 F.3d 246 (3d Cir. 1995) ......... 51

*Ross v. State Bd. of Elections*, 876 A.2d 692 (Md. 2005) ..................................................... 52

*Ryan v. Gifford*, 918 A.2d 341 (Del. Ch. 2007) .............................................................. 34, 43

*Sadler v. Dimensions Healthcare Corp.*, 836 A.2d 655 (Md. 2003) ..................................... 42

*Sanders v. Wang*, 1999 Del. Ch. LEXIS 203 (Del. Ch. Nov. 8, 1999) ................................ 54

*Scalisi v. Fund Asset Management, L.P.*, 380 F.3d 133 (2d Cir. 2004) ................................ 28

*Sekuk Global Enterprises Profit Sharing Plan v. Kevenides*, 2004 WL 1982508 (Md. Cir. Ct. May 25, 2004) ................................................................................................................ 28

*Strougo v. Scudder, Stevens & Clark, Inc.*, 964 F. Supp. 783 (S.D.N.Y. 1997) ................... 53

*Swanson v. Traer*, 354 U.S. 114 (1957) ............................................................................... 42

*Syracuse Television, Inc. v. Channel 9, Syracuse, Inc.*, 273 N.Y.S.2d 16 (1966) ................. 46

*Trumball Inv..Ltd., v. Wachovia Bank, N.A.,* 2005 U.S. Dist. LEXIS 7195 (E.D Va., Apr. 15, 2005) ..................................................................................................................................... 55

*Tydings v. Berk*, 565 A.2d 391 (Ct. Sp. App, Md. 1989) ……………………………… 50

*U.S. Int'l Associates v. Steiner*, 1995 Conn. Super. LEXIS 2202 (Conn. Super. July 31, 1995) ..................................................................................................................................... 37

*Washtenaw County Employees' Retirement System v. Wells Real Estate Investment Trust, Inc.*, 2008 WL 2302679 (N.D. Ga. Mar. 31, 2008) ............................................................ 28

*Weiss v. Sunasco Inc.*, 316 F. Supp. 1197 (E.D. Pa. 1970) .................................................. 53

*Werbowsky v. Collomb*, 766 A.2d 123 (Md. 2001). .............. 26, 27, 28, 30, 33, 45, 47, 50, 51

*Williams v. Salisbury Ice Co.*, 176 Md. 13 (Md. 1939) ........................................................ 42

*Winterstein v. Wilcom*, 293 A.2d 821 (Ct. Sp. App. Md. 1972)...........................................57

*Wolf v. Ford,* 644 A.2d 522 (Md.1994)...............................................................................57

*Zimmerman v. Bell*, 585 F. Supp. 512 (D. Md. 1984);.........................................................52

## Statutes

15 U.S.C. § 80a-1....................................................................................................40, 57

15 U.S.C. § 80a-2.............................................................................................................38

15 U.S.C. § 80a-13.....................................................................................................44, 58

15 U.S.C. § 80a-15.....................................................................................................47, 54

15 U.S.C. § 80a-17...........................................................................................................56

15 U.S.C. § 80a-46...........................................................................................................58

Maryland Code § 1-403....................................................................................................44

Maryland Code § 2-405.1 .....................................................................................30, 49, 50

Maryland Code § 2-405.2.................................................................................................56

Maryland Code § 2-407....................................................................................................32

Maryland Code § 5-418....................................................................................................56

Minn. Stat. § 302A.165.....................................................................................................44

## Other Authorities

*First Australia Fund, Inc., SEC No-Action Letter*, 1987 WL 108483 (S.E.C.) (Oct. 8, 1987)
.............................................................................................................................38

## Treatises

7A Fletcher Cyc. Corporations §§ 3399, 3402 ..................................................................43

Derivative Plaintiffs,[1] on behalf of Morgan Keegan Select Fund, Inc. ("Company"), and its three portfolios,[2] submit this memorandum in opposition to the motions to dismiss by Nominal Defendants and by Defendants Blair, Johnson, McFadden, Pittman, Stone, Willis, Morgan, Alderman, Joseph C. Weller, J. Thompson Weller, Maxwell, Kelsoe, Tannehill, George, Wood, Sullivan, Regions Financial Corporation, Morgan Keegan & Co., Inc, Morgan Asset Management, Inc, and MK Holding, Inc.[3]

## PRELIMINARY STATEMENT

This is a derivative action by Plaintiffs, who collectively invested $2.6 million in the Funds, on behalf of the Company/Funds against Morgan Asset Management, Inc. ("MAM"), the Funds' investment adviser, Morgan Keegan & Company, Inc. ("MK"), the Funds' distributor and administrator, and controlling persons of the Funds' investment adviser, and the Company's/Funds' officers and directors for breach of contract, breach of fiduciary duty, negligence and negligent misrepresentation involving the waste and mismanagement of the Funds' assets.

In breach of obligations imposed by contract and otherwise, the Defendants caused the

---

[1]     Derivative Plaintiffs are H. Austin and Jeanette H Landers, Charles M. and Diana W Crump,. James H. Frazier, Lloyd R. Thomas, M.D., and James P. and Peggy C. Whitaker ("Plaintiffs"). Each of the Plaintiffs, except the Whitakers, is a named plaintiff in two related actions in this Court: *In re Regions Morgan Keegan Open-End Mutual Fund Litigation*, No. 2:07-cv-02784-SHM-dkv (the "PSLRA Case"), and *Atkinson v. Morgan Asset Management*, No. 2:08-cv-02694-SHM-dkv.

[2]     These portfolios are Regions Morgan Keegan Select Short Term Bond Fund ("Short Term Fund"), Regions Morgan Keegan Select Intermediate Bond Fund ("Intermediate Fund"), and Regions Morgan Keegan Select High Income Fund ("High Income Fund") ("the Funds"). Morgan Keegan Select Fund, Inc. is now known as Helios Select Fund, Inc. and its three portfolios are now known as Helios Select Short Term Bond Fund, Helios Select Intermediate Bond Fund, and Helios Select High Income Fund following shareholder approval of the transfer of the Funds' investment advisory agreements to Hyperion Brookfield Asset Management ("HBAM") on July 29, 2008.

[3]     Dkt Nos. 24-26, 28, 29. Plaintiffs are responding separately to PricewaterhouseCoopers' ("PwC") motion to dismiss.

1

Funds to take on concentration, credit, liquidity and valuation risks as a result of investing an extraordinarily large portion of their respective portfolios in thinly traded securities of uncertain valuation that could and did suddenly become unsalable at their estimated values upon shifting market sentiments, resulting in catastrophic losses to the Funds. The Funds' heavy investments in these securities violated the Funds' investment objectives, policies and restrictions and substantially exceeded such types of investments and risks by their respective peer funds. Significantly, MK does not move to dismiss the Funds' breach of contract claim against it, thus demonstrating that lack of merit cannot be a basis for refusing to bring this action.

This action is not like the situation where, as Defendants argue, if only the purportedly non-conflicted board had received a formal demand before the derivative action was filed on March 28, 2008, they could and would have taken appropriate action on behalf of the Company/Funds. As demonstrated by the sequence of events that preceded the filing of this action as well as certain subsequent events, the futility of a demand is clearly evidenced, and demand is therefore excused.

Notwithstanding that the three Regions Morgan Keegan Funds – Short Term, Intermediate, and High-Income – were advertised as either the same as, or safer than, funds in their peer groups, the Funds suffered catastrophic losses unmatched by virtually all of their peers. The risks taken on by the Funds as a result of their mismanagement by Defendants materialized in the summer and fall of 2007 to cause unprecedented losses. Through February 2008, the Short Term, Intermediate and High Income Funds lost $17.1 million (23%), $405.5 million (70%), and $515.0 million (72%) respectively. The direct cause of these losses was the composition of these Funds' portfolios that exposed the Funds to much higher credit, concentration, liquidity and valuation risks than their respective peers.

In August 2007, the Funds disclosed they were encountering difficulty in valuing their portfolio securities (a responsibility of the Defendant directors) and that an outside consultant had been retained to assist in "fair valuing" the illiquid securities held in the port-

2

folios. This difficulty was caused by the precipitous drop in the prices of the portfolio securities. The true extent of the over-concentration in illiquid, so called "fair-valued" securities was first shown in the Funds' annual report that was filed with the Securities and Exchange Commission ("SEC") on October 4, 2007, and highlighted by PwC in its auditor's report. This report disclosed that as of June 30, 2006 and 2007, the Short Term Bond Fund had 18.2% and 30.7% of its assets, respectively, invested in "fair valued" or illiquid securities; that the Intermediate Bond Fund had 55.8% and 50.4% invested in "fair valued" or illiquid securities; and the High Income fund had 49.5% and 59.8% invested in "fair valued" or illiquid securities. These investments significantly exceeded the SEC's 15%-of-assets limitation on illiquid securities. The numbers for 2006 were not previously disclosed, either in PwC's audit report or otherwise. These "fair valued" securities included or were in addition to the illiquid "restricted securities" held by the Funds. Despite the Funds' disastrous losses, the Defendant directors on October 26, 2007, renewed the investment advisory contract with MAM, and in so doing, indicated that they would "closely monitor" the performance of the Funds.

Beginning on December 6, 2007, several class actions involving these three open-end Funds and four closed-end funds managed by MAM and the Defendant directors ("sometimes referred to as the "Old Board") were filed in federal and state courts in Tennessee and elsewhere. The Defendant directors herein were also defendants in many of these cases and were therefore acutely aware of the serious challenges to their stewardship of the Funds prior to the filing of this derivative action in March 2008.

Unbeknownst to the Funds' shareholders, including Plaintiffs, and, therefore, not alleged in the complaint as a basis for excusing demand as futile, MAM began discussions in late December 2007 to transfer the investment management of the Funds to Hyperion Brookfield Asset Management ("HBAM"). The outside Defendant directors were informed of this plan on January 16, 2008, and again discussed this possibility in a board meeting on January 23, 2008. Thereafter, the board conferred several times to discuss this proposal. On

3

April 21, 2008, after this derivative action was filed on March 28, 2008, the board approved MAM's proposal to transfer the Funds' management to HBAM. An integral part of this proposal was the replacement of the Defendant directors by five new directors ("the New Directors"), who were directors of other funds managed by HBAM. Upon the election of the New Directors and the change in management to HBAM, the Defendant directors were to have no further responsibility for oversight of the Funds.

The Defendant directors, having already been sued individually in several class actions and other litigation before the filing of this derivative action, were clearly on notice – in a manner much more informative than through a demand letter – that there were serious problems with the Funds' management. The numerous lawsuits that were filed before this action, particularly those that named the Funds as defendants, put the Defendant directors on notice of the need to take action on behalf of the Funds in their fiduciary capacities. Instead, the Defendant directors focused on terminating their fiduciary responsibilities for the management of the Funds, so that, when this action was filed, the Defendant directors were about to approve a plan that allowed them to escape all future oversight responsibility for the Funds. It defies credulity to believe that the Defendant directors would have, upon receipt of a demand by Plaintiffs, postponed their anticipated exit in order to oversee long-term litigation against Defendants, including themselves.

That the Defendant directors were consumed with ending their responsibility for oversight of the Funds, making it extremely unlikely that they would have taken action in the event of a demand, is evidenced by their lack of response to matters brought to their attention by Plaintiffs' counsel after the filing of the Funds' preliminary May 2, 2008 proxy statement, recommending that the Funds' shareholders approve the transfer of the Funds' management to HBAM and elect the New Directors. Plaintiffs' counsel told the New Directors that the proxy statement misrepresented the estimated damages sought on behalf of the Funds and omitted material information about this action. Counsel requested that the proxy statement be corrected to state the estimated damages sought in the derivative action and to

4

disclose the New Directors' intentions with respect thereto. Counsel for the New Board forwarded that letter to the Defendant directors. No response was received, and the proxy statement was not corrected.  Immediately following the shareholders' meetings in July 2008, management of the Funds was transferred to HBAM and the New Directors took office.

In December of 2008, HBAM announced in a prospectus supplement/sticker that the Short Term Bond Fund would be liquidated, and this announcement was repeated in the Funds' Semi-Annual Report filed on January 12, 2009 and a preliminary proxy statement dated February 3, 2009.  None of these disclosures addressed this action. Plaintiffs' counsel became concerned that liquidation would jeopardize the benefits of this derivative litigation for the Short Term Fund's shareholders.  On February 20, 2009, Plaintiffs' counsel advised the staff of the SEC's Division of Investment Management and on February 25, 2009, informed the Funds' new counsel that the derivative litigation could be a significant asset of the liquidating Fund and should be protected. Plaintiffs' counsel requested, among other things, that the shares of the Short Term Bond Fund not be cancelled upon liquidation and that a constructive trust be established for the benefit of all shareholders in the event that the derivative litigation should be successful.

In April 2009, HBAM and the Funds filed a prospectus supplement with the SEC, proposing that all three Funds be liquidated. The April 2009 prospectus supplement  and the following May 1, 2009 definitive proxy statement discussed the derivative litigation.  In a manner that responded to Plaintiffs' counsels' earlier requests, the proxy statement disclosed that the proposed plan of liquidation would preserve the derivative claims, that a liquidating trust would be established, that the Funds' shares would not be cancelled although a liquidating distribution would be paid, and that the derivative claims would be pursued on their merits. The Funds' shareholders approved the Funds' liquidation on May 29, 2009, based on the representations in the May 1, 2009 proxy statement.  Having publicly stated in a filing with the SEC that the New Directors would preserve and pursue the derivative claims, the

issue of whether demand should have been made on the Defendant directors, who in any event could not have fairly and objectively considered such a demand, is now moot.

Demand was excused as futile not only because the Defendant directors were so conflicted that they could not be expected to respond to a demand in good faith within the ambit of the business judgment rule but also because their conduct was *ultra vires*, thereby excusing demand. Demand was also excused because of the applicable short statute of limitations to the claims against PwC that, if this action was delayed, would have caused irreparable harm. Plaintiffs' Complaint sets forth in detail the facts supporting the claims they assert on behalf of the Company/Funds and, therefore, easily satisfies applicable pleading standards. Even the Funds' auditor acknowledges that the Complaint's allegations are sufficient to show actionable knowledge on the part of the Funds' directors and officers. These claims, based on gross negligence and reckless disregard of duties, are explicitly allowed under the exculpatory provisions of the Company/Funds' governing documents. Finally, the exculpatory provisions, which do not in any event apply to breach of contract claims, are unenforceable.

## STATEMENT OF FACTS

### I.   FACTS RELATING TO DEMAND

The allegations in the complaint and evidence of events subsequent to the filing of the complaint, together with certain Defendants' assertions, establish that a demand in this action was excused. In March 2008, the Company did not have a majority of non-conflicted directors capable of making a decision on the question of whether to sue the Defendants herein. That decision is one in which at least a majority, if not all, of the Company's directors had a personal interest, financial and otherwise. There was no choice to be made that could be protected by the business judgment presumption because the Company/Funds had no interests that were separate and apart from the interests of the Funds' shareholders with respect to whether this action should be pursued against the Defendants. Delay would have potentially resulted in irreparable harm to the Funds in light of the applicable short statute of

limitations to some claims.

### A.    Delay in Making a Demand Risked Irreparable Harm.

Defendant PricewaterhouseCoopers ("PwC") asserts that, because Plaintiffs' allegations show that all Defendants had full knowledge by August 2006 of the Funds' claims against it based on the faulty audit of the Funds' 2006 financial statements, this action is barred because it was not commenced by August 2007. PwC Br. at 11-13, 18. The Defendant directors, who say they could have fairly evaluated a demand if only one had been made on them, contend Plaintiffs were not diligent in bringing this action until March 2008. Directors' Br. at 8 n 5. They claim that Plaintiffs cannot rely on the exception from the demand requirement where delay arising from a demand would result in irreparable harm because plaintiffs did nothing to protect the Funds. *Id.*

That delay risked irreparable harm is amply demonstrated by PwC's and the former directors' assertions. The initial action seeking recovery for the Funds' losses was brought by a plaintiff represented by counsel herein in December 2007.[4] A First Amended Complaint was filed in that action in February 2008.[5] This action was filed in March 2008. While Plaintiffs proceeded diligently in bringing this action, the Defendant directors did nothing to preserve or pursue the Funds' claims against not only PwC but against all of the other Defendants, including themselves.

### B.    The Defendant Directors' Conduct during 2006 - 2008 Is Not Entitled to the Protection of the Business Judgment Rule.

#### 1.    On repeated occasions, the Defendant directors failed to address their  and the other MK Defendants' mismanagement of the Funds.[6]

Plaintiffs allege that the mismanagement complained of herein was not an exercise

---

[4]    *Richard A. Atkinson, M.D., Patricia B. Atkinson, et al.  v. Morgan Asset Management, Inc. et al.*, United States District Court, Western District of Tennessee, No. 2.07-cv-2784.

[5]    *Id.*, Dkt. No. 53.

[6]    "MK Defendants" collectively refers to the Funds' individual officers and directors, MAM, MK, Holding, and Regions. ¶ 38.

of good faith business judgment by the Defendant directors. ¶ 359.[7] Plaintiffs allege that, having failed to fulfill their fiduciary duties of loyalty and good faith in allowing the complained of waste and mismanagement to occur, the Defendant directors could not and would not in good faith have considered a demand in March 2008 to commence this action.[8] *Id.*

Plaintiffs allege the conditions that existed in the Funds' portfolios by at least mid-2006 that caused the Funds to collapse over one year later. *See, generally,* ¶¶ 41-168. These allegations, asserts PwC, demonstrate the MK Defendants' knowledge of the Funds' claims against PwC for a deficient 2006 audit. PwC Br. at 11-13, 18. These same facts support the claims against the MK Defendants for mismanagement. ¶¶ 95-104, 128, 152-68. Notwithstanding their knowledge, the Defendant directors did nothing to either require MAM and the Funds' officers to take corrective action, while there was adequate time to do so, or to bring an action when the Funds suffered losses in late 2007.[9]

The Defendant directors had numerous opportunities to consider the Funds' mismanagement. Besides the knowledge they had by August 2006 of the Funds' violations of their respective investment objectives, policies and restrictions, the Defendant directors learned no later than August 2007 that the Funds were having great difficulty valuing their securities to satisfy PwC and that the Funds would be unable to timely issue their June 30, 2007 annual report. ¶¶ 115-16. The directors also learned that, because MAM and MK were unable to value a large portion of the Funds' portfolios, MAM engaged an "independent

---

[7]      Unless otherwise noted, all paragraph ("¶") references are to the complaint [Dkt. No. 1] and all exhibit references are to the Affidavit of Jerome A. Broadhurst.

[8]      Plaintiffs agree the Company/Funds' board consisted of six members in March 2008.

[9]      As discussed in Plaintiffs' opposition to PwC's motion to dismiss, while correctly asserting Plaintiffs have adequately alleged that the MK Defendants had the requisite knowledge for claims against themselves and PwC in August 2006, PwC is incorrect that this action had to have been initiated by August 2007. ¶¶ 246, 270-71, 278-79; PwC Br. at 11.

valuation consultant to assist in determining the fair value of certain of the Fund's portfolio securities." ¶ 117. Notwithstanding their 2006 knowledge and the valuation problems in 2007 necessitating outside assistance to determine the Funds' values, Defendant directors did nothing. Even after the Funds finally disclosed the liquidity issues afflicting the Funds' portfolios (¶ 118), the directors did nothing.

In October 2007, while conceding, in a remarkable understatement, that the Funds had "significantly underperformed" their respective benchmarks, the directors nevertheless renewed the advisory agreement between the Funds and MAM. ¶ 357. In agreeing to the renewal, the directors did not consider whether the "significant underperformance" warranted a careful examination of whether the Funds had claims against the MK Defendants, including themselves, despite the directors' accusation that Plaintiffs were dilatory in bringing this action.[10]

---

[10]     The Funds' disclosed in their December 31, 2007 semi-annual report what the former directors considered in deciding to renew the Funds' investment advisory agreement with MAM:

> With respect to the performance of the Funds, the Board considered the performance of each Fund relative to its benchmark index and a peer group of investment companies pursuing broadly similar strategies. The Board also considered *performance in relation to the degree of risk undertaken* by the portfolio manager. The Board noted that during the past year Short Term Bond Fund underperformed its benchmark, while Intermediate Bond Fund and High Income Fund *significantly underperformed* their respective benchmarks. The Board also noted the extraordinary market developments in 2007 and the high level of net redemptions experienced by Intermediate Bond Fund and High Income Fund. The Board discussed each Fund's performance with the Adviser and discussed steps that the Adviser had taken, or intended to take, to improve each Fund's performance. The Board also determined to *monitor closely the performance of Intermediate Bond Fund and High Income Fund on an ongoing basis.*

¶ 358 (emphasis supplied). There is nothing about whether consideration was given to the Funds' claims. The board's determination "to monitor closely the performance of [the Intermediate and High Income Funds] on an ongoing basis" begs the question whether the board was not previously doing this. This recitation of what the board considered is to be compared with the recitation of what it considered in agreeing to MAM's recommendation

Soon after renewing the investment advisory agreement, the directors did an abrupt about-face and, after purportedly engaging in a self-described "careful consideration" of the matter, concluded that they would recommend that the Funds' shareholders approve the transfer of the Funds' recently renewed advisory agreement with MAM to HBAM. Ex. A. On April 21, 2008, at the end of an undisclosed process that began on January 16, 2008, the Defendant directors approved a new advisory agreement with HBAM and agreed to recommend that the Funds' shareholders approve the new advisory agreement, which they did in July 2008. *Id.* at pp. 7-8.

In three densely packed pages, the proxy statement describes what the Funds' directors purportedly considered in reaching their conclusions about replacing MAM with HBAM. *Id.* at 7-9. However, nowhere do the directors address this action or the potential effect that engaging a new investment adviser and electing new directors might have on this action or the Funds' claims. *See id.* This omission led Plaintiffs' counsel in May 2008 to inquire of the New Directors whether this issue was addressed. Ex. B. In particular, counsel notified the New Directors of errors in the proxy statement and requested information:

> We believe that there are many material omissions in the proxy statement, which are the basis for the requests for information contained in the letter. Among other material omissions, the statement in the proxy statement that the *Landers* derivative "complaint seeks unspecified damages" is patently misleading; the *Landers* complaint, at paragraphs 475-76, estimates the damages to the three Funds at $937.5 million. In order to advise the *Landers* plaintiffs in connection with the proposed transfer of the Funds' advisory agreements to HBAM and the election of new directors, we request that you provide the following information, in view of the absence of this and other material information in the proxy statement:
>
> . . .
>
> 4. Describe any informal or unwritten, and provide any formal or written, agreements, understanding or undertakings into which you entered with the Funds' present directors and/or Morgan Asset Management, Inc., the Funds' current investment adviser, or any of its affiliates (including Re-

to unload the Funds' advisory agreement.

gions Financial Corporation), or any discussions with the foregoing, re-
garding the *Landers* derivative action.

5. Describe any assurances that the Funds' current directors or Morgan As-
set Management, Inc. requested, or that you provided to the Funds' current
directors or Morgan Asset Management, Inc., that you would pursue the
claims asserted in the *Landers* derivative action.

*Id.* This letter was forwarded to MAM and the Defendant directors. Ex. C. Counsel re-
ceived no response and the proxy statement was not amended. Broadhurst Aff. ¶ 3; Exs. A,
F.[11]

Certain of the class actions filed in late 2007 and early 2008 asserted claims against
the Funds themselves under the Securities Act of 1933, § 11. ¶¶ 4, 149-51, 356.[12] These ac-
tions further threatened the Funds' assets. *Id.* Nevertheless, the Funds' directors took no re-
medial or corrective action, such as that taken herein. *Id.*

In the face of knowledge they acquired by August 2006 of claims against the MK
Defendants (including themselves) and PwC, the Defendant directors did nothing. In the
face of the 2006 knowledge and the losses suffered by the Funds in 2007 and the Funds' in-
ability to value their portfolios, resulting in a delay in the issuance of the Funds' financial
statements, they did nothing. In the face of the 2006 knowledge and the losses suffered by
the Funds in 2007 and the Funds' inability to value their portfolios, resulting in a delay in

---

[11]    It is reasonable to infer that the refusal to make these disclosures was purposeful.
HBAM paid nothing for the Advisory Agreement for the Funds and was willing to take
them over to get the advisory agreements for the closed-end funds, which had not suffered
the loss in managed assets that the open-end funds had. However, because the Funds were
of insufficient size to profitably manage, HBAM did not want to discourage redemptions, so
that it could formally liquidate the Funds and be rid of the expense of managing them. Dis-
closing information about a potentially valuable asset might interfere with those plans be-
cause it might lead existing shareholders to refrain from redeeming or it might lead to buy-
ing by those who perceived the Funds to be vastly undervalued (the derivative claims were
not given any value). In any event, the failure to make the requested disclosures and to mis-
represent the lack of information about the estimated damages misled existing shareholders
as to the potential value of their shares in the Funds as they continued to redeem.

[12]    *Willis et. al. v. Morgan Keegan & Company, Inc., et. al.*, United States District Court,
Western District of Tennessee, 2:07-cv-02830-SHM-sta ("*Willis* Action") Dkt. No. 1.

the issuance of the Funds' 2007 financial statements, they renewed the management agreement with MAM in 2007. After *Atkinson* was filed in December 2007, at the behest of MAM, these "independent directors" resolved to unload the Funds, approving a false and misleading proxy statement and failing to correct it after being informed of its errors, steadfast in their determination to do nothing to preserve or pursue these claims. In failing to preserve and pursue the claims against the MK Defendants and PwC and in failing to direct MAM and MK to correct the Funds' violations of their respective investment objectives, policies and restrictions, the Defendant directors failed to exercise reasonable business judgment in good faith.

> ## 2. The Defendant directors had actual knowledge in 2006 of the Funds' substantial investments in illiquid securities whose value was highly uncertain in violation of the Funds' investment objectives, policies and restrictions.

"Restricted" and "fair valued" securities are illiquid. ¶¶ 87-92. The SEC requires that open-end registered investment companies limit their investments in illiquid securities to no more than 15% of their portfolios. ¶ 77. At June 30, 2007, fair valued and restricted securities constituted 69%, 74% and 44%, respectively, of the Intermediate, High Income, and Short Term Funds' portfolios. ¶ 96.[13]

The Intermediate and High Income Funds were subject to an investment restriction that prohibited them from investing in "any security if, as a result, more than 15% of its net assets would be invested in securities that are illiquid because they are subject to legal or contractual restrictions on resale or because they cannot be sold or disposed of in the ordinary course of business at approximately the prices at which they are valued." ¶ 79. The

---

[13]     These June 30, 2007 percentages combine fair valued and restricted securities. Based on the information available to Plaintiffs, percentages for fair valued and restricted securities combined cannot be calculated for any prior period. ¶¶ 96, 99.

Short Term Fund was subject to an even stricter restriction.[14] ¶ 80. Disregarding these restrictions, the MK Defendants managed the Funds in such a manner as to expose them to substantial liquidity risk by investing in illiquid securities significantly in excess of such limitations from June 2004 through December 2007. ¶¶ 81-108. The asset- and mortgage-backed securities purchased by the Funds made up a large portion of these illiquid securities. ¶ 94..

While the fair valued securities held by the Funds were identified for the first time in the Funds' June 30, 2007 financial statements, the Defendant directors and other MK Defendants were informed of the quantity of fair valued securities at the time the Funds' June 30, 2006 financial statements were issued and knew or recklessly disregarded the huge risks in the Funds' heavy investments in such securities. ¶¶ 96, 99, 109-14. The Funds first reported publicly on October 3, *2007* the percentages of their respective portfolios that, as of June 30, *2006*, were fair valued, as follows: Intermediate Fund: 55.8%; High Income Fund: 49.5%; and Short Term Fund: 18.2%. ¶¶ 96, 99. From June 30, 2006 through September 30, 2007, restricted securities accounted for 47% to 70% of the Intermediate and High Income Funds' portfolios. ¶ 96. From June 30, 2006 through 2007, 26% to 39% of the Short Term Fund's portfolio consisted of restricted securities, even though during that period the Short Term Fund could not invest more than 10% of net assets in securities "for which there is no readily available market." ¶ 98.

Recognizing the need to maintain "liquidity and flexibility" as a "defensive tactic" in "unusual market conditions," the Intermediate Fund was supposed to invest in investment-grade short-term securities. Contrary to this representation, the Intermediate Fund failed to invest in sufficient amounts of liquid investment-grade short-term securities to maintain the Fund's requisite liquidity. ¶ 105. It was essential for the Funds, as bond funds, to maintain rela-

---

[14]     The Short Term Fund was prohibited from investing more than 10% of its total assets in "(a) restricted securities, . . .and (c) securities that are not readily marketable" and said it would not invest in any restricted securities in 2006. *Id.*

tively stable NAVs to enable the Funds' shareholders to redeem their shares on demand. This was necessary to avoid precipitous changes in their NAVs, which would cause shareholders to panic and seek to redeem shares, creating a run on the Funds and forcing the Funds to sell assets at what might be disadvantageous prices. ¶ 106. Defendants now admit this is what happened. ¶ 358.

From June 2004 through 2007, the MK Defendants, including the Defendant directors, all of whom had knowledge of these matters, mismanaged the Funds and wasted their assets by ignoring the liquidity and valuation risks inherent in the thinly traded structured financial instruments and ignoring the need to maintain liquidity to meet redemptions and to maintain a sufficiently stable NAV to avoid mass redemptions by the Funds' shareholders. ¶¶ 96-108. As a result, the MK Defendants failed to maintain the Funds' NAV stability, as they represented they would and as they were required to do. ¶¶ 130-33. In connection with their mismanagement, the MK Defendants misled the Funds' shareholders about the enormous risks embedded in the Funds. ¶¶ 149-68. Notwithstanding their knowledge of the Funds' violations of their respective investment objectives, policies and restrictions, Defendants did nothing to correct the MK Defendants' (including the Defendant directors) mismanagement.[15]

### 3.    There was no decision to which the business judgment rule applied.

There was no choice to be made in 2008 that could be protected by the business judgment presumption because the Company/Funds had no interests that were separate and apart from the interests of the Funds' shareholders with respect to whether this action should be pursued against the MK Defendants. ¶ 338. Given the complete identity of interests between the Funds' shareholders and the Funds, what is in the interest of the Funds' shareholders is likewise wholly in the interests of the Funds. *Id.*

The Funds were open-end mutual funds; an open-end fund has characteristics that dis-

---

[15]       ¶¶ 4(c), 40, 96, 99, 104, 108, 111-14, 128, 206, 214-15, 220-25, 246, 270-71, 278-79, 356-57, 449, 466; PwC Br. at 11-13, 18.

tinguish it from a conventional business corporation. For example, an open-end fund has no business interests that compete or conflict with the interests of the fund's shareholders. ¶ 339. While a conventional business corporation has multiple constituencies whose interests are to be considered in deciding whether to pursue litigation against persons affiliated with the corporation, open-end funds have only one constituency—their shareholders. *Id.* While a conventional business corporation has customers who are not necessarily its shareholders and whose interests may be considered separate and apart from the shareholders' interests, the Funds' shareholders were also the customers, and were the only customers, of the Company/Funds, whose only function was to invest, manage and preserve, or not unduly risk, the investments of the Funds' shareholders. *Id.* While a conventional business corporation has its own management, the Company/Funds did not have their own officers or other employees but were managed and administered by Defendants MAM and MK; in addition, the Funds' officers, employed by MAM (or MK), were also officers of other mutual funds managed by MAM. *Id.* While a conventional business corporation actively carries on its business, the Funds were only passive vehicles that served solely to gather and hold assets that were managed by Defendant MAM, not by the Company/Funds, pursuant to a contract between the Company and Defendant MAM. *Id.*

While a conventional business corporation retains earnings and pays dividends only as the corporation's management and board of directors, in their sole discretion, determine to pay, open-end funds must pass through—i.e., pay out to their shareholders—all, or virtually all, interest and dividends received on securities held by the funds, and must likewise pay out to the fund's shareholders all capital gains realized upon the sale of securities held by the fund. *Id.* An open-end fund does not even control its capital; while a conventional corporation's assets are not subject to being liquidated and the proceeds paid out to the corporation's shareholders upon demand, the assets of an open-end fund are subject at all times to being sold upon the fund's shareholders demanding redemption of their fund shares. *Id.*

While a conventional corporation cannot be liquidated except upon approval of a ma-

15

jority of its shareholders, an open-end fund is self-liquidating—it can in actuality be liquidated upon all of the shareholders simply simultaneously demanding that their shares be redeemed. *Id.* Any recovery herein by the Company/Funds would have, prior to the Funds' liquidation, inured directly to the benefit of the Funds' shareholders. *Id.*

Thus, with respect to the decision to sue the MK Defendants, the Company/Funds had no interests in March 2008 that were counter to, or conflicted with, the interests of the Funds' shareholders; whatever was in the interest of the Company/Funds was without exception also in the interest of the Funds' shareholders and vice versa. ¶ 340. The only competing or conflicting interests are between the Company/Funds and their shareholders on the one hand and the MK Defendants on the other hand. ¶ 343. A demand would concede the Defendant directors have a choice between suit and non-suit, when in fact there is no such choice. *Id.*

### C.   Plaintiffs' Efforts to Obtain Action by the Funds' Defendant and New Directors.

On several occasions, Plaintiffs sought to obtain action by the Defendant directors and the New Directors to preserve and pursue the derivative claims. In May 2008, Plaintiffs pointed out a misrepresentation in the proxy statement soliciting shareholder approval of the Funds' new adviser and directors, asking what measures had been taken to preserve the derivative claims in view of the prospective new adviser and directors. This communication was forwarded to the Defendant directors and MAM, but no response was received, and the proxy statement was not corrected. Exs. A-C. Remarkably, the Funds' new counsel argued to the SEC staff that the disclosures requested by Plaintiffs in the proxy statement would be moot following the shareholders' meeting because the basis for Plaintiffs' counsel's questions was to obtain information to be used in advising Plaintiffs on how to vote at the meeting, thus conceding that the requested information was omitted and was material. Exs. D, E.

In following up on the responses of the Funds' new counsel, Plaintiffs' counsel pointed out that Regions Bank had a conflict of interest in voting Fund shares held by its

16

trust accounts on the question of approving new directors and a new adviser. Ex. F. Plaintiffs' counsel also noted that the Defendant directors were subject to the same conflict of interest as Regions Bank was later found by the Alabama probate court to have. *Id.*[16] Plaintiffs' counsel received no response to this letter. Broadhurst Aff., ¶ 3

Upon learning in February 2009 that HBAM filed a preliminary proxy statement to seek approval of the Short Term Fund's shareholders to liquidate that fund, Plaintiffs' counsel wrote the SEC to point out that the proxy statement omitted any reference to the pendency of this action or the effect the proposed liquidation would have on the maintenance thereof and that any liquidation should be structured so as to preserve and pursue the derivative claims. Exs. G, H. In the course of discussing these points with the Funds' counsel, the Funds' counsel advised Plaintiffs' counsel that he did not have the complaint, and a copy thereof was furnished to him on February 25, 2009. Ex. I.

In April 2009, Plaintiffs' counsel spoke with and wrote to the Funds' counsel about a new proposal to liquidate all three Funds. *Id.* The proposal was disclosed in a prospectus supplement dated April 1, 2009 and included disclosures responsive to the February comments by Plaintiffs' counsel, including measures to be taken to preserve the derivative claims following the liquidation. Ex. U. Counsel suggested additional issues to be addressed, including the Funds' being among the named defendants in the federal class actions. Ex. I  There followed a telephone conversation between Plaintiffs' counsel and the Funds' counsel. Broadhurst Aff. ¶ 4. As a result, the proxy statement and plan of liquidation

---

[16]     Plaintiffs' counsel stated: "Clearly, if Regions Bank has a conflict with respect to evaluating and pursuing the class actions in light of the claims asserted against Regions Bank and its affiliates, MAM and Morgan Keegan Select Fund's current directors likewise have such a conflict with respect to both the class and derivative actions, in light of the claims asserted against them. Further, such a conflict extends to the proposed transaction with HBAM and the election of the new directors, since these are matters that are being recommended by MAM and the current directors. However, this conflict was not disclosed in the proxy statement. This conflict should preclude RMK Trust from voting its trust account shares at the July 11 shareholder meetings." *Id*. at pp. 1-2.

addressed the key issues raised by Plaintiffs' counsel regarding preserving the derivative claims and providing a mechanism for collecting and distributing any recovery from this derivative action. Ex. J at 2, 4.

**D.    The Funds' Conflicted Board.**

At the time this action was commenced, the Company's Board did not have a majority of non-conflicted directors capable of disinterestedly deciding whether to pursue this litigation against themselves and the other Defendants. That decision was one in which at least a majority, if not all, of the Company's directors had a personal interest, financial and otherwise. ¶¶ 338, 345, 353.

**1.    The entire board was disabled by its conflicting interests.**

The Company/Funds' entire board in March 2008 was not disinterested because of conflicting fiduciary loyalties and an inability to fairly and objectively discharge their fiduciary responsibilities to the Company/Funds. ¶¶ 346-60.

Regions Bank, which is not a defendant herein but is a defendant in the shareholders' class actions referenced above, recognized a conflict between its interests as a defendant, or an affiliate of the MK Defendants, in those actions and its duties as a fiduciary for its trust and other fiduciary accounts that purchased the Funds' shares. Regions Bank petitioned an Alabama probate court for an order appointing a trustee *ad litem* for its trusts to participate in the class actions and take any and all appropriate actions on behalf of those accounts. That probate court granted that petition, finding that "Regions Bank has an apparent or actual conflict of interest in the evaluation and pursuit of the Class Actions and the possible assertion of other claims concerning the Funds against Morgan Keegan & Co., Morgan Asset Management, Inc., and other affiliates of Regions Bank." Ex. K (Amended Order p. 3). By letter dated June 18, 2008, a Regions Bank Assistant Vice President, R. Lance Cowles, informed a member of the *Atkinson* class as follows: "The trustee ad litem is independent of Regions and will serve ... to protect the interests of affected accounts...." Ex. L.

Just as Regions Bank understood it could not discharge its fiduciary responsibilities to

its fiduciary accounts because it and its affiliates were defendants in a class action that included those accounts, so too the Funds' former directors were not able in March 2008 to discharge their fiduciary duties to the Funds in connection with any demand that might have been made. Regions Bank's recognition of its inability to act in the unbiased interests of its fiduciary accounts because it and its affiliates had been sued in an action for the benefit of those accounts is evidence of the disabling effect on the Defendant directors of their being sued in an action for the benefit of the Funds to which they owed a fiduciary duty.

The Defendant directors are also defendants in the securities class actions pending in this Court.[17] Defendants are liable for omissions and misrepresentations to the shareholders in the Funds. ¶¶ 153-59. Directors facing liability in a related class action cannot be disinterested where bringing a derivative action against themselves is likely to aid the plaintiffs in the class action in establishing the directors' liability therein.[18]

The Funds' directors in March 2008 faced conflicting loyalties between the Funds and the other Regions MK funds of which they were also directors and who had MAM as their investment adviser.  All six directors were also directors of 15 other Regions Morgan Keegan ("RMK") funds, to whom they also owed a fiduciary duty to act solely in the best

---

[17]    *Richard A. Atkinson, M.D., Patricia B. Atkinson, et al.  v. Morgan Asset Management, Inc. et al.*, United States District Court, Western District of Tennessee, No. 2.07-cv-2784; *Willis et. al. v. Morgan Keegan & Company, Inc., et. al.*, 2:07-cv-02830-SHM-statement, Dkt. No. 1; *Hartman et. al. v. Morgan Keegan & Company, Inc., et. al.*, 2:08-cv-2071-SHM-dkv, Dkt. No. 1.

[18]    *See In Re: UnitedHealth Group Incorporated Shareholder Derivative Litig.*, United States District Court, District of Minnesota, Master File No. 06-1216 JMR/FLN, Report of the Special Litigation Committee, December 6, 2007 ("The SLC has determined that it would be contrary to the Company's best interests to set forth detailed factual findings regarding the claims asserted in the Derivative Actions, as the Company is subject to ongoing federal securities fraud actions involving similar allegations."), Affidavit of Vernon J. Vander Weide, Ex. A. That a special litigation committee with no personal exposure declines to make findings out of a concern that such findings would aid plaintiffs in their class action against the company is evidence of the inability of directors who do have personal liability to fairly consider a demand that they sue themselves.

interests of those funds and their shareholders. ¶ 355. The officers of the Funds were also officers of the other 15 funds. *Id.* All 15 of those funds were also managed and administered by MAM and MK and were audited by PwC. *Id.* It obviously would not have been in the best interests of those funds and their shareholders for their investment adviser, distributor and auditor to be sued by the Company/Funds herein. *Id.* Thus, in determining whether to sue the Defendants herein, the Funds' Defendant directors were faced with an irreconcilable conflict between the interests of the Company/Funds and their shareholders and the interests of the other Regions Morgan Keegan funds and their shareholders. *Id.*

The Funds' directors were selected by MAM or by persons affiliated therewith. *Id.* The Funds' directors were entirely insulated from shareholder influence or control. *Id.* The Funds had no annual shareholder meetings at which the shareholders could seek to remove directors. *Id.* The Funds' directors selected their replacements and filled any vacancies that arose on the board. *Id.* The Funds' directors significant directors' compensation substantially exceeded their minimal to nonexistent investments in the Funds. *Id.*

A demand would ask the Funds' directors to sue themselves for an amount that likely substantially exceeds the amounts for which they are insured as officers and directors. *Id.* The Company/Funds' directors' and officers' liability insurance coverage likely prohibits directors from bringing suits against each other (the "insured versus insured" exclusion). *Id.* Thus, if the Defendant directors caused the Company to sue its officers and directors for the liability asserted in this case, they would not be insured for that liability.  *Id.* They could not reasonably be expected to do this to themselves. *Id.* The Company's officers' and directors' liability insurance was purchased and paid for with funds belonging to the Company/Funds for the protection of the Company/Funds.  *Id.* However, this derivative action does not trigger the "insured versus insured" exclusion, and therefore only this derivative action can obtain a recovery from the Company/Funds' officers' and directors' insurance. *Id.*

All but one of the Funds' five purportedly "independent" directors owned none to insignificant dollar amounts of the Funds' shares but held significantly greater investments in the

other Funds in which they were directors. ¶¶ 346-49. Thus, a minimal to non-existent portion of these purportedly independent directors' personal assets was at risk in the Funds. ¶ 350.

The Defendant directors were necessarily preoccupied with the other 15 Regions Morgan Keegan funds of which they were directors. *Id.* This preoccupation led them to fail to devote the necessary and appropriate attention to the risks and uncertainties unique to the Funds. *Id.*

### 2.   A majority of directors was conflicted in March 2008.

Of the Company/Funds' six directors in March 2008, one (Alderman) is admittedly not independent or disinterested. ¶¶ 20, 351; Directors Br. at 9 n. 6. Of the remaining five, two are conflicted for personal reasons regarding whether to sue the Defendants.

Defendant McFadden was conflicted because he had a significant banking and business relationship with Regions, which, *prima facie*, precludes him from being viewed as independent or disinterested. ¶ 352(a). McFadden Communications, LLC ("McFadden Communications"), a company of which McFadden is a majority owner, had borrowed approximately $2.3 million from Regions Bank. ¶ 23. McFadden Communications also had a ten-year equipment lease with Regions Bank at a cost of $272,000 annually, and it sold printing services to Regions and/or its subsidiaries: for the period January 1, 2005 through June 30, 2007, total revenues from services provided to Regions was approximately $2.46 million representing approximately 5.0% of McFadden Communications' revenue. *Id.*

Defendant Stone was conflicted because of her professional and academic reputation. She has been a professor at the University of Alabama Culverhouse School of Accountancy and has held the Hugh Culverhouse Endowed Chair of Accountancy since 2002. She has served as Director of the Culverhouse School of Accountancy since 2004. One of Stone's fellow faculty members holds a fellowship contributed by Defendant PwC. Stone is a Certified Public Accountant. She is a past President of the American Accounting Association and a member of the Financial Accounting Standards Advisory Council, the AICPA Accounting Standards Executive Committee, the AACSB International Accounting Accreditation

21

Committee, and the Board of Trustees of the Accounting Hall of Fame. ¶¶ 25, 352(b). She is widely published in various accounting journals and is co-author of "Business in a Changing World." ¶ 352(b). Stone, whose position is dependent upon maintaining a distinguished reputation in the areas of accounting and auditing, is *prima facie* conflicted and disabled from rendering a disinterested decision on this matter. ¶¶ 25, 352(b).  Because accounting and auditing issues are a major part of this case, her circumstances are unique among her fellow Company directors as she risks serious harm to her professional and academic reputation if the allegations herein are proven. ¶¶ 170-326, 352(b). She had substantially greater expertise regarding these matters than her fellow directors did and, therefore, cannot hide behind a good faith defense or reliance on experts for these matters; thus, she is deprived of the kinds of defenses typically asserted by directors in derivative actions in which they are being sued. ¶ 352(b).

Defendants Johnson, McFadden, Pittman and Stone were members of the Company's Audit Committee and were held out by the Company/Funds as "financial experts." ¶¶ 27, 28, 354. Although to a lesser extent than Stone, Defendants Johnson, McFadden, and Pittman, in light of their acknowledged expertise in matters of finance and accounting, will be held to a standard more rigorous than that applied to their "non-expert" director colleagues and therefore deprive them of the kinds of defenses typically asserted by directors in actions such as this. ¶ 354. In light of their heightened exposure, these four Defendant directors cannot reasonably be viewed as having no personal interest in the question of whether this action should be pursued. *Id.* Adding these four directors to the admitted one interested director means five of the six directors of the Company/Funds in March 2008 were conflicted and were not disinterested in this matter.

**II.     FACTS RELATING TO FAILURE TO STATE A CLAIM**

**A.     The Derivative Claims against the Defendant Directors and Officers Are Supported by Detailed Factual Allegations.**

Plaintiffs allege, "*By their conduct*, the Individual Fiduciary Defendants did not act in

good faith but intentionally, in bad faith, with gross negligence or reckless disregard of their duties and of the *information readily available to them regarding the manner in which the Funds were being managed*, engaged in the waste of the Funds' assets and, in so doing, breached their fiduciary duties, as alleged herein." ¶ 389 (emphasis supplied). This purported "conclusory" allegation (Directors' Br. at 18) is preceded by 388 paragraphs of detailed allegations.

The risks taken on by the Funds as a result of their mismanagement materialized in the summer and fall of 2007 and caused the Funds' losses: the total net assets of the three Funds dropped from $2.2 billion at December 31, 2006, to $372.5 million at December 31, 2007, approximately half of which decline is attributable to the loss in the values of the Funds' investments; the balance was attributable to net redemptions. ¶¶ 2, 475. The net asset value per share of the Short Term, Intermediate and High Income Funds dropped 23%, 70% and 72% respectively during 2007. ¶¶ 2, 41-62. The direct cause of these losses was the composition of these Funds' portfolios that exposed the Funds to much higher credit, concentration, liquidity and valuation risks than their respective peers. ¶¶ 3, 46-52, 140-48.

Plaintiffs allege a multitude of specific facts supporting the Funds' claims against the Defendant directors and officers relating to the Funds' stated investment policies and restrictions (¶¶ 41-62), the Funds' net asset value losses and estimated damages (¶¶ 41-50, 474-77), the Funds' performance compared to their respective peers (¶¶ 45, 63-76), the MK Defendants failure to limit the Funds' investments in illiquid securities (¶¶ 77-108), the Funds' speculative net asset values (¶¶ 109-29), the MK Defendants failure to maintain stable net asset values for the Funds (¶¶ 130-33), the MK Defendants failure to limit the Funds investments in a single industry and avoid risky concentrations (¶¶ 134-39), and how the Funds' extraordinary concentration, liquidity and valuation risks caused the Funds' losses (¶¶ 140-48).

The Defendant directors owed the Company/Funds and their shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were required to use their ut-

most ability to manage the Company/Funds in a fair, honest, and equitable manner and to protect and preserve the Funds' assets. ¶ 328. The Defendant directors were required to act solely in furtherance of the best interests of the Company/Funds and the shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit or in furtherance of the interest or benefit of the non-director Defendants. ¶ 329.

To discharge their duties, the Defendant directors were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company/Funds and the management thereof by MAM and MK and the Funds' officers. ¶ 331. This included the exercise of good faith and due care (i) in ensuring that the assets of the Company/Funds were managed and administered by the Funds' officers, MAM and MK in a manner that complied in all respects with the Funds' respective investment objectives, policies, restrictions, and representations to the Funds' shareholders and with all applicable federal and state laws, rules, regulations and requirements; (ii) in ensuring that the Funds were not managed in a manner that exposed them to risks wholly beyond what was contemplated by their respective investment objectives, policies, restrictions, and representations to the Funds' shareholders; (iii) in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company/Funds; and (iv) in ensuring that the Company's financial statements were prepared in accordance with generally accepted accounting principles ("GAAP"). ¶ 331. Plaintiffs further allege that the Defendant directors, and particularly the Defendant directors who were members of the Audit Committee, were responsible for maintaining and establishing an internal accounting control structure to ensure that the Funds' financial statements were based on accurate financial information, as required by GAAP. ¶¶ 332-33. They were also  responsible for maintaining and establishing adequate risk management for the Company/Funds to ensure that the risks being assumed by the Funds as a result of how their assets were managed by MAM were consistent with

24

the Funds' respective stated investment objectives, policies, restrictions and representations made to the Funds' investors. *Id.*

From at least August 2006, Defendant officers and directors knew (i) the nature of the risks being assumed by an investment in the Funds, (ii) the extent to which the Funds' portfolios contained securities that were illiquid or exhibited the characteristics of illiquid securities that were at great risk of suddenly becoming unsalable at their estimated values, (iii) the extent to which the Funds' portfolios were subject to fair value procedures, (iv) the extent to which the values of such securities, and, consequently, the net asset values of the Funds, were based on speculative estimates of value and the uncertainty inherent in such speculative values, and (v) the concentration of investments in a single industry. ¶¶ 88-104, 111-139. According to Defendant PwC, Plaintiffs sufficiently allege the Funds' officers and directors had actual knowledge of these matters sufficient to inform them of the Funds' mismanagement and the Funds' potential claims therefor as of August 2006. PwC Br. at 11-13, 18.

## B.   The Derivative Claims against the MK Defendants Are Permitted by the Funds' Articles of Incorporation and Advisory Agreement.

The claims against the MK Defendants are based on their knowledge of the Funds' mismanagement, gross negligence, or reckless disregard for the truth. ¶¶ 40, 104, 111-14, 128, 129, 147(c), 148, 389, 398, 440, 441. Neither the Funds' Articles of Incorporation, nor the Advisory Agreement between the Company/Funds and MAM, nor the Fund Accounting Service Agreement between the Company/Funds and MK precludes the claims asserted against the MK Defendants. ¶¶ 363-390, 402-10.

## ARGUMENT

## I.   PLAINTIFFS WERE EXCUSED FROM MAKING A DEMAND

### A.   Purpose and Use of the Derivative Action

As the Supreme Court recognized in *Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 95-96 (1991), "the purpose of the derivative action [is] to place in the hands of the individual

shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers.'"   "This remedy, born of stockholder help-lessness, was long the chief regulator of corporate management and has afforded no small incentive to avoid at least grosser forms of betrayal of stockholders' interests.  It is argued, and not without reason, that without it there would be little practical check on such abuses." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 548 (1949).

The shareholders' derivative action was developed as an equitable device to enable shareholders to enforce a corporate right that the corporation fails to assert on its own be-half, including the recovery of losses occasioned by grossly negligent misconduct on the part of the corporate directors or officers. *Werbowsky v. Collomb,* 766 A.2d 123, 133 (Md. 2001). The derivative form of action serves as a check on the power of the directors and permits an individual shareholder to bring "suit to enforce a corporate cause of action against officers, directors, and third parties" where those in control of the company refuse to assert a claim belonging to it. *In re Infosonics Corp. Derivative Litig.*, 2007 WL 2572276, at *6 (S.D. Cal. Sept. 4, 2007) (citing  *Bender v. Schwartz*, 917 A.2d 142, 152 (Md. Ct. App. 2007)). Ex. M.

Restrictions on derivative actions are intended to protect the board's managerial pre-rogatives and discourage frivolous "strike suits." *Werbowsky,* 766 A.2d at 133-34, 138, 144 (directors or their corporation should not "be put unnecessarily at risk by minority share-holders . . . who file derivative actions not to correct abuse as much to coerce nuisance set-tlements"). Because MK does not seek to dismiss the breach of contract claim against it, De-fendants must acknowledge this is not a meritless strike suit. Thus, the purposes sought to be achieved by such restrictions, as noted in *Werbowsky*, are not relevant here. Plaintiffs' complaint alleges that the Funds collectively lost almost one billion dollars as a result of the MK Defendants' mismanagement of the Funds. Considering the magnitude of the estimated losses and the seriousness of the misconduct alleged with great specificity, this action can-

not be viewed as contemplating a "nuisance" settlement.[19]

The demand requirement is a corollary to the business judgment rule, which, in turn, is predicated on "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Werbowsky,* 766 A.2d at 138 (citing *Aronson v. Lewis*, 473 A.2d 805 812 (Del. 1984)). Here, unlike in *Werbowsky*, the Defendant directors made no affirmative business judgment in connection with considering the MK Defendants' mismanagement of the Funds.

### B. Applicable Law regarding Derivative Actions

The requirements of demand for a derivative suit are determined by the law of the state of incorporation.  *Kamen*, 500 U.S. at 108-09. Since the Funds are incorporated in Maryland, Maryland law determines whether demand must be made or whether it was ex-

---

[19]   Plaintiffs, unlike those in *Werbowsky*, are not holders of a mere handful of shares and are not "professional" plaintiffs. 766 A.2d at 144 n.11. Plaintiffs collectively invested $2.6 million in the Funds and held 183,000 shares at the commencement of this action. ¶¶ 9-13. That these are matters of substance that pose a substantial liability threat to the Defendants is evidenced by the SEC's interest in this litigation. In its 2008 Form 10-K, Regions disclosed that the SEC staff had requested information related to the class action lawsuits filed in late 2007 and early 2008 alleging that investors in certain Regions Morgan Keegan Select Funds were misled about the Funds' investment activities. Regions Financial Co., Form 10-K (Feb. 27, 2008) at 17. Ex. N. On July 15, 2009, Regions reported it had received a "Wells notice" on July 9, 2009 relating to a possible SEC enforcement action related to certain mutual funds formerly managed by MAM. Ex. O.

Directors in a substantially similar situation have been sanctioned by the SEC. In *Heartland Advisors, Inc., et al.*, Release Nos. 33-8884, 34-57206, IA-2698, IC-28136 (Jan. 25, 2008), the SEC found that the Heartland Funds' independent directors violated Sections 17(a)(2) and 17(a)(3) of the Securities Act of 1933 because they (1) failed both to monitor adequately the liquidity of certain bonds in the funds' portfolios and to assure the continued liquidity of the bonds so that the funds could meet shareholder redemption requests; (2) failed to adequately fulfill their responsibility to participate meaningfully in the valuation of funds and ensure that the funds' securities were priced at fair value; and (3) allowed and did not rectify Heartland's devaluation of the bonds when the independent directors knew or should have known that the investment adviser's actions resulted in prices that did not represent the fair values of the bonds affected. PwC was the Heartland Funds' auditor.

cused on the ground of futility.

Before bringing a derivative suit under Maryland law, the shareholder must either make a demand on the board of directors that the corporation bring the suit or show that demand is excused as futile. *Washtenaw County Employees' Retirement System v. Wells Real Estate Investment Trust, Inc.*, 2008 WL 2302679, at * 10 (N.D. Ga. Mar. 31, 2008). Ex. P. Under *Werbowsk*y, a demand is futile only when the allegations demonstrate that (1) making a demand, or the delay in waiting for a response to the demand, "would cause irreparable harm to the corporation;" or (2) "a majority of the directors are so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule." *Werbowsky*, 766 A.2d at 144; *Scalisi v. Fund Asset Management, L.P.*, 380 F.3d 133, 139 (2d Cir. 2004) (citing *Werbowsky*); *Felker v. Anderson*, 2005 WL 602974, at * 1 (W.D. Mo. Feb. 11, 2005) (same) Ex. Q; *Sekuk Global Enterprises Profit Sharing Plan v. Kevenides*, 2004 WL 1982508, at *3 (Md. Cir. Ct. May 25, 2004) (same) Ex. R.

Although *Werbowsky* declines to adopt the *Aronson* two-prong test[20] for demand futility, the *Werbowsky* test resembles *Aronson* in that the second part has two prongs, the first focusing on conflicted interests (*Aronson* uses the term "disinterested") and the second on how committed the directors are to the decision in dispute. *Werbowsky* differs from *Aronson* in that *Werbowsky* incorporates good faith and the business judgment rule into both prongs. Significantly, as formulated, the *Werbowsky* test addresses an affirmative decision by the board, not, as here, board inaction in the face of actionable knowledge.

Maryland law requires a "practical" and "common sense" inquiry into the issue of whether a demand upon directors (and shareholders) would be futile. *Grill v. Hoblitzell*, 771 F. Supp. 709, 711-12 (D. Md. 1991). In determining futility, *Werbowsky* held that a court may consider the allegations *or* evidence offered by plaintiff. *Werbowsky*, 766 A.2d at 620;

---

[20]      *Aronson v. Lewis*, 473 A.2d at 814.

*see also Danielewicz v. Arnold*, 769 A.2d 274, 292 (Md. Ct. App. 2001).

    **C.**    **Demand Is Excused as Futile.**

    **1.**    **The allegations and evidence demonstrate Defendant directors could not reasonably  have been expected to respond to a demand in good faith and within the ambit of the business judgment rule**.

In view of their conduct, the Defendant directors could not reasonably have been expected to respond to a demand in good faith and within the ambit of the business judgment rule. Their conduct did not offer a reasonable prospect of "*meaningful* pre-litigation alternative dispute resolution."[21] In March 2008, the Defendant directors, having already failed to take corrective action in the face of actionable knowledge of the Funds' mismanagement and then having renewed the Funds' advisory agreement with MAM, were close to deciding to acquiesce in the Funds' adviser's decision to unload the Funds and to their quitting the Funds' board. Notwithstanding Plaintiffs' request for such information, there is no evidence the Defendant directors considered what effect that transaction might have on the Funds' claims or that they did anything to ensure these claims would be preserved and pursued. Such actions demonstrate that demand was futile.

On repeated occasions during the period from at least August 2006 through April 2008, the Defendant directors considered matters that directly implicated the MK Defendants' mismanagement of the Funds, including the liquidity, valuation, and concentration risks incurred by the Funds. Yet, the Defendant directors never considered whether they should either direct MAM and MK to correct the violations of the Funds' respective investment objectives, policies and restrictions or bring an action against the MK Defendants, including themselves. Nor did the Defendant directors respond to Plaintiffs' request that the proxy statement soliciting shareholder approval of a new adviser and directors be corrected to not misrepresent the Funds' estimated damages and disclose material information about

---

[21]    *See Werbowsky*, 766 A.2d at 619 (the demand requirement represents a "chance at meaningful pre-litigation alternative dispute resolution").

this action.

As a check on their broad managerial authority, directors are required to perform their duties in good faith, in a manner they reasonably believe to be in the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances. *Werbowsky,* 766 A.2d at 133 (citing Maryland Code § 2-405.1(a)). The Funds' Articles of Incorporation imposed upon Defendant directors the duty to ensure that the Company fulfilled its purpose: "to do any and all acts and things for the preservation, protection, improvement and enhancement in value of" the Funds' portfolios. ¶ 364.

The Defendant directors, even though knowledgeable about the Funds' mismanagement, ignored their duty to act with the care of an ordinarily prudent person to preserve and protect the Funds' assets by taking corrective action. Even after the Funds were sued in the class actions, and even after inquiry was made regarding what measures were being taken to preserve the Funds' claims upon the advent of new management and directors, the Defendant directors did nothing.

Plaintiffs have found no case applying *Werbowsky* where the challenged conduct consists of inaction in the face of actionable knowledge, as distinguished from the transaction extensively considered by the board in *Werbowsky*.[22] In cases in which the board is charged with a failure of oversight or failing to act, Delaware law provides a separate test that determines  "whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment

---

[22]    Despite Defendants' extensive reliance thereon, *Werbowsky* is readily distinguishable. In that case, the transaction challenged by the derivative plaintiffs was carefully considered by a committee, consisting of directors found by the court to be independent, with the assistance of outside expert advisers. Here, the challenged conduct consists of the Defendant directors' failure to address the Funds' mismanagement despite knowledge thereof, even after the Funds' suffered catastrophic losses as a result of that mismanagement.

in responding to a demand." *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993). *See also McCall v. Scott*, 239 F.3d 808, 816 (6th Cir. 2001) (using *Rales* instead of *Aronson* where there is no conscious decision by the directors); *In re InfoUSA, Inc. Shareholders Litig.,* 953 A.2d 963, 986 (Del. Ch. 2007) (when there is no board action, it is proper to use *Rales* test because the "court cannot address the business judgment of an action not taken"); *Conrad v. Black*, 940 A.2d 28, 36 n.17 (Del. Ch. 2007) (*Rales* test used instead of *Aronson* when the board did not make the business decision being challenged in the litigation); *In re Veeco Instruments, Inc. Sec. Litig.,* 434 F. Supp. 2d 267, 274 (S.D.N.Y. 2006) (citing *Rales* as proper test in a "*Caremark*" case where loss is the result of "considered inaction" and not from a "decision")*; In re Mut. Funds Inv. Litig.*, 384 F. Supp. 2d 873, 878 (D. Md. 2005) (*Rales* test is "a well considered and useful means for deciding the demand futility issue in a failure of oversight context."); *In re Caremark Int'l, Inc.,* 698 A.2d 959, 967 (Del. Ch. 1996) (director liability may arise from an unconsidered failure of the board to act in circumstances in which due attention would have prevented the loss).

Such a "'sustained and systematic failure of the board to exercise oversight,'" subjects the Defendant directors to a substantial likelihood of liability for breach of the "the duty of care, the duty of loyalty, and the duty of good faith," excusing demand. *See In re Abbott Labs. Derivative Shareholders Litig.*, 325 F.3d 795, 808-809 (7th Cir. 2003); *In re Caremark Int'l, Inc.,* 698 A.2d at 972 (bad faith in "permit[ting] a known violation of law by the corporation to occur."); *In re Oxford Health Plans, Inc.*, 192 F.R.D. 111, 114 (S.D.N.Y. 2000) (demand excused where complaint alleged a generalized failure or neglect to monitor the activities of management); *Stone v Ritter*, 911 A.2d 362, 369 (Del. 2006) (failure to act in good faith included failing to act in the face of a known duty to act or demonstrating a conscious disregard for duties). Given the Defendant directors' knowledge and repeated failures and inaction, a demand was futile.[23]

---

[23]    The MK Defendants ignore Plaintiffs' allegations that the Defendant directors failed

2.   **The Defendant directors' efforts to quit the Funds' board and refusal to include proxy statement disclosures about the derivative action is evidence of demand futility**.

Upon being informed that the May 2008 proxy statement seeking shareholder approval of new directors and a new adviser misrepresented the derivative action's estimated damages and omitted information regarding what, if any, measures were taken to preserve and pursue the action, the Defendant directors and the New Directors did nothing. Upon inquiry into whether Regions Bank intended to vote the Funds' shares held by its trust accounts and pointing out Regions Bank's admitted conflict of interest, as well as that of the Defendant directors for the same reason as Regions Bank's, there was no response.

These proxy statement disclosures assume added significance because, under the Maryland corporate statute, the Funds' board could not select a special litigation committee that was not approved by shareholders. While the Funds' bylaws allow the board to expand the number of directors,[24] thereby creating vacancies, and then fill the vacancy, the Maryland Code § 2-407(c)(1) requires that the person selected by the board to fill a vacancy arising from increasing the number of directors must face election at the next annual shareholders meeting. A proxy statement soliciting shareholders to elect a special litigation committee would necessarily require extensive disclosures about the derivative action, an obviously awkward prospect for the Defendant directors and the other MK Defendants when they were seeking to shed their fiduciary obligations. This was avoided by the Defendant directors quitting *en masse* to be replaced with new directors in the guise of transferring the advisory agreements and electing a new board, along with minimizing disclosures (which included a material misrepresentation) about the derivative action.[25]

---

to act in a good faith exercise of reasonable business judgment. ¶ 359. Indeed, the Defendant directors inferentially confirm the truth of these allegations by asserting that the Plaintiffs were dilatory in not bringing this action until March 2008. Directors' Br. at 8 n.5.

[24]   Morgan Keegan Select Fund, Inc. Bylaws Section 3.05. Ex. S.

[25]   *See* footnote 11 *supra* regarding why HBAM and the New Directors did not want to disclose the potential value of the Funds' claims.

### 3. The Funds' board in March 2008 lacked a majority of directors who were not directly conflicted.

#### a. The entire board was personally and directly conflicted.

That a fiduciary being named a defendant in an action disables that fiduciary from fairly considering an action against him or her is evidenced by Regions Bank's actions in the class action. Just as Regions Bank owed a fiduciary duty to its trust accounts, the Defendant directors owed a fiduciary duty to the Funds. Regions Bank, recognizing the obvious conflict of interest that precluded it from both defending itself in the class actions and carrying out its fiduciary responsibilities to its trust accounts, properly sought the appointment of a trustee *ad litem* to represent the interests of the Regions Bank trust accounts in the class actions. The Defendant directors' position is no different than that of Regions Bank; they too could not be expected to carry out their fiduciary responsibilities to the Funds in the face of the allegations and claims against them.[26] As is apparent from PwC's arguments, any claims brought by the Funds against PwC carries a substantial risk to the Defendant directors of being blamed by PwC. *See* PwC Br. at 9, 11-13, 18. Also, the Defendant directors are defendants in securities class actions pending in this Court.

Under Maryland law, a complaint that sufficiently states a cause of action against the board for fraud, concealment, illegality, gross negligence, waste of corporate assets, or adequately alleges that a majority of the board has taken part in the asserted wrongdoing has established futility. *Edge Partners, L.P. v. Dockser*, 944 F. Supp. 438, 442 (D. Md. 1996); *Block v. Fischbach*, 1997 WL 198005, at *3 (N.Y. Sup. Ct. Mar. 10, 1997) (no demand necessary where complaint alleges that the majority of the directors engaged in conduct which involves fraud, illegality or other breach of fiduciary duty). Ex. T. In *Felker*, the court applied *Werbowsky*, where the plaintiff alleged, among other things, that defendants permitted

---

[26] Because Regions Bank had previously delegated the responsibility of managing the trusts' investments to the Funds' investment adviser and distributor, MAM and MK also face the same conflict of interest between defending themselves in this litigation and the fiduciary responsibilities owed by them to the trust accounts.

and/or approved the dissemination of false or misleading press releases, violated state law and fiduciary duties, had not sought to recover any part of the damages suffered, and had concealed information from the public, demand was excused as being futile. 2005 WL 602974, at * 3. Similarly, courts have held that a board's misrepresentations to shareholders is not a valid exercise of business judgment and excuses demand. *See Ryan v. Gifford*, 918 A.2d 341, 355-56 (Del. Ch. 2007) ("It is difficult to conceive of a context in which a director may simultaneously lie to his shareholders [] and yet satisfy his duty of loyalty.").

A board's exposure to a substantial likelihood of liability prevents it from "exercise[ing] its independent and disinterested business judgment in responding to a demand." *In re Mutual Funds Investment Litig.*, 384 F. Supp. 2d 873, 879 (D. Md. 2005) (citing *Rales*, 634 A.2d at 934; *McCall*, 239 F.3d at 817; and *Aronson*, 473 A.2d at 805). *See also In re Cendant Corp. Derivative Action Litig.*, 189 F.R.D. 117, 129 (D.N.J. 1999) (director is sufficiently interested to render demand futile where "he is a defendant in other pending class action suits" and "faces significant personal liability for the wrongdoing alleged in the complaint"). Directors are deemed to be sufficiently "interested" (i.e., "conflicted") to render demand futile where they face a "substantial likelihood" of liability for the wrongful conduct alleged in the complaint. *Rales*, 634 A.2d at 936. *See also In re SFBC International, Inc. Securities & Derivative Litig.*, 495 F. Supp. 2d 477, 483-84 (D.N.J. 2007).

Allegations that directors knew of the wrongdoing in the corporations for which they were responsible subject them to the substantial likelihood of liability that renders demand futile. *In re Mut. Funds Inv. Litig.*, 384 F. Supp. 2d at 880 (citing *In re Abbott Laboratories Derivative Shareholders Litig.*, *supra*,, and *McCall*, *supra*). PwC correctly contends that Plaintiffs have alleged that the Funds' directors and management possessed actionable knowledge of the Funds' violations of their investment objectives and restrictions by August 2006. PwC Br. at 11-13, 18.[27]

---

[27]   A demand futility test predicated on allegations of a board's actual knowledge of wrongdoing that subjects the board to a substantial likelihood of liability is consistent with

In *McCall*, the Sixth Circuit held demand was excused as futile where plaintiffs alleged that the board had been given audit information showing "unmistakable signs that improper practices were being employed throughout the corporation." The court ruled:

> A director is considered interested when, for example, he will receive a personal financial benefit from a transaction that is not equally shared by the stockholders, or when a corporate decision will have a "materially detrimental impact" on a director but not the corporation or its stockholders. *Rales*, 634 A.2d at 936. While the mere threat of personal liability is not sufficient, *reasonable doubt as to the disinterestedness of a director is created when the particularized allegations in the complaint present "a substantial likelihood" of liability on the part of a director.*

*McCall*, 239 F.3d at 817 (emphasis added) (citations omitted).

Directors may face such a substantial likelihood of liability for the issuance of false and misleading financial statements, and audit committee members, in particular, are unable to impartially consider a demand due to their potential liability for the approval and issuance of such statements. *See Cendant*, 189 F.R.D. at 128-29 (demand excused where complaint alleged overstated financial results which were publicly disseminated); *Oxford Health*, 192 F.R.D. at 118 (demand excused where defendants violated fiduciary duties by allowing others to make materially false or misleading statements concerning the company's financial matters); *In re Lernout & Hauspie Sec. Litig.*, 286 B.R. 33, 38-39 (D. Mass. 2002) (denying motion to dismiss securities fraud claims against three members of an audit committee because they failed in their "duty to oversee the auditors, that is, to guard the guardians"); *Greenfield v. Prof'l Care, Inc.*, 677 F. Supp. 110, 114 (E.D.N.Y. 1987) (same).

Defendant directors, who claim to be independent, concede their inability to consider

---

*Werbowsky*. 766 A.2d at 143 (generalized or speculative allegations that directors are conflicted insufficient to excuse demand), 144 (demand excused "when the allegations or evidence clearly demonstrate, in a very particular manner" that a majority of the directors are so "personally and directly conflicted" that they cannot render an impartial judgment). As to the possibility that the Defendant directors might, upon a demand, have sought the advice of a special litigation committee (*see id.*), any such committee was subject to shareholder approval. *See* discussion *supra*.

a demand if they are exposed to personal liability in the litigation. ". . . the Independent Directors were *able* to consider a demand *because the sole substantive claim against them is barred* by the unambiguous provisions in the funds' articles of incorporation." Directors' Br. at 2 (emphasis supplied). Having asserted they were "able to consider a demand" because, as they contend, the claim against them is barred by the articles of incorporation, Defendant directors concede that their potential liability is a disabling factor where the claims are not so barred. Here the "sole substantive claim against them" is *not barred* by the Funds' articles of incorporation; the claim against them is based on knowledge, gross negligence, and reckless disregard and is *expressly allowed* by the articles of incorporation, which Defendant directors concede on the next page of their brief. *Id.* at 3.

### b.    *A majority of Defendant directors was personally and directly conflicted*

The Defendant directors claim that even if Plaintiffs are correct that three of the six directors were conflicted, an even split in the number of interested and disinterested directors is decided in their favor.  Directors' Br. at 9, n. 6.  However, *every* court to consider this issue has found that an even split is the equivalent of a board compromised by a majority of interested directors because the consequences of an evenly divided board are the same as a fully conflicted board—an evenly divided board cannot command a majority to take action on a demand, just as a board with a majority of interested directors cannot.[28]

In *Beneville v. York*, 769 A.2d 80, 82 (Del. Ch. 2000), the court determined that a divided board equates to a majority of conflicted directors. The *Beneville* court reasoned that if board members have equal voting power, the interested directors have the power to prevent the corporation from acting on a demand and have the same effect as if a majority were conflicted.  *Id.  See also In re The Limited, Inc. Shareholders Litig.,* 2002 WL 537692, at *7 (Del. Ch. Mar. 27, 2002) ("[W]here the challenged actions are those of a board consisting of

---

[28]    Plaintiffs have found no cases in which a court determined that an even split favored Defendants' position.

an even number of directors, plaintiffs meet their burden of demonstrating the futility of making demand on the board by showing that half of the board was either interested or not independent.") Ex. V; *In re Oracle Corp. Derivative Litig.*, 824 A.2d 917, 944 (Del. Ch. 2003) (same); *In re The Student Loan Corp. Derivative Litig.*, 2002 WL 75479, at *3, n.4 (Del. Ch. Jan. 8, 2002) (concluding that three is a majority of six directors, "because that is the number required to block action on a demand.") Ex. W; *In re Walt Disney Co. Derivative Litig.,* 731 A.2d 342, 354 (Del. Ch. 1998) (". . .for demand to be futile, the Plaintiffs must show a reasonable doubt as to the disinterest of at least half of the directors."). Thus, to excuse demand, Plaintiffs need only allege a reasonable doubt that three of the Funds' six directors are disinterested and independent. *See Beam v. Stewart*, 845 A.2d 1040, 1046 (Del. 2004) ("If three directors of a six person board are not independent and three directors are independent, there is not a majority of independent directors and demand would be futile.").

As noted above, one director (Alderman) is admittedly not independent or disinterested.  ¶¶ 20, 351.  Of the remaining five, two are not independent or disinterested based on business and professional relationships with one or more of the Defendants.

Director McFadden had a substantial banking and business relationship with Regions. ¶¶ 23, 352(a). Courts have recognized that a director is deemed interested if he personally has, or is affiliated with an entity that has, a business relationship with the subject corporation.  *See*, *e.g.*, *U.S. Int'l Associates v. Steiner*, 1995 Conn. Super. LEXIS 2202, at **9-10 (Conn. Super. July 31, 1995) (director who is employed by a law firm having business relationship with subject corporation is not disinterested) Ex. X; *Eichenholtz v. Brennan*, 1989 U.S. Dist. LEXIS 8778, at *36 (D.N.J. July 27, 1989) (directors who were employees of the advertising and law firms used by the corporation were not disinterested and demand was, therefore, excused) Ex. Y; *In re New Valley Corp.*, No. 17649, 2001 WL 50212, at *7 (Del. Ch. Jan. 11, 2001) (a "long-standing pattern of mutually advantageous business relations" is sufficient to raise a reasonable doubt regarding independence). Ex.

37

Z.[29]

Similarly, Director Stone was not independent or disinterested with respect to suing PWC.  Plaintiffs allege her business and academic relationships and detail how her position is dependent upon maintaining a distinguished reputation in the areas of accounting and auditing.  *See* ¶¶ 25, 170-326, 352(b).  Defendant PWC is a significant benefactor of the University of Alabama Culverhouse School of Accountancy, of which she is a prominent member.  *Id.*  ¶¶ 25, 352(b).   Courts have found individuals in similar situations to not be independent.  In *In re Oracle Corp. Derivative Litig.*, *supra,* the  court held that two Stanford University professors who comprised a "special litigation committee" formed to consider whether the company should pursue claims against certain corporate officers and directors for insider trading were not independent because the corporate officers and directors had

---

[29]    Defendant McFadden was an "interested" director under the ICA, and this Court may so determine in this action. ICA § 2(a)(19) includes as an "interested person" someone who has "had at any time since the beginning of the last two completed fiscal years of such investment company a *material business* or professional *relationship* with [a registered investment company's] investment adviser or principal underwriter or . . . any *controlling person of such investment adviser or principal underwriter*." ICA § 2(a)(19)(B)(vii) (emphasis supplied). Regions Bank was controlled by Regions Financial, and Regions Financial controlled MAM, the Funds' investment adviser, and MK, the Funds' distributor. ¶¶ 14-18. A shareholder of an investment company may challenge a director's presumed disinterestedness by asking a court to find that the director is interested as part of the court's evaluation of a substantive claim under the ICA or state law. *See Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 328-30 (4th Cir. 2001); *Krantz v. Prudential Inv. Fund Management LLC*, 305 F. Supp. 2d 150, 155 (D. Mass 2000) (addressing the issue of whether certain factual circumstances can "rebut the statutory presumption of non-control and render the directors 'interested' persons within the meaning of the ICA"); *Olesh v. Dreyfus Corp.*, 1995 WL 500491, at *15 (E.D.N.Y. Aug. 8, 1995) ("The court is free to adjudicate facts that might underlie a claim that an individual falls within the per se categories [of 'interested persons'], and the court may then apply the appropriate remedy . . . .") Ex. AA; *Scalisi*, 380 F.3d at 139. A court's determination of a director's interestedness will be governed by federal law under the ICA, and not the particular state law governing the requirements for determining demand futility for a derivative action. *Migdal*, 248 F.3d at 330; *Krantz*, 305 F. Supp. 2d at 155; *First Australia Fund, Inc., SEC No-Action Letter*, 1987 WL 108483 (S.E.C.), at *7 (Oct. 8, 1987) (delineating criteria relevant to a determination of control over directors). Ex. CC.

made large financial contributions to Stanford.  824 A.2d at 921.  The Court held that the Stanford professors were not independent even though the professors were renowned experts in their fields and included a former SEC commissioner, even though the contributions "constitute a very small proportion of Stanford's endowment and annual donations," and even though the professors were unaware of the CEO's relationship with Stanford at the time. *Id.* at 923-924, 945, 947.[30]

Even if no single allegation taken in isolation would be sufficient to raise a reasonable doubt regarding a director's independence, the totality of a plaintiff's allegations may be sufficient to do so.  *International Equity Capital Growth Fund, L.P. v. Clegg*, 1997 Del. Ch. LEXIS 59, at *15 (Del. Ch. Apr. 21, 1997). Ex. BB. When all of Plaintiffs' allegations are considered, it is clear that at least one-half of the Funds' directors were so personally and directly conflicted that they could not reasonably be expected to have responded to a demand in good faith and within the ambit of the business judgment rule.

> **4.    Demand is excused because there was no decision that required business judgment as a mutual fund offers no choice to which the business judgment rule applies in view of the identity of interests of a fund and its shareholders**.

The factors relevant to the usual business corporation whose directors are compelled to consider a derivative action against themselves and others are not present here. As open-end mutual funds, the interests of the Funds and their shareholders are entirely co-extensive; there are no other stakeholders whose interests can be deemed to be separate and apart from the interests of the Funds and their shareholders that would take priority over the Funds and their shareholders' interests – i.e., there is no choice to be made between the interests of the

---

[30]     *See also In re The Limited, Inc. Shareholders Litig.*, 2002 WL 537692, at *6-7 (Georgetown University president who had solicited a $25 million contribution from CEO was not independent of that corporate official in light of the sense of "owingness" that the university president might harbor to the CEO); *Lewis v. Fuqua*, 502 A.2d 962, 966-67 (Del. Ch. 1985) (Duke University president was not independent where the university received a $10 million charitable pledge from the CEO and the CEO was a trustee of the university).

Funds in pursuing these claims and the interests of anyone else that could be protected by the business judgment presumption.[31] ¶¶ 337-41.[32]

The Company/Funds and the Old Board were duty-bound to pursue this action; they had no discretion to not do so.[33] The investment objective of the Short Term Fund was preservation of capital. ¶ 344. Thus, given that part of what the Company undertook to do was to preserve the capital of those who invested in the Short Term Fund, pursuit of this litigation to recover losses is nothing more than carrying out the functions and purposes of the

---

[31]    The identity of the Funds' and their shareholders' interests is recognized by the ICA, which provides that the interests of shareholders of a registered investment company clearly have primacy over the interests of all affiliates and others. The ICA provides that the interests of mutual fund investors are adversely affected:

>   (1) when investors purchase, . . . receive dividends upon, . . . sell, or surrender securities issued by investment companies *without adequate, accurate, and explicit information, fairly presented*, concerning the character of such securities and the *circumstances, policies*, and financial responsibility *of such companies* and their managements;
>
>   (2) when investment companies are organized, operated, managed, or their portfolio securities are selected, in the interest of directors, officers, investment advisers, depositors, or other affiliated persons thereof,. . .
>
>   (5) when investment companies, in keeping their accounts, in maintaining reserves, and *in computing* their earnings and the *asset value* of their outstanding securities, *employ unsound or misleading methods, or are not subject to adequate independent scrutiny*.

15 U.S.C. §§ 80a-1(b)(1), (5) (emphasis supplied).

[32]    Defendants do not dispute these distinguishing characteristics of mutual funds, saying only that these specific factual allegations regarding the nature of open-end funds are "artificial." Directors' Br. at 16-17.

[33]    Failing to pursue the Funds' claims against the MK Defendants amounts to forfeiting the Funds' remaining assets, which would be "a plain breach of trust." *See Werbowsky,* 766 A.2d at 136, citing *Davis v. Gemmell*, 17 A. 259, 265 (Md. 1889) (allowing an affiliated person to profit at the expense of the corporation was "a plain breach of trust," recognizing that where "the directors, or officers of a corporation having the authority to direct its litigation, are themselves guilty of the wrong complained of, . . . a demand upon them would . . . be useless, and further that it would be against the plainest principles of justice to permit the perpetrators of the wrong to conduct a litigation against themselves.").

40

Fund. As to this function there can be no discretion, as it is entirely consistent with the stated purpose and objective of the Fund, which could not be changed without shareholder approval. *Id.*

The investment objective of the Intermediate Fund was to invest primarily in intermediate-term investment-grade securities, the types of investments widely viewed as not risking capital, a view encouraged by the MK Defendants in advertising the Intermediate Fund as being appropriate for investors seeking to preserve their capital. *Id.* Thus, given that part of what the Company undertook to do was to preserve the capital of those who invested in the Intermediate Fund, pursuit of this litigation to recover losses as a result of the mismanagement of its assets by the MK Defendants is nothing more than carrying out the functions and purposes of the Fund. As to this function there can be no discretion, as it is entirely consistent with the stated purpose and objective of the Fund, which could not be changed without shareholder approval. *Id.*

While the High Income Fund's investment objective permitted investments in below investment-grade securities, it was not those investments that primarily caused that Fund's losses; instead it was the High Income Fund's heavy concentration in asset- and mortgage-backed securities. ¶¶ 145-48, 344(c). The MK Defendants represented the High Income Fund would be managed in such a manner so as to shield it from the kinds of NAV fluctuations experienced by other high-yield funds, but the MK Defendants failed to do so. ¶ 344(c). Seeking to recover the losses incurred by the High Income Fund is entirely consistent with how the Company's directors allowed the Fund to be held out to investors, and they are estopped from taking any different course of action that is contrary to how they and the MK Defendants encouraged investors to perceive the High Income Fund. *Id.*

In any event, the Funds have liquidated and ended their business, leaving only the resolution of their liability in the class action and the derivative claims. Because the Funds now exist solely for the purpose of satisfying liabilities and collecting assets, consisting entirely of the claims herein, there are no competing considerations that in the usual case of a

41

business corporation the business judgment rule is intended to protect. Thus, there is no business purpose to be served by not pursuing these claims as the pursuit thereof could not be considered a distraction and the claims are not against current management or directors.

Defendants offer no relevant response to this argument. *See* Directors' Br. at 16-17.[34] Defendants cite no case that addresses this issue.[35]

### 5.    Demand is not required where the challenged conduct is *ultra vires*.

An *ultra vires* action is not protected by the business judgment rule. *Moran v. Household Int'l, Inc.*, 500 A.2d 1346, 1350 (Del. 1985) (transactions beyond the powers explicitly conferred by the articles of incorporation do not constitute an exercise of valid business judgment). Maryland law is the same. *Sadler v. Dimensions Healthcare Corp.*, 836 A.2d 655, 665 (Md. 2003) (the management of a corporation is the responsibility of the officers and directors, and not subject to judicial scrutiny, unless there is fraud or *ultra vires* activity); *Murray-Baumgartner Surgical Instr. Co. v. Requardt*, 23 A.2d 697, 699-700 (1942) ("It has been held in this as in most courts, that we cannot pass upon or interfere with the internal management of a corporation, unless, of course, its corporate acts are fraudulent, illegal, or ultra vires."); *Williams v. Salisbury Ice Co.*, 176 Md. 13, 26 (Md. 1939) (court will not intervene as to any action of either directors or stockholders of a corporation, at the instance of a minority stockholder, if the act complained of be neither *ultra vires*, fraudulent, or illegal). *See also Swanson v. Traer*, 354 U.S. 114, 116 (1957); *Gearhart Industries, Inc. v. Smith International*, 741 F.2d 707, 721 (5th Cir. 1984); *Onvoy, Inc. v. SHAL, L.L.C.*,

---

[34]    *In re Franklin Mutual Fund Fee Litig.*, 388 F. Supp. 2d 451 (D.N.J. 2005), cited by Defendant directors for the proposition that a mutual fund's structure does not change the nature of a derivative claim (Directors' Br. at 16), had to do with whether claims arising from an investment in a mutual fund are direct or derivative. Plaintiffs agree these are derivative claims and simply say there is nothing for business judgment to address. ¶ 338.

[35]    This does not eliminate demand in all mutual fund derivative cases. The business disruption argument that would apply in the typical case (operating funds suing their management) does not apply here because the management being sued quit the funds. The magnitude of the losses here far surpasses any expense and inconvenience to the funds.

669 N.W.2d 344, 354-55 (Minn. 2003) (*ultra vires* contracts are those outside the express or implied powers of the corporation fixed in its charter, statutes, or common law, citing 7A Fletcher Cyc. Corporations §§ 3399, 3402).

It follows that demand is excused where the challenged conduct is *ultra vires*. *In re Nuveen Fund Litig.,* 1996 U.S. Dist. LEXIS 8062, at *17 (N.D. Ill. June 11, 1996) ("if a plaintiff pleads particularized facts that raise a reasonable doubt that the challenged conduct was *ultra vires,* then he or she has satisfactorily pled futility"). Ex. DD.[36] The Defendants and the New directors lack the ability to ratify or otherwise approve the *ultra vires* actions of the former board and consequently the power to dismiss or control this derivative action. "[I]t would be inappropriate to rely upon directors to determine whether the corporation should pursue an action that challenges their conduct as ultra vires." *Id.*, at *16. *See Cal. Pub. Emples. Ret. Sys. v. Coulter*, 2002 Del. Ch. LEXIS 144 (Del. Ch. Dec. 18, 2002) (demand excused relating to the repricing of outside directors' options; any action of the board that falls outside the broad scope of its authority is not entitled to the protection of the business judgment rule, excusing demand) Ex. EE; *Lewis v. Hett*, 1984 Del. Ch. LEXIS 546, at *9-11 (Del. Ch. September 4, 1984) (demand excused where complaint alleged adoption of severance package was *ultra vires* and could not be the product of valid business judgment) Ex. FF; *Ryan*, 918 A.2d at 354-55  (where alleged facts suggested that the director defendants violated an express provision of shareholder-approved option plans, thus exceeding the shareholders' grant of express authority, the court held that demand on the board would have been futile and thus was excused where the allegations showed a reason to doubt whether the challenged transactions were a valid exercise of business judgment).

Plaintiffs have alleged the *ultra vires* nature of the conduct at issue. While the Defendant directors failed to act in the face of actionable knowledge that the Funds were not

---

[36]     In *Nuveen*, the plaintiffs challenged the issuance of rights to purchase shares of two closed-end funds' new stock at a price below the funds' net asset value per share in violation of the funds' articles of incorporation.

being properly managed, the directors also participated directly in the fair valuation of the illiquid exotic securities in which the Funds invested.[37] ¶¶ 91, 109-10, 161, 192 (2.36, 2.38), 195, 210, 223-26, 230-33. These investments violated the Funds' respective investment objectives, policies and restrictions. ¶¶ 77-139, 147, 155, 157, 159, 263, 289-90, 315, 319, 370-71, 388, and 396

The Advisory Agreement, which could not be changed without the Funds' shareholders' approval, required that MAM manage each Fund "in accordance with each [Fund's] investment objective, policies and limitations as provided in its Prospectus and Statement of Additional Information." [38] ¶¶ 14, 363. The Advisory Agreement bound MAM and the Funds' directors to adhere to the restrictions on the Funds' investments described in the prospectuses and statements of additional information. In failing to adhere to the Funds' investment objectives and restrictions, the Funds' directors and management both breached the Advisory Agreement (¶¶ 370-71) and failed to adhere to limits imposed on their authority by the Funds' shareholders. Thus, the Funds' shareholders are able to challenge *ultra vires* conduct in a shareholders representative action.[39]

### D.   Demand Is Excused because Delay in Bringing This Action Would Have Resulted in Irreparable Harm.

In order to demonstrate futility under Maryland law, Plaintiffs may show evidence

---

[37]   The illiquidity of a security and the need to fair value such security are interrelated. ¶¶ 77-139.

[38]   The ICA requires that registered investment companies be managed in accordance with their investment objectives, which cannot be changed without shareholder approval. 15 U.S.C. § 80a-13.

[39]   Maryland Code, Corporations and Associations, § 1-403(a) provides that a corporation's act is not invalid or unenforceable *solely because* the corporation lacked the power or capacity to take the action, unless the lack of power or capacity is asserted in an action described in this section. Section 1-403(c) provides that *ultra vires* can be raised in a representative suit brought by a stockholder against the corporation's present or former officers or directors. Section 1-403(c) resembles the Minnesota corporate statute dealing with *ultra vires*, Minn. Stat. § 302A.165, at issue in *Nuveen*.

supporting their allegation that delay in waiting for a response would cause irreparable harm to the Company. *See Werbowsky*, 766 A.2d at 144; *In re Key Energy Services, Inc. Derivative Litig.*, 2006 WL 5979882, at * 3 (W.D. Tex. July 10, 2006). Ex. GG. Here, the Funds' claims against PwC are subject to Tennessee's one-year statute of limitations. PwC Br. at 11-13. While Plaintiffs timely brought this action under Tennessee law, relying on the Defendant directors or even the New Directors would have resulted in the loss of those claims.

Events of which Plaintiffs were unaware at the time they brought this action, and events since March 2008 consisting of communications by Plaintiffs to both the New and Defendant directors to which no response was made, especially the decision by the latter to unload the funds without seeking to protect the Funds' claims, establish that the inaction by the Defendant directors and the New Directors would have allowed this statute of limitations to run.[40] Indeed, Plaintiffs' counsel were very recently informed that the New Directors are still investigating the derivative claims, long after, in the absence of this action, the statute of limitations would have run.[41]

The statute of limitations in question relates only to the Funds' claims against PwC. Given PwC's apparent willingness to blame the MK Defendants, a possibility that likely would not have eluded Defendant directors in considering any demand to sue PwC, Defendant directors understandably might have found it in their best interests to not rush into any decision to bring a suit against PwC within the very short one-year period.

### E.    The Demand Issue Is Moot: The New Directors' Motion Contradicts Their Representations to the Funds' Shareholders, and the Defendant Directors and New Directors Are Estopped from Asserting Demand Was Not Excused.

---

[40]    *Sekuk Global Enters. Profit Sharing Plan*, *supra*, cited by Defendant directors (Directors' Br. at 8 n. 5), did not involve a short statute of limitations. Instead the court's decision turned on the immediacy of the relief sought; plaintiffs' withdrawal of their request for an injunction persuaded the court that delay caused by making a demand would not have resulted in irreparable harm.

[41]    Ex. NN, received by Plaintiffs' counsel by e-mail at 5:05 CDT Friday, July 21, 2009.

### 1.    Demand was made on the New Directors.

Plaintiffs contend that the demand issue is to be resolved on the basis of the Funds' board at the time suit was initiated in March 2008. *See Harris v. Carter*, 582 A.2d 222, 231 (Del. Ch. 1990) (change in control of a board of directors does not require a demand on the new board or require alleging facts that would excuse demand at that time). Without waiving that argument, Plaintiffs, alternatively, assert that demand was made on the New Directors.

The question of the adequacy of a shareholders' pre-suit demand must be determined on a case by case basis. *Allison v. General Motors Corp.*, 604 F. Supp. 1106, 1117 (D. Del. 1985). Demand does not have to be in any particular form or recite any particular language. *Syracuse Television, Inc. v. Channel 9, Syracuse, Inc.*, 273 N.Y.S.2d 16, 24-25 (1966).  In fact, a pre-suit demand may even be inferred from discussions taking place during conferences. *Id.* All that is required is that "[a]t a minimum, a demand must identify the alleged wrongdoers, describe the factual basis of the wrongful acts and the harm caused to the corporation, and request remedial relief." *Allison*, 604 F. Supp. at 1117; *see Bender*, 917 A.2d at 154. In determining the sufficiency of a demand, the board's prior knowledge is relevant. *Lewis v. Sporck*, 646 F. Supp. 574 (N. D. Cal. 1986) (question of whether underlying purpose of demand requirement had been served must be viewed in light of board's own prior knowledge concerning subject matter). Although the New Directors took office in July 2008, the new adviser had been a consultant to MAM since August 2007. ¶¶ 110(j), 117-18.

In July 2008, after learning of the proposed change in investment advisers, Plaintiffs wrote to the New Directors seeking assurances that the derivative action would be maintained. The New Directors forwarded Plaintiffs' letter to the Defendant directors but made no further response. Plaintiffs continued to prosecute this action, seeking remand to state court. After the New Directors proposed the liquidation of the Short Term Fund in February 2009 but said nothing about that Fund's claims herein or the effect of the proposed liquidation on the preservation of these claims, Plaintiffs again contacted the New Directors to state the need to address these matters. This resulted in the New Directors making provision for pre-

serving the derivative claims and representing their intention to pursue them in connection with the liquidation of the three Funds.[42]

This action began in March 2008, and the first letter to the new adviser and directors was sent in July 2008. Since no response was received to this inquiry and since instead a proposal was made to liquidate the Short Term Fund in February 2009 without making any provision for preserving these derivative claims, and without having even obtained a copy of the complaint, sufficient time has passed for the New Directors to respond to this demand. *See Werbowsky,* 766 A.2d at 140 (discussing the American Law Institute proposal's regarding an appropriate lapse of time under exigent circumstances).[43]

Given the New Directors' representations in the Funds' May 2009 proxy statement, the issue now is not whether demand to bring this action should have been made; the issue now is who is to represent the Funds in their pursuit of a recovery for the gross mismanagement that they suffered at the hands of the Defendants.[44]

> **2. The demand issue is moot because the New Directors have represented to Fund shareholders their intention to pursue the derivative claims on their merits.**

---

[42]    The Funds' claims cannot be adversely affected by the change in investment advisers. 15 U.S.C. § 80a-15(f)(1)(B).

[43]    *See also Lewis v. Sporck*, 646 F. Supp. 574 (N. D. Cal. 1986) (board's obvious familiarity with the underlying factual circumstances supported the conclusion that three months was sufficient time for a response to plaintiff's demand).

[44]    While beyond the purview of the issues presented by Defendants' current motions to dismiss and not requiring a decision by the Court at this time, given the work done by them to preserve and pursue the claims thus far, Plaintiffs and their counsel are best suited for this task, as evidenced by their counsel's investigation into the Funds' mismanagement. While the New Directors are still investigating (Ex. NN), Plaintiffs are pursuing the Funds' claims and defending against Defendants' motions to dismiss, including motions to dismiss for failure to state a claim. Investigating is hardly an adequate response to motions to dismiss. Given the short statute of limitations applicable to claims against PwC, the Funds were fortunate that Plaintiffs acted with dispatch in bringing this action and did not have to await continuing inaction by the Defendant directors or the outcome of the New Directors' continuing investigation.

Again, without waiving the argument that demand excused is to be determined on the basis of the Funds' board in March 2008, alternatively, demand is now moot in light of the events transpiring since this action was begun. The New Directors have represented to the Funds' shareholders that a plan for liquidating the Funds includes provisions to preserve the Plaintiffs' standing as derivative plaintiffs and the Funds will pursue the derivative claims on their merits; in response to these representations, the shareholders approved the liquidation of the Funds. Ex. HH ¶¶ 15(b).

In the definitive Proxy Statement, filed with the SEC on May 1, 2009, soliciting the approval of the Funds' shareholders for the liquidation of the Funds, the Funds (i.e., their New Directors and management) made the following representations:

> … With respect to the derivative lawsuit, the Board noted that the complaint alleges claims that belong to the Company and the Funds, and considered that the Plan was structured *in order to **preserve** any such claims* for appropriate action by the Board. …

> The Plan provides that *shareholders' shares in the Funds will remain outstanding after payment of the Liquidation Distribution*. Although shares will remain outstanding, it is expected that the Funds' shares will have no net asset value after payment of the Liquidation Distribution and the right of shareholders to redeem their shares will be indefinitely suspended. *In the event that claims held by the Company or the Funds are found to have merit* and the Funds *receive a recovery*, such recovery will be retained as an asset of the Funds pending the resolution of other claims and liabilities. Any amounts remaining after such resolution will be distributed to such shareholders of the Funds at such time as is determined by the Board and in a manner that complies with applicable law.

Ex. J (Definitive Proxy Statement) at pp. 2, 4 (emphasis supplied).; *see also* Ex. HH.[45]

By this disclosure, the New Directors state two things: the Liquidation Plan was de-

---

[45]   In connection with deregistering as an investment company, the Company states: "In order to preserve [the derivative] claims for appropriate action by the Board of Directors, the Plan of Liquidation (the "Plan") was structured so that following the complete liquidation of all of the Funds' assets (after the creation of reserves) and distribution to the Funds' shareholders of the proceeds of the liquidation, although shareholders' shares' net asset value is $0, their shares in the Funds technically remain outstanding." Ex. HH ¶ 18(b)

48

signed to preserve the derivative standing of the Plaintiffs to enable them to pursue this action. This was done in response to Plaintiffs' request that the Plan do so. Ex. I. If the New Directors intended to seek dismissal for failure to make a demand, they should have so stated in the proxy statement, rather than mislead the Funds' shareholders into believing the *derivative* claims would be *preserved*. Second, the New Directors represented their determination to pursue the derivative claims *on their merits* to obtain a recovery, thus foreclosing any possibility that they would determine, on the grounds of business judgment, that pursuit of such claims is not in the Funds' best interests.

### 3. The New Directors' representations to the Funds' shareholders and the Defendant directors' and New Directors' inequitable conduct estop them from asserting demand was not excused.

Contrary to representations made to the Funds' shareholders just two months ago, the Funds' New Directors have now moved to dismiss for failure to make a demand on the Old Board.[46] While previously representing their intention to pursue the Funds' derivative claims on their merits, and even though these directors have had a year to consider this matter, the New Directors now say they need to think about it further. Their delay in pursuing these claims is inexcusable, is not an exercise of reasonable business judgment, and is inconsistent with the prudent-man standard by which their conduct is to be judged. *See* Maryland Code § 2-405.1.[47] As between the New Directors and Plaintiffs, it is abundantly clear

---

[46]     Because the Funds' motion is inconsistent with the New Directors prior representations, Plaintiffs inquired of the New Directors, through the Funds' new counsel, about these inconsistencies and about the New Directors' intentions. Ex. II. Plaintiffs have received no response to this inquiry. Ex. NN. In this same letter, Plaintiffs inquired of the New Directors regarding their intentions in opposing Defendants' motions to dismiss for failure to state a claim. As to this request, Plaintiffs were informed late on July 31, 2009 that the New Directors are still "investigating" these claims. *Id.*

[47]     Pursuant to Maryland Code § 2-405.1, a director must perform his duties as a director, including his duties as a member of a committee of the board on which he serves: (1) in good faith; (2) in a manner he reasonably believes to be in the best interests of the corporation; and (3) with the care that an ordinarily prudent person in a like position would use under similar circumstances. *See* ¶¶ 328-33, 386.

that it is the latter, and not the former, who have satisfied the requirements of Maryland law regarding the stewardship of a corporation's assets.  Nor was the New Directors' decision to be represented by counsel who are representing parties with conflicting interests consistent with the prudent-man, good faith, reasonable business judgment required of them. In *Werbowsky,* the directors were careful to engage advisers and counsel who were free of conflicts. In this action, the New Directors chose to be represented by counsel who are also representing the Defendant directors against whom claims have been asserted on behalf of the Funds, a clear conflict of interest. *Tydings v. Berk*, 565 A.2d 391 (Ct. Sp. App, Md. 1989). Plaintiffs notified the New Directors of this issue. Ex. II. Only after Plaintiffs raised the issue did the New Directors procure new counsel for the Funds. Exs. II, NN; Dkt. No. 34. Although the Funds have now replaced their counsel, the New Directors' initial choice of counsel lacked a good faith reasonable business judgment, and the motion to dismiss brought by the Funds with conflicted counsel is not consistent with the May 2009 proxy statement or Maryland Code § 2-405.1.[48] Again, as between the New Directors and Plaintiffs, it is the latter who are protecting the Funds' interests with the requisite care and prudence.

Because the New Directors represented their intentions to preserve the derivative claims and to pursue the derivative claims on their merits and because the Funds' shareholders approved the Funds' liquidation, the New Directors are now equitably estopped from failing to do so. *See Knill v. Knill*, 510 A.2d 546, 549 (Md. 1986) (equitable estoppel is the ef-

---

[48]    Courts have placed special emphasis on whether board committees engaged independent counsel to "guide its deliberations and to advise it" when considering a demand. *Bender*, 917 A.2d at 155-156 (citing *Brinckerhoff v. JAC Holding Corp*., 263 A.D.2d 352, 692 N.Y.S.2d 381 (N.Y. App. Div. 1999) (plaintiffs created reasonable doubt as to the reasonableness of directors' investigation of a demand where directors were not represented by independent counsel but rather by an attorney who had represented the corporation in connection with the challenged transaction)). The Funds' and New Directors' initial counsel represented certain of the Defendants, represented the Funds, and the allegations herein call into question its work product and advice.

fect of a party's voluntary conduct that absolutely precludes him from asserting rights that might perhaps have otherwise existed as against another person, who has in good faith relied upon such conduct); *Dousman v. Kobus*, 2002 Del. Ch. LEXIS 67 (Del. Ch. June 6, 2002) (board of directors estopped from relying on the supermajority provision in corporation's by-laws where corporation previously misrepresented in its communications that only a simple majority was required for shareholder action). Ex. JJ.

The New Directors were elected on the basis of a false and misleading proxy statement that misrepresented the damages sought herein and failed to disclose material facts about the Funds' claims. Accordingly, their election may be set aside. *See, e.g, Reschini v First Federal Sav and Loan Ass'n of Indiana,* 46 F.3d 246, 249-50 (3d Cir. 1995) (where a merger is obtained through fraudulent proxy statements, possible forms of relief will include setting aside the merger or granting other equitable relief; nullifying the corporate action taken on the basis of fraudulent proxies is a traditional form of relief).

The derivative action, recognized as an equitable device, and the demand requirement in Maryland are the creature of common law. *Werbowsky,* 766 A.2d at 135. Accordingly, the court is free to shape both the remedy and limitations thereon to do justice in light of the facts. Demand is a defense to an equitable remedy. To defeat an equitable remedy, defendants must do equity.[49]

The New Directors and the Defendant directors stonewalled Plaintiffs' efforts to get an honest proxy statement in 2008 asking shareholders to approve the New Directors and the new investment adviser that corrected errors identified by Plaintiffs and informed shareholders of the derivative action and the effect thereon of the proposed transfer of the Funds' ad-

---

[49]     One asserting an equitable defense should be subject to principles of equity. *Post v. Bregman*, 707 A.2d 806 828 (Md. 1998) (court majority (5-2) held that reliance upon an ethical rule as a defense to claim seeking to enforce a fee-splitting agreement between two attorneys is to be considered in the nature of an equitable defense; dissent contended the person asserting such an equitable defense is to be subject to principles of equity, such as clean hands and equitable estoppel).

viser and a new board. The New Directors ignored this action from July 2008 through February 2009 (they did not even have the complaint). The New Directors, only at Plaintiffs' insistence, adopted measures to preserve the Funds' claims. Now, after representing to shareholders the Funds' claims would be pursued on their merits, the New Directors allowed counsel who had a clear conflict of interest to advise and represent them in connection with the Funds' motion to dismiss and have informed this Court they have not yet determined whether to pursue the Funds' claims. Ex. NN. This conduct is not equitable.[50] Nor, in failing to take the actions requested by Plaintiffs (except to preserve Plaintiffs' derivative standing) during the more than one year they have been directors, have the New Directors acted in accordance with the reasonably prudent man standard demanded of them pursuant to the Funds' articles of incorporation and the Maryland corporate code.

###    F.    Demand on the Funds' Shareholders Was Excused.

Demand upon shareholders is excused where it would be futile. *Zimmerman v. Bell*, 585 F. Supp. 512, 515 (D. Md. 1984); *Parish v. Maryland and Virginia Milk Producers Association*, 242 A.2d 512, 544 (Md. Ct. App. 1968); *Eisler v. Eastern States Corp.*, 35 A.2d 118, 119-120 (Md. Ct. App. 1943).

No shareholder demand is necessary if "it would be unreasonable or useless to require it." *Parish*, 242 A.2d at 546. Such futility exists when the shareholders have no adequate power or authority to remedy the wrong asserted by the individual shareholders. *Id*. Thus, the *Parish* court noted that "if a stockholder's derivative action is based upon an alleged wrong committed by directors against the corporation, of such a nature as to be beyond ratification by a majority of the stockholders, as in the case of fraud, it is not necessary to make a demand upon the stockholders before bringing the action." *Id*. Demand is futile if the shareholder could only bring a suit against the defendants by demanding that the direc-

---

[50]    *Ross v. State Bd. of Elections*, 876 A.2d 692, 704 (Md. 2005) (the clean hands doctrine is intended to protect the courts from having to endorse or reward inequitable conduct that is related to the subject of the action) (citations omitted).

tors bring an action against themselves. *Zimmerman*, 585 F. Supp. at 516 (citing *Parish*). *See also Edge Partners, L.P.*, 944 F. Supp. At 442 (pre-suit demand on shareholders would have been futile because plaintiff has alleged that the entire board committed the wrongful conduct).

Demand on shareholders is excused "when it is not feasible because of the large number of shares outstanding." *Weiss v. Sunasco Inc.*, 316 F. Supp. 1197, 1206 (E.D. Pa. 1970) (citing *Meltzer v. Atlantic Research Corp.*, 330 F.2d 946 (2nd Cir. 1964)); *Levitt v. Johnson*, 334 F.2d 815, 817 (1st Cir. 1964) (shareholder demand excused in corporation with 48,000 shareholders). As of December 31, 2007, the outstanding shares for all three classes of the Short Term, Intermediate and High Income Funds were, respectively, 5,929,627, 37,574,227, and 45,563,290, respectively.[51] A court also must consider "the extent of the effort and the expense in making such a demand." *New Crawford Valley, Ltd. v. Benedict*, 847 P.2d 642, 646 (Colo. Ct. App. 1993). Given the large number of shareholders in the Funds in March 2008, such an undertaking would be prohibitively expensive and likely would involve making a communication that would have to comply with the proxy solicitation requirements of the Securities Exchange Act of 1934. *Id.*; *Harhen v. Brown*, 730 N.E.2d 859, 868 (Mass. Sup. Ct. 2000) (shareholder demand is excused when such a demand "would place a tremendous financial and administrative burden on plaintiffs").

"No Maryland case has based a dismissal solely on failure to make demand on shareholders, and the shareholder demand rule has been widely criticized." *Strougo v. Scudder, Stevens & Clark, Inc.*, 964 F. Supp. 783, 795-96 (S.D.N.Y. 1997). Because shareholders are poorly equipped to make a determination whether to sue, "demand on shareholders is rarely

---

[51]   Ex. KK (Funds' 12/31/07 semi-annual report p. 40). Plaintiffs do not have access to the actual number of shareholders in each Fund on March 28, 2008; however, in their deregistration filed July 7, 2009, the Funds disclose the following numbers of shareholders: Short Term Fund 99; Intermediate Bond Fund 1777; High Income Fund 2442. Ex. HH. These more than 4000 shareholders are substantially fewer than the numbers of shareholders in March 2008 because most of those shareholders since redeemed their shares.

necessary." *Id*. (citing *Kamen*).

Each case cited by Defendants in support of this argument clearly states that shareholder demand is excused if it would be futile. Given the thousands of shareholders in the Funds on March 28, 2008 and the burden that would be placed on plaintiffs, shareholder demand would have been futile and should be excused.

## II.   PLAINTIFFS STATE CLAIMS ON WHICH RELIEF CAN BE GRANTED.

### A.   The Exculpatory Provisions of the Funds' Articles of Incorporation and Advisory Agreement Do Not Bar Plaintiffs' Claims.

There are three sources for the exculpatory provisions that the MK Defendants argue bar Plaintiffs' claims: the Funds' Articles of Incorporation, the Advisory Agreement between the Funds and MAM,[52] and the Underwriting Agreement between the Funds and MK. The Articles of Incorporation cover only the Funds' officers and directors, the Advisory Agreement relates only to MAM, and the Underwriting Agreement relates only to MK.

The complaint should not be dismissed on grounds of exculpatory provisions, as these are affirmative defenses. *Sanders v. Wang*, 1999 Del. Ch. LEXIS 203, at *35 (Del. Ch. Nov. 8, 1999) (Ex. LL):

> Because the nature of the defendants' breach of fiduciary duty remains unclear at this time, I may not now properly consider exculpatory provisions. The defendants will have the opportunity to present their affirmative defense as the case progresses. At this stage of the proceedings, I can not conclude as a matter of law that the Board acted in good faith and that their actions constituted no more than mere carelessness.

Plaintiffs have adequately alleged that the MK Defendants were knowledgeable of the manner in which the Funds were being mismanaged. *See* PwC Br. at 11-13, 18.

#### 1.   The MAM Advisory Agreement exculpatory provision does not apply to breach of contract claims.

Section 7.A. of the Advisory Agreement limits the liability of MAM (but not the Funds' officers and directors), in the performance of its responsibilities pursuant to said

---

[52]   The Advisory Agreement required approval by the Funds' shareholders. 15 U.S.C. § 80a-15.

Agreement, to "willful misfeasance, bad faith, gross negligence, or reckless disregard of obligations or duties" thereunder – i.e., MAM is protected from liability for negligence. This is the language of tort; there is no such thing as a negligent breach of contract. "Insofar as a breach of contract action is concerned, it matters not a whit whether the breach was an intentional one or an unintentional one caused by negligence in attempting to perform. The action still remains in contract." *Harvest Corp. v. Ernst & Whinney*, 610 S.W.2d 727, 728 (Tenn. App. Ct. 1980). The exculpatory provision of the Advisory Agreement does not apply to Plaintiffs' breach of contract claim against MAM.

The cases cited by Defendants MK and MAM do not say otherwise. These cases generally hold that a breach of contract claim is not subject to exculpatory provisions unless said provisions expressly apply to breach of contract actions.[53] Here, the exculpatory language does not include breach of contract.

Plaintiffs claim that MAM breached the Advisory Agreement. ¶¶ 363-71. Plaintiffs further claim that MK breached the Fund Accounting Service Agreement and was negligent in providing the services it was required to provide under that Agreement. ¶¶ 376-82, 400-10. These claims are not precluded by any exculpatory provision. The obligation imposed by the Company's Articles of Incorporation to comply with generally accepted accounting principles, including the financial statement disclosures required by GAAP, which obligation was

---

[53]    *Trumball Inv..Ltd., v. Wachovia Bank, N.A.,* 2005 U.S. Dist. LEXIS 7195 (E.D Va., Apr. 15, 2005) (breach of contract action dismissed because plaintiffs had no cause of action for breach of contract under their discretionary brokerage investment account agreements, *not* because an otherwise meritorious breach of contract action was excused by the exculpatory provision; an exculpatory provision must "clearly and unequivocally release the defendant from precisely the type of liability alleged by Plaintiff") Ex. MM; *CompuSpa, Inc. v. I.B.M. Corp.,* 228 F. Supp. 2d 613 (D.Md. 2002) (exculpatory clause expressly stated that "in no event will either party be liable to the other *in contract* or tort or otherwise for any lost revenues, lost profits") (emphasis supplied); *Champion Home Builders Co. v. ADT Security Servs. Inc.,* 179 F. Supp. 2d 16 (N.D.N.Y. 2001) (exculpatory language that included a clause stating that there would be no liability for losses "from performance or non-performance of obligations imposed by this contract" was held to cover plaintiff's tort and UCC breach of warranty claims but not his breach of contract claim).

delegated to MAM and MK, is just one of the ways MAM and MK breached these agreements and MK was negligent. ¶¶ 365, 370, 380, 381(b). These GAAP failures are spelled out in detail in the Complaint. ¶¶ 282-91.

> **2.    The Company's Articles of Incorporation and Advisory and Underwriting Agreements do not bar Plaintiffs' gross negligence claims against the MK Defendants**.

The Company/Funds' Articles of Incorporation, Section 11.1, provides, "To the maximum extent permitted by applicable law (including Maryland law and the 1940 Act) as currently in effect or as it may hereafter be amended, no director or officer of the Corporation shall be liable to the Corporation or its stockholders for money damages." ¶ 385. Although Maryland Code §§ 2-405.2 and 5-418 provide that officers and directors can be liable for money damages to the corporation only for active and deliberate dishonesty, pursuant to the Investment Company Act of 1940 § 17(h), 15 U.S.C. § 80a-17(h), section 11.1's exculpation is limited: the officers and directors of the Company/Funds can be held liable to the Company/Funds for willful misfeasance, bad faith, gross negligence, or reckless disregard of the duties involved in the conduct of their respective offices. *Id.*[54]

The breach of fiduciary duty claim against the Funds' officers and directors is based on their knowledge of the Funds' mismanagement, gross negligence, or reckless disregard for the truth. ¶¶ 40, 104, 111-14, 128, 129, 147(c), 148, 398, 440, 441. Accordingly, the claim is based on a permissible standard of liability. ¶¶ 383-90.

Likewise, the claims against MK and MAM are based on knowledge of the Funds' mismanagement, gross negligence, or reckless disregard for the truth.[55] ¶¶ 40, 104, 111-14,

---

[54]    ICA § 17(h) provides that a registered investment company's articles of incorporation cannot protect any director or officer "against any liability to the company or to its security holders to which he would otherwise be subject by reason of willful misfeasance, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of his office." 15 U.S.C. § 80a-17(h).

[55]    MK argues the exculpatory provision in the Underwriting Agreement bars a claim for negligent misrepresentation but concedes a claim for "gross negligence" or "reckless disregard" is allowed. MK Br. at 19.

128, 129, 147(c), 148, 398, 440, 441.[56] Thus, to the extent that the Underwriting Agreement is the basis for Plaintiffs' claims, they are permitted.

### 3.    The Advisory Agreement exculpatory provision is invalid.

Public policy does not permit exculpatory agreements in transactions affecting the public interest. *Wolf v. Ford,* 644 A.2d 522, 531, 532 (Md.1994). Transactions affecting the public interest include "the performance of a public service obligation, e.g. public utilities" and "those transactions, not readily susceptible to definition or broad categorization, that are so important to the public good that an exculpatory clause would be 'patently offensive,' such that "the common sense of the entire community would pronounce it 'invalid." *Id.* at 532. While "Maryland courts have been hesitant to strike down voluntary bargains on public policy grounds," including a defendant's negligent violation of a statute, a "refinement" to this general rule recognizes "a growing tendency to the contrary where a safety statute enacted for the protection of the public is violated. The rationale is that the obligation and the right so created are public ones which is not within the power of any private individual to waive." *Winterstein v. Wilcom*, 293 A.2d 821, 825 (Ct. Sp. App. Md. 1972). Congress determined that investment companies are "affected with a national public interest" because, *inter alia* "such companies are media for the investment in the national economy of a substantial part of the national savings and may have a vital effect upon the flow of such savings into the capital markets." 15 U.S.C. § 80a-1.

According to its Articles of Incorporation, the Company's purpose was to "hold, invest

---

[56]    For example, Plaintiffs allege MK "negligently, *or knowingly or in reckless disregard of the truth*, approved or directly assisted in the preparation of the false and misleading registration statement and prospectus filed with the SEC and used to distribute the Funds' shares" and "negligently, *or knowingly or in reckless disregard of the truth*, approved or directly assisted in the preparation of the Funds' false and misleading 2006 annual and semiannual financial statements filed with the SEC, which filings were necessary to enable the MK Defendants and Funds to continue to sell the Funds' shares to the investing public to the benefit of the MK Defendants in the form of increased commissions and management and administrative fees." ¶¶ 440, 441 (emphasis supplied).

and reinvest the funds of the Corporation, . . . and . . . to hold for investment or otherwise . . . securities of any corporation,. . .and to do any and all acts and things for the preservation, protection, improvement and enhancement in value of any and all such securities." ¶ 364. The Articles, section 6.7, required the Company's board "to determine, in accordance with generally accepted accounting principles. . . the net asset value per Share . . . at such times and by such methods as it shall determine subject to any restrictions or requirements under the 1940 Act and the rules, regulations and interpretations thereof promulgated or issued by the [SEC]." ¶ 365. The Company's board delegated this function to MAM and to MK pursuant to the Articles, section 10. ¶¶ 365, 366, 380.

The Advisory Agreement between the Company and MAM provides, "The Adviser shall direct the investments of each Portfolio, subject to and in accordance with each Portfolio's investment objective, policies and limitations as provided in its Prospectus and Statement of Additional Information. . ." ¶ 363. The Advisory Agreement also provides that the Funds' NAV was to be determined in accordance with the Funds' Articles of Incorporation, bylaws and the ICA. Advisory Agreement § 5. These provisions contractually obligated MAM to adhere to the ICA, which requires registered investment companies to comply with their investment objective. ICA § 13. Assuming the Advisory Agreement's exculpatory provision does apply to a breach of contract claim, it amounts to a waiver of compliance with the ICA and is, therefore, invalid pursuant to ICA § 47(a). ¶ 374.

The exculpatory provision of the Advisory Agreement is invalid for an additional reason. Neither Section 6.7, nor Section 10.1, nor any other provision of the Company/Funds' Articles of Incorporation contain a provision exculpating any entity from liability for failing to perform the duties, obligations, and requirements set out in Article FOURTH and Section 6.7 in form or in substance akin to that found in paragraph 7.A. of the Advisory Agreement. Furthermore, the Company/Funds' Articles of Incorporation do not contain a provision authorizing the Company/Funds' Board on behalf of the Company/Funds to enter into an agreement that proposes to allow any such exculpation. The inclusion of any such provision

58

would have violated, and been prohibited by, Section 10.2 as not being "reasonable and fair and not inconsistent with the provisions of [Section 10.1]." ¶¶ 367-69.

In entering into the Advisory Agreement, the Company/Funds' directors were not authorized under the Articles of Incorporation to agree to such an exculpatory provision because such a provision is neither "reasonable [nor] fair." Such a provision is a product of the type of non-arm's-length self-dealing recognized by Article 10.2 of the Articles of Incorporation, which is inherent in the fund-adviser relationship, and its potential for ignoring the best interests of the Funds and their shareholders.[57] Accordingly, the Advisory Agreement exculpatory provision is subject to being set aside as *ultra vires*.[58]

### 4. Plaintiffs' negligence claim against MK is not barred by any exculpatory provision.

MK argues the exculpatory provision in its Underwriting Agreement with the Funds bars Plaintiffs' negligence claim. Plaintiffs' negligence claim is not based on the Underwriting Agreement; it is based on the Fund Accounting Service Agreement. ¶ 400. MK ignores the Fund Accounting Service Agreement and the relevant allegations. ¶¶ 380, 403-10.

---

[57]    Articles of Incorporation Section 10.2 provides (emphasis supplied): "Any contract of the character described in Section 10.1 or for services as administrator, custodian, transfer agent or disbursing agent or related services may be entered into with any corporation, firm, trust or association, although any one or more of the directors or officers of the Corporation may be an officer, director, trustee, stockholder or member of such other party to the contract, and no such contract shall be invalidated or rendered voidable by reason of the existence of any such relationship, nor shall any person holding such relationship be liable merely by reason of such relationship for any loss or expense to the Corporation under or by reason of said contract or accountable for any profit realized directly or indirectly therefrom, *provided that the contract when entered into was reasonable and fair* and not inconsistent with the provisions of this Article TENTH." One way to determine the reasonableness and fairness of the exculpatory provisions is to inquire whether such provisions were included in MAM's advisory agreements with its institutional and individual accounts. *See Gallus v. Ameriprise Fin., Inc.*, 561 F.3d 816 (8th Cir. 2009) (recognizing studies documenting the absence of arm's-length negotiations between funds and their advisors, court held that district court erred in rejecting a comparison between the fees charged to the advisors' institutional clients and its mutual fund clients and dismissing breach of fiduciary duty claim).

[58]    *See* discussion *supra* regarding *ultra vires* actions.

The Fund Accounting Service Agreement between the Company and MK provides, *inter alia*, MK would provide portfolio accounting services, including the valuation of the Funds' portfolio securities, and compliance control and reporting services. ¶ 380. That Agreement explicitly provides that MK be "held to the exercise of reasonable care in carrying out the provisions of this Agreement" and would be "without liability to the Fund for any action taken or omitted by it in good faith *without negligence* or willful misconduct." ¶¶ 403 (emphasis supplied).

**B.      Adequacy of Allegations regarding MK Holding and MK.**

MK Holding is the parent of, and controlled, MAM and is a subsidiary of Regions Financial. ¶¶ 1, 15-18. Plaintiffs allege the Regions Financial and its subsidiaries cross-marketed and cross branded its MK and Regions brands, of which MAM and MK Holding were a part. ¶¶ 18, 372.

Notably, MK does not seek to dismiss Count II, the breach of contract claim against MK, which is based on both the Underwriting Agreement and the Fund Accounting Service Agreement. *See* MK Br. at 19-20; ¶¶ 375-382.

**III.      PLAINTIFFS COMPLAINT WAS VERIFIED**

Defendants incorrectly state that the Derivative Complaint is unverified. The Complaint was originally filed in the Shelby County Tennessee Chancery Court ("Chancery Court") on March 28, 2008, as Case No. CH-08-0597-2. The Complaint was verified by Plaintiffs James H. Frazier and James P. Whitaker by the filing of their respective affidavits with the Chancery Court on April 3, 2008. Ex. OO. Counsel for Defendants were notified on April 3, 2008 and the Verified Complaint was forwarded to counsel for Defendants on April 4, 2008. Ex. PP. The case was removed to this Court on April 29, 2008.

### CONCLUSION

For the reasons stated herein, Defendants' motions to dismiss should be denied in their entirety.

DATED:  August 3, 2009                              Respectfully submitted,

**APPERSON, CRUMP & MAXWELL, PLC**

*/s/ Jerome A. Broadhurst*
Jerome A. Broadhurst, TN BPR 12529
Charles D. Reaves, TN BPR 22550
6000 Poplar Avenue, Suite 400
Memphis, TN 38119-3972
Tel : 901-260-5133
Fax : 901-435-5133
jbroadhurst@appersoncrump.com

**HEAD, SEIFERT & VANDER WEIDE, P.A.**

Vernon J. Vander Weide
Thomas V. Seifert
333 South Seventh Street, Suite 1140
Minneapolis, MN 55402-2422
Tel: 612-339-1601
Fax: 612-339-3372
vvanderweide@hsvwlaw.com

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
Richard A. Lockridge
Gregg M. Fishbein
Matthew R.Salzwedel
100 Washington Avenue South
Suite 2200
Minneapolis, MN  55401
Tel:  (612) 339-6900
Fax:  (612) 339-0981
gmfishbein@locklaw.com

**ZIMMERMAN REED P.L.L.P.**
Carolyn G. Anderson
Timothy J. Becker
Kirsten D. Hedberg
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
Tel: 612-341-0400
Fax: 612-341-0844
cga@zimmreed.com

*Attorneys for Derivative Plaintiffs*

## CERTIFICATE OF SERVICE

  The undersigned hereby certifies that this 3rd day of August, 2009, a true and correct copy of the foregoing is being served by electronic means via e-mail transmission (including the Court's ECF System) to the following:

    Shepherd D. Tate, Esq.
    Michael A. Brady, Esq.
    **Bass, Berry, & Sims, PLC**
    100 Peabody Place, Suite 900
    Memphis, TN 38103-3672

    Matthew M. Curley, Esq.
    Michael L. Dagley, Esq.
    W. Brantley Phillips, Jr.
    **Bass, Berry, & Sims, PLC**
    100 Peabody Place, Suite 900
    Memphis, TN 38103-3672

    David B. Tulchin
    D. Andrew Pietro
    David E. Swarts
    **Sullivan & Cromwell, LLP**
    125 Broad Street
    New York, NY 10004

    Peter J. Anderson, Esq.
    S. Lawrence Polk, Esq.
    **Sutherland Asbill & Brennan LLP**
    999 Peachtree Street, NE
    Atlanta, GA 30309-3996

    Jeffrey Maletta, Esq.
    Nicole A. Baker
    **K & L Gates**
    1601 K Street NW
    Washington, DC 20006

    Emily Nicklin, Esq.
    Timothy A. Duffy
    **Kirkland & Ellis**

200 East Randolph Dr., Ste. 5400
Chicago, IL 60601-6636

Leo Maurice Bearman, Jr.
Eugene J. Podesta, Jr.
**Baker Donelson Bearman Caldwell
& Berkowitz**
165 Madison Avenue, Suite 2000
Memphis, TN 38103

Kevin C. Logue
Asa R. Danes
**Paul, Hastings, Janofsky & Walker LLP**
Park Avenue Tower
75 East 55th Street
First Floor
New York, NY 10022

s/Jerome A. Broadhurst
Jerome A. Broadhurst