# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### MEMPHIS DIVISION

| | |
|---|---|
| IN RE REGIONS MORGAN KEEGAN SECURITIES, DERIVATIVE and ERISA LITIGATION )<br><br>This Document Relates to:<br>*Landers* v. *Morgan Asset Management, Inc.*, No. 2:08-cv-02260-SMH-dvk | MDL Docket No. 2009<br><br>Judge Samuel H. Mays, Jr.<br><br>Magistrate Judge Diane K. Vescovo<br><br>ORAL ARGUMENT REQUESTED |

## DERIVATIVE PLAINTIFFS' CONSOLIDATED MEMORANDUM IN OPPOSITION TO MOTIONS TO DISMISS PLAINTIFFS' FIRST AMENDED DERIVATIVE COMPLAINT BY NOMINAL DEFENDANT FUNDS AND ALL DEFENDANTS OTHER THAN PRICEWATERHOUSECOOPERS

**HEAD, SEIFERT & VANDER WEIDE, P.A.**
Vernon J. Vander Weide
Thomas V. Seifert
333 South Seventh Street, Suite 1140
Minneapolis, MN 55402-2422
Telephone: 612-339-1601
Fax: 612-339-3372
vvanderweide@hsvwlaw.com

**ZIMMERMAN REED, P.L.L.P.**
Carolyn G. Anderson
Timothy J. Becker
Kirsten D. Hedberg
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
Telephone: 612-341-0400
Fax: 612-341-0844
cga@zimmreed.com

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
Richard A. Lockridge
Gregg M. Fishbein
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981
gmfishbein@locklaw.com

**APPERSON CRUMP PLC**
Jerome A. Broadhurst, TN BPR 12529
Charles D. Reaves, TN BPR 22550
6070 Poplar Avenue, Sixth Floor
Memphis, TN 38119-3954
(901) 260-5133 direct
(901) 435-5133 fax
jbroadhurst@appersoncrump.com

*Attorneys for Derivative Plaintiffs*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ...................................................................................... 5

I.   FACTS RELATING TO DEMAND ...................................................................... 5

     A.   Delay in Making a Demand Risked Irreparable Harm. ..................................... 6

     B.   The Old Board's Conduct during 2006 - 2008 Is Not Entitled to the Protection
          of the Business Judgment Rule. .................................................................. 6

          1.   The Old Board failed to address their  and the other RMK Defendants'
               mismanagement of the Funds. ............................................................ 6

          2.   The Old Board had actual knowledge in 2006 of the Funds' substantial
               investments in illiquid securities of uncertain value in violation of the
               Funds' investment objectives, policies and restrictions. ....................... 10

          3.   There was no decision to which the business judgment rule applied.... 12

          4.   The Funds are insolvent and were in a liquidating mode throughout
               2008 and have since liquidated. ......................................................... 14

     C.   Plaintiffs' Efforts to Obtain Action by the Funds' Old and New Boards. ...... 15

     D.   The Funds' Conflicted Board. .................................................................. 16

          1.   The entire board was disabled by its conflicting interests. .................... 16

          2.   A majority of directors was conflicted in March 2008. ......................... 18

II.  FACTS RELATING TO FAILURE TO STATE A CLAIM ...................................... 19

     A.   The Derivative Claims against the Old Board and Officers Are Supported by
          Detailed Factual Allegations. .................................................................... 19

     B.   The Derivative Claims against the MK Defendants Are Permitted by the
          Funds' Articles of Incorporation and Advisory Agreement. .......................... 22

ARGUMENT ...................................................................................................... 22

I.   DEMAND IS IRRELEVANT IN THIS CASE. ...................................................... 23

     A.   Purpose and Use of the Derivative Action; the Limits of the Business
          Judgment Rule ....................................................................................... 23

     B.   Demand Is Not Required as to either the Old or New Boards. ....................... 26

1.     Demand is not required where the challenged conduct was fraudulent, incompetent or in bad faith, as the business judgment rule does not apply. ................................................................................... 27

2.     Demand is not required where the challenged conduct is *ultra vires*.... 27

3.     Demand was not required because the Funds were defendants in a class action brought on behalf of the Funds' former shareholders, were not economically viable and have since been liquidated........................... 30

     a.     Under Maryland law, the Old and New Board's members were and are trustees for the Funds' creditors...................................... 30

     b.     The New Board owes, and the Old Board owed, a fiduciary duty to the Funds' shareholders as creditors....................................... 33

     c.     Neither the Old nor the New Board had discretion not to pursue these claims.................................................................................. 35

4.     Demand is irrelevant because in view of the identity of interests of a fund and its shareholders. ...................................................... 35

II.     PLAINTIFFS WERE EXCUSED FROM MAKING A DEMAND OR DEMAND WAS MADE AND EFFECTIVELY REFUSED. .......................................................................................... 38

     A.     Demand on the Old Board in March 2008 Was Excused as Futile. ................ 38

     1.     The Old Board could not reasonably  have been expected to respond to a demand in good faith and within the ambit of the business judgment rule. .................................................................................................. 38

     2.     The  Old Board's efforts to quit and refusal to include proxy statement disclosures about the derivative action is evidence of demand futility. 41

     3.     The Funds' Old Board in March 2008 lacked a majority of directors who were not directly conflicted. ........................................................ 42

     a.     The entire Old Board was personally and directly conflicted. .... 43

     b.     At least half of the  Old Board was personally and directly conflicted. .................................................................................... 49

     B     Demand Is Excused because Delay in Bringing This Action Would Have Resulted in Irreparable Harm...................................................................... 51

     C.     Alternatively, Demand Was Made on the New Board and Was Refused; Its Motion Contradicts Its Representations to the Funds' Shareholders, and the Old and New Boards Are Estopped from Asserting Demand Was Not Excused........................................................................................................ 52

     1.     Demand was made on the New Board and has been effectively refused. ............................................................................................................. 52

iii

2.     Alternatively, the demand issue is moot because the New Board has represented to Fund shareholders its intention to pursue the derivative claims. ...........................................................................................57

3.     The New Board's representations to the Funds' shareholders and the inequitable conduct of the Old and New Boards estop them from asserting demand was not excused. .....................................................58

D.     Demand on the Funds' Shareholders Was Excused. .......................................61

II.    PLAINTIFFS STATE CLAIMS ON WHICH RELIEF CAN BE GRANTED. ........................63

A.     Adequacy of Allegations regarding MK Holding and MK. ...........................63

B.     The Exculpatory Provisions of the Funds' Articles of Incorporation and Advisory Agreement Do Not Bar Plaintiffs' Claims. ......................................66

1.     The MAM Advisory Agreement exculpatory provision does not apply to breach of contract claims. ......................................................................67

2.     The Company's Articles of Incorporation and Advisory Agreement do not bar Plaintiffs' gross negligence and knowing misconduct claims against the MK Defendants. ..................................................................68

3.     The Advisory Agreement exculpatory provision is invalid. ................70

C.     The ICA § 47 Provides Relief for Violations of the ICA; Defendants Contracted to Give the Funds a Private Cause of Action for Violating the ICA. ...........................................................................................................73

CONCLUSION .....................................................................................................................75

iv

## TABLE OF AUTHORITIES

**Cases**

*Albers v. Edelson Tech. Partners, L.P.*, 31 P.3d 821 (Ariz. Ct. App. 2001) ........................ 54

*Alexander, et al v. Hillman*, 296 U.S. 222 (1935) ................................................ 31

*Allison v. General Motors Corp.*, 604 F. Supp. 1106 (D. Del. 1985). .................................. 53

*Angell v. Kelly*, 336 F. Supp. 2d 540 (M.D.N.C. 2004) ........................................ 33

*Aronson v. Lewis*, 473 A.2d 805 (Del. 1984) ...................................... 25, 26, 40, 44

*Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009) ........................................................ 48, 63

*Bagel v. Bagel*, 1992 Bankr. LEXIS 2501 (Bankr. E.D. Pa. Dec. 17, 1992) ....................... 34

*Bender v. Schwartz*, 917 A.2d 142 (Md. Ct. App. 2007) .................................. 24, 53, 55, 59

*Beneville v. York*, 769 A.2d 80 (Del. Ch. 2000) ................................................... 49

*Berg & Berg Enterprises, LLC v. Boyle*, 178 Cal. App. 4th 1020 (Cal. App. 6th Dist. 2009) ............................................................................................................... 33

*Bertoglio v. Texas Int'l Co.*, 488 F. Supp. 630 (D. Del. 1980) ............................................. 60

*Billman v. State Deposit Ins. Fund Corp.*, 593 A.2d 684  (Md. Ct. Spec. App. 1991) ......... 25

*Black v. Fox Hills North Community Ass'n*, 599 A.2d 1228 (Md. Ct. Spec. App. 1992) ..... 27

*Braddock v. Zimmerman*, 906 A.2d 776 (Del. 2006) ............................................... 52

*Cal. Pub. Emples. Ret. Sys. v. Coulter*, 2002 Del. Ch. LEXIS 144 (Del. Ch. Dec. 18, 2002) ............................................................................................................... 28

*Champion Home Builders Co. v. ADT Security Servs. Inc.,* 179 F. Supp. 2d 16 (N.D.N.Y. 2001) ........................................................................................................... 67

*Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949)...................................... 24, 61

*CompuSpa, Inc. v. I.B.M. Corp.,* 228 F. Supp. 2d 613 (D. Md. 2002)................................ 67

*Conrad v. Black*, 940 A.2d 28 (Del. Ch. 2007) ................................................... 40

*Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.*, 1991 Del. Ch. LEXIS 215  (Del. Ch., December 30, 1991) ................................................... 34

*Damazo v. Wahby*, 305 A.2d 138 (Md. 1973)........................................................... 32

*Danielewicz v. Arnold*, 769 A.2d 274 (Md. Ct. App. 2001).......................................... 26

*Davis v. Gemmell*, 17 A. 259 (Md. 1889)............................................................... 37

*Davis v. Woolf*, 147 F.2d 629 (4th Cir. 1945)......................................................... 33

*Dousman v. Kobus*, 2002 Del. Ch. LEXIS 67 (Del. Ch. June 6, 2002)............................... 60

*Edge Partners, L.P. v. Dockser*, 944 F. Supp. 438 (D. Md. 1996)........................... 25, 44, 61

*Eichenholtz v. Brennan*, 1989 U.S. Dist. LEXIS 8778 (D.N.J. July 27, 1989).................... 49

*Eisler v. Eastern States Corp.*, 35 A.2d 118 (Md. Ct. App. 1943)........................................ 61

*Federal Deposit Ins. Corp. v. Howse*, 736 F. Supp. 1437 (S.D. Tex. 1990) ........................ 47

*Federal Deposit Ins. Corp. v. Hudson*, 673 F.Supp. 1039 (D. Kan. 1987) .......................... 47

*Federal Deposit Ins. Corp. v. Appling*, 992 F.2d 1109 (10th Cir. 1993) ............................. 47

*Federal Deposit Ins. Corp. v. y*, 754 F. Supp. 179 (D.Kan. 1990)...................................... 48

*Federal Deposit Ins. Corp. v. Greenwood*, 739 F. Supp. 450 (C.D. Ill. 1989) .................... 48

*Federal Deposit Ins. Corp. v. Sea Pines Co.*, 692 F.2d 973 (4th Cir. 1982)........................ 32

*Federal Sav. and Loan Ins. Corp. v. Williams*, 599 F. Supp. 1184 (D. Md. 1984).............. 47

*Felker v. Anderson*, 2005 WL 602974 (W.D. Mo. February 11, 2005) ............................... 44

*Froelich v. Erickson*, 96 F. Supp. 2d 507 (D. Md. 2000) ..................................................... 27

*Gallus v. Ameriprise Fin., Inc.*, 561 F.3d 816 (8th Cir. 2009) ............................................ 72

*Gearhart Industries, Inc. v. Smith International*, 741 F.2d 707 (5th Cir. 1984) ................. 28

*Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784 (Del. Ch. 1992) ........................................... 33

*Goldstein v. Lincoln Nat'l Convertible Secs. Fund, Inc.*, 140 F. Supp. 2d 424 (E.D. Pa. 2001)
................................................................................................................................. 28, 60

*Greenfield v. Prof'l Care, Inc.*, 677 F. Supp. 110 (E.D.N.Y. 1987) .................................... 45

*Grill v. Hoblitzell*, 771 F. Supp. 709 (D. Md. 1991). ........................................................... 26

*Harhen v. Brown*, 730 N.E.2d 859 (Mass. Sup. Ct. 2000) ................................................... 62

*Harris v. Carter*, 582 A.2d 222 (Del. Ch. 1990) .................................................................. 52

*Harvest Corp. v. Ernst & Whinney*, 610 S.W.2d 727 (Tenn. Ct. App. 1980) ...................... 67

*Hecht v. Resolution Trust Corp.*, 635 A.2d 394 (Md. 1994) ........................................... 47, 48

*Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983) .................................................... 31

*In re Abbott Labs. Derivative Shareholders Litig.*, 325 F.3d 795 (7th Cir. 2003) ............... 41

*In re Bowman*, 181 B.R. 836 (Bankr. D. Md. 1995) ............................................................. 32

*In re Caremark Int'l, Inc.*, 698 A.2d 959 (Del. Ch. 1996) .................................................... 40

*In re Cendant Corp. Derivative Action Litig.*, 189 F.R.D. 117 (D.N.J. 1999) ..................... 44

*In re Franklin Mutual Fund Fee Litig.*, 388 F. Supp. 2d 451 (D.N.J. 2005) .................. 38, 48

*In re InfoUSA, Inc. Shareholders Litig.*, 953 A.2d 963 (Del. Ch. 2007).............................. 40

*In re Jones*, 114 B.R 917 (Bankr. N.D. Ohio 1990).............................................................. 34

*In re Key Energy Services, Inc. Derivative Litig.*, 2006 WL 5979882 (W.D. Tex. July 10,
2006) .................................................................................................................................. 51

*In re Lernout & Hauspie Sec. Litig.*, 286 B.R. 33 (D. Mass. 2002) ..................................... 45

*In re Mut. Funds Inv. Litig.*, 384 F. Supp. 2d 873 (D. Md. 2005)................................... 40, 44

*In re Mutual Funds Investment Litig.*, 384 F. Supp. 2d 873 (D. Md. 2005) ........................ 44

*In re New Valley Corp.*, No. 17649, 2001 WL 50212 (Del. Ch. Jan. 11, 2001) .................. 49

*In re Nuveen Fund Litig.,* 1996 U.S. Dist. LEXIS 8062 (N.D. Ill. June 11, 1996) .............. 28

*In re Oxford Health Plans, Inc.,* 192 F.R.D. 111 (S.D.N.Y. 2000) ....................................... 41

*In re Sapient Corp. Derivative Litig.,* 555 F. Supp. 2d 259 (D. Mass. 2008) ................ 52, 56

*In re SFBC International, Inc. Securities & Derivative Litig.,* 495 F. Supp. 2d 477 (D.N.J. 2007) ................................................................................................................................ 44, 46

*In re Tel-Net Hawaii, Inc.,* 105 Bankr. 594 (Bankr. D. Hawaii 1989) ................................. 32

*In re The Limited, Inc. Shareholders Litig.,* 2002 WL 537692 (Del. Ch. Mar. 27, 2002) .... 51

*In re Thorsen and Co.,* 98 B.R. 527 (Bankr. D. Colo. 1989) ................................................. 34

*In re Veeco Instruments, Inc. Sec. Litig.,* 434 F. Supp. 2d 267 (S.D.N.Y. 2006)................. 40

*In re Walt Disney Co. Derivative Litig.,* 825 A.2d 275 (Del. Ch. 2003)............................... 70

*In re Wines,* 112 B.R. 44 (Bankr. S.D. Fla. 1990)................................................................. 34

*Indurated Concrete Corp. v. Abbott,* 74 A.2d 17 (Md. 1950) ............................................... 46

*Justin Indus., Inc., v. Choctaw Securities,* 920 F.2d 262 (5th Cir. 1990)............................. 60

*Kamen v. Kemper Fin. Servs.,* 500 U.S. 90 (1991) ........................................................ 24, 62

*Kingsville Dodge, LLC v. Almy,* 2007 U.S. Dist. LEXIS 59131 (D. Md. July 30, 2007) ..... 32

*Knill v. Knill,* 510 A.2d 546 (Md. 1986) ............................................................................... 59

*Lacey v. Van Royen,* 267 A.2d 91 (Md. 1970) ...................................................................... 32

*Lessler v. Little,* 857 F. 2d 866 (1st Cir. 1988)...................................................................... 74

*Levitt v. Johnson,* 334 F.2d 815 (1st Cir. 1964) .................................................................... 62

*Lewis v. Fuqua,* 502 A.2d 962 (Del. Ch. 1985)..................................................................... 51

*Lewis v. Hett,* 1984 Del. Ch. LEXIS 546 (Del. Ch. September 4, 1984) .............................. 29

*Lewis v. Sporck,* 646 F. Supp. 574 (N.D. Cal. 1986).......................................................53, 54

*Lutherville Supply & Equip. Co. v. Dimon,* 192 A.2d 496 (Md. 1963)................................. 32

*Martin Marietta Corp. v. Gould, Inc.,* 70 F.3d 768 (4th Cir. 1995)...................................... 47

*Mathers Fund, Inc. v. Colwell Company,* 564 F. 2d 780 (7th Cir. 1977)............................. 74

*McCall v. Scott,* 239 F.3d 808 (6th Cir. 2001) ................................................................. 40, 44

*Mechanics Universal Joint Co. v. Culhane,* 299 U.S. 51 (1936) ......................................... 33

*Mercedes-Benz Credit Corp. v. Carretta (In re Carretta),* 219 B.R. 66 (Bankr. D.N.J. 1998) ................................................................................................................................................ 33

*Migdal v. Rowe Price-Fleming Int'l,* 248 F.3d 321 (4th Cir. 2001) ...................................... 65

*Mona v. Mona Elec. Group, Inc.,* 934 A.2d 450 (Md. Ct. Spec. App. 2007) ....................... 55

*Moran v. Household Int'l, Inc.,* 500 A.2d 1346 (Del. 1985)................................................. 28

*Mountain Manor Realty, Inc. v. Buccheri,* 461 A.2d 45 (Md. Ct. Spec. App. 1983)............ 41

*Murray-Baumgartner Surgical Instr. Co. v. Requardt,* 23 A.2d 697 (Md. 1942)................. 28

*Mutchka v. Harris,* 373 F. Supp. 2d 1021 (C.D. Cal. 2005)..................................................74

*New Crawford Valley, Ltd. v. Benedict*, 847 P.2d 642 (Colo. Ct. App. 1993).....................62

*Oklahoma Contracting Co. v. Commissioner*, 153 F.2d 770 (5th Cir. 1946) ......................33

*Olesh v. Dreyfus Corp.*, 1995 WL 500491 (E.D.N.Y. Aug. 8, 1995) ...................................50

*Parish v. Maryland and Virginia Milk Producers Association*, 242 A.2d 512 (Md. Ct. App. 1968) ..........................................................................................................................25, 41

*Post v. Bregman*, 707 A.2d 806 (Md. 1998)..........................................................................60

*Pritchard v. Myers*, 197 A. 620 (Md. 1938)...........................................................................31

*Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993). .......................................................40, 44

*Reschini v First Federal Sav and Loan Ass'n of Indiana,* 46 F.3d 246 (3d Cir. 1995).........60

*Resolution Trust Corp. v. Gardner*, 798 F.Supp. 790 (D.D.C.1992) ...................................47

*Resolution Trust Corp. v. Scaletty*, 810 F. Supp. 1505 (D.Kan. 1992) ................................47

*Resolution Trust Corp. v. Scaletty*, 891 P.2d 1110 (Kan. 1995) ..........................................47

*Ross v. State Bd. of Elections*, 876 A.2d 692 (Md. 2005) ....................................................61

*RSL COM Primecall, Inc. v. Beckoff (In re RSL COM Primecall, Inc.)*, 2003 Bankr. LEXIS 1635 (Bankr. S.D.N.Y. Dec. 11, 2003)..................................................................passim

*Ryan v. Gifford*, 918 A.2d 341 (Del. Ch. 2007).....................................................................44

*Sadler v. Dimensions Healthcare Corp.*, 836 A.2d 655 (Md. 2003)....................................28

*Sanders v. Wang*, 1999 Del. Ch. LEXIS 203 (Del. Ch. Nov. 8, 1999) ................................66

*Scalisi v. Fund Asset Management, LP,* 380 F.3d 133 (2d. Cir. 2004) .................................48

*SEC v. Bank of America*, 653 F. Supp. 2d 507 (S.D.N.Y. 2009) ..........................................69

*SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963) ....................................65

*Stegall v. Ladner*, 394 F. Supp. 2d 358 (D. Mass. 2005) .....................................................74

*Stone v Ritter*, 911 A.2d 362 (Del. 2006) ..............................................................................41

*Storetrax.com, Inc. v. Gurland*, 915 A.2d 991 (Md. 2007) ...................................................46

*Strougo v. Bassini*, 1 F. Supp. 2d 268 (S.D.N Y. 1998).......................................................50

*Strougo v. Scudder, Stevens & Clark, Inc.*, 964 F. Supp. 783 (S.D.N.Y. 1997) .............50, 62

*Swanson v. Traer*, 354 U.S. 114 (1957) ...............................................................................28

*Syracuse Television, Inc. v. Channel 9, Syracuse, Inc.*, 273 N.Y.S.2d 16 (N.Y. 1966)........53

*Trumball Inv..Ltd., v. Wachovia Bank, N.A.,* 2005 U.S. Dist. LEXIS 7195 (E.D Va., Apr. 15, 2005) ................................................................................................................................67

*Tydings v. Berk*, 565 A.2d 391 (Ct. Sp. App. Md 1989) .......................................................59

*U.S. Int'l Associates v. Steiner*, 1995 Conn. Super. LEXIS 2202 (Conn. Super. July 31, 1995)..................................................................................................................................49

*Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d 206 (3d Cir. 1990)......33

*Weiss v. Sunasco Inc.*, 316 F. Supp. 1197 (E.D. Pa. 1970) .................................................... 62

*Werbowsky v. Collomb,* 766 A.2d 123 (Md. 2001). ...................................................... passim

*Williams v. Salisbury Ice Co.*, 176 Md. 13 (Md. 1939) .................................................... 28

*Wilson v. Bryant*, 67 S.W.2d 133 (Tenn. 1933) ........................................................... 33

*Wittman v. Crooke*, 707 A.2d 422 (Md. Ct. Spec. App. 1998) ............................................. 27

*Wolf v. Ford*, 644 A.2d 522 (Md. 1994) ....................................................................... 68, 71

*Yost v. Early*, 589 A.2d 1291 (Md. 1991) ................................................................... 27

*Zimmerman v. Bell*, 585 F. Supp. 512 (D. Md. 1984) ........................................................ 61

## Statutes

11 U.S.C. § 523(a) ................................................................................................... 34

Investment Company Act of 1940 § 1, 15 U.S.C. § 80a-1 ................................................. 36, 71

Investment Company Act of 1940 § 13, 15 U.S.C. § 80a-13 .............................................. 29, 66

Investment Company Act of 1940 § 15, 15 U.S.C. § 80a-15 .............................................. 29, 54

Investment Company Act of 1940 § 17(h), 15 U.S.C. § 80a-17(h) ........................................ 69

Investment Company Act of 1940 § 34(b), 15 U.S.C. § 80a-33(b) ....................................... 75

Investment Company Act of 1940 § 36(a), 15 U.S.C. § 80a-35(a) ....................................... 65

Investment Company Act of 1940 § 47(a), 15 U.S.C. § 80a-46(a) ....................... 71, 73, 74, 75

Investment Company of 1940 § 2(a)(19), 15 U.S.C. § 80a-2(a)(19) .................................... 48

Maryland Code § 1-403 ............................................................................................ 30

Maryland Code § 2-405.1 ...................................................................................... 39, 59

Maryland Code § 2-405.2 ........................................................................................ 68

Maryland Code § 2-407 ........................................................................................... 42

Maryland Code § 5-418 ........................................................................................... 68

Md. Code Ann. Corps. & Ass'ns § 3-408(b) ................................................................ 14

Md. Code Ann. Corps. & Ass'ns § 3-410 ................................................................... 33

Md. Code Ann. Corps. & Ass'ns § 3-410(a) ................................................................ 30

Md. Code Ann. Corps. & Ass'ns § 3-410(b)(1) ............................................................ 30

Md. Commercial Law § 15-203 ................................................................................ 32

Md. Commercial Law § 15-204 ................................................................................ 32

Securities Act of 1933 § 11, 15 U.S.C. § 77k(b) .......................................................... 10, 31

Tenn. Code Ann. § 29-6-101 .................................................................................... 33

## Rules

Fed. R. Civ. P. 64 .................................................................................................. 33

Fed. R. Civ. P. 8(d) ................................................................................................ 53

## Other Authorities

American Law Institute, *Principles of Corporate Governance* § 7.03 ................................ 54

*First Australia Fund, Inc., SEC No-Action Letter*, 1987 WL 108483 (S.E.C.) (Oct. 8, 1987) .................................................................................................................. 50

*Heartland Advisors, Inc., et al.*, Release Nos. 33-8884, 34-57206, IC-28136 (Jan. 25, 2008) .................................................................................................................. 25

Model Business Corporation Act § 7.42 ............................................................... 54

**Treatises**

7A Fletcher Cyc. Corporations § 3399 ................................................................. 28

Derivative Plaintiffs,[1] on behalf of Morgan Keegan Select Fund, Inc. ("Company"), and its three former portfolios,[2] submit this memorandum in opposition to the motions to dismiss by Nominal Defendants and by Defendants Blair, Johnson, McFadden, Pittman, Stone, Willis, Morgan, Alderman, Joseph C. Weller, J. Thompson Weller, Maxwell, Kelsoe, Tannehill, George, Wood, Sullivan, Regions Financial Corporation, Morgan Keegan & Co., Inc, Morgan Asset Management, Inc, and MK Holding, Inc.[3]

This action was commenced in state court in Shelby County, Tennessee, on March 28, 2008, and was removed on April 29, 2008. Plaintiffs' motion to remand was denied. Following the completion of briefing on Defendants' motions to dismiss for Plaintiffs' purported failure to make an unexcused demand on the Company/Funds to bring this action and for failure to state a claim, Plaintiffs filed their First Amended Derivative Complaint ("FADC") on October 13, 2009 (Dkt. No. 46).

## PRELIMINARY STATEMENT

This derivative action by Plaintiffs, who collectively invested $2.3 million in the Funds, on behalf of the Company/Funds is against Morgan Asset Management, Inc. ("MAM") (the Funds' investment adviser), Morgan Keegan & Company, Inc. ("MK") (the Funds' distributor and administrator), controlling persons of MAM/MK, the Com-

---

[1] Derivative Plaintiffs are H. Austin and Jeanette H Landers, Charles M. and Diana W Crump,. James H. Frazier, and James P. and Peggy C. Whitaker ("Plaintiffs").

[2] These portfolios were, before they were liquidated in June 2009, Regions Morgan Keegan Select Short Term Bond Fund ("STF"), Regions Morgan Keegan Select Intermediate Bond Fund ("IBF"), and Regions Morgan Keegan Select High Income Fund ("HIF") ("the Funds"). Morgan Keegan Select Fund, Inc. is now known as Helios Select Fund, Inc. and the "Regions Morgan Keegan" was replaced with "Helios" for its three portfolios following transfer of the Funds' investment advisory agreements to Hyperion Brookfield Asset Management ("HBAM") on July 29, 2008.

[3] Dkt Nos. 57-1, 59, 62-1, 64-1, 65-1. Plaintiffs are responding separately to PricewaterhouseCoopers' ("PwC") motion to dismiss.

1

pany/Funds' officers and directors, and PwC, the Funds' auditor.[4] Plaintiffs assert claims for breach of contract and fiduciary duty, negligence and negligent misrepresentation. MK does not move to dismiss the Funds' breach of contract claim against it.

Defendants caused the Funds to take on concentration, credit, liquidity and valuation risks by investing an extraordinarily large portion of their portfolios in thinly traded securities of uncertain valuation that risked suddenly becoming unsalable at their estimated values upon shifting market sentiments, resulting in catastrophic losses. The Funds' heavy investments in these securities violated their investment objectives, policies and restrictions and substantially exceeded such types of investments and risks by their respective peer funds. The concealed risks materialized in fall 2007 when the Funds' assets did become unsalable at their estimated values, and the Funds lost almost $1 billion.

Notwithstanding that the Funds were advertised as either as safe as, or safer than, other funds in their peer groups, the Funds suffered catastrophic losses unmatched by their peers. Through February 2008, STF lost $17.1 million (23%), IBF $405.5 million (70%), and HIF $515.0 million (72%). The direct cause of these losses was the composition of the Funds' portfolios that exposed them to vastly higher risks than their respective peers.

In August 2007, the Funds disclosed they were unable to value their portfolios and had retained an outside consultant to assist in "fair valuing" the illiquid securities held in the portfolios. The true extent of the over-concentration in illiquid, so called "fair-valued" securities was first shown in the Funds' annual report that was filed with the Securities and Exchange Commission ("SEC") on October 4, 2007, and highlighted by PwC in its auditor's report. This report disclosed that as of June 30, 2006 and 2007, STF had 18.2% and 30.7% of its assets, respectively, invested in "fair valued" or illiquid securities; IBF had 55.8% and 50.4% invested in such securities; and HIF 49.5% and 59.8%. These investments signifi-

---

[4]        MAM/MK, the Funds' officers and directors and MAM/MK's corporate controlling persons are collectively referred to as the "RMK Defendants."

cantly exceeded the SEC's 15%-of-assets limitation on illiquid securities. These "fair val-
ued" securities included or were *in addition* to the illiquid "restricted securities" held by the
Funds. Despite the Funds' disastrous losses, the Defendant directors herein ("Old Board")
on October 26, 2007, *renewed* the investment advisory contract with MAM, although it did
say that now it would "closely monitor" the Funds' performances.

Beginning on December 6, 2007, several class actions involving these three open-end
Funds and four closed-end funds managed by MAM and Defendant directors were filed in
federal and state courts. The Old Board's members were also defendants in many of these
cases and were therefore acutely aware of the serious challenges to their stewardship of the
Funds prior to the filing of this derivative action in March 2008.

Unbeknownst to the Funds' shareholders, including Plaintiffs, and, therefore, not al-
leged in the initial complaint as a basis for excusing demand as futile, MAM began discus-
sions in December 2007 to transfer the investment management of the Funds to HBAM. The
Old Board was informed of this plan on January 16, 2008, and discussed it several times
thereafter. On April 21, 2008, after this derivative action was filed on March 28, 2008, the
board approved MAM's proposal to transfer the Funds' management to HBAM. An integral
part of this proposal was the replacement of the Old Board by five new directors ("New
Board"). Upon the election of the New Board and the change in management to HBAM, the
Old Board was to no longer be responsible for overseeing the Funds.

The Old Board, whose members had already been sued individually in several class
actions before the filing of this derivative action, was clearly on notice – in a manner much
more informative than through a demand letter – that there were serious problems with the
Funds' management and the need to take action on behalf of the Funds in its fiduciary ca-
pacity. Instead, the Old Board focused on terminating its fiduciary duties to the Funds, so
that, when this action was filed, the Old Board was about to approve a plan that allowed it to
escape all future oversight responsibility for the Funds. That the Old Board was consumed
with ending its responsibility for oversight of the Funds is evidenced by its complete lack of

response to Plaintiffs upon being told that the Funds' preliminary May 2, 2008 proxy state-
ment, recommending that the Funds' shareholders approve the transfer of the Funds' man-
agement to HBAM and elect the New Board, misrepresented the estimated damages sought
on behalf of the Funds in the derivative action. Plaintiffs wrote to the New Board to request
that the proxy statement be corrected and that shareholders be assured the New Board would
pursue this action. The New Board forwarded the letter to the Old Board. Plaintiffs received
no response, and the proxy statement was not corrected.

In December of 2008 and January and February 2009, HBAM disclosed, without ad-
dressing this action, that STF would be liquidated. Concerned that liquidation would jeop-
ardize the benefits of this derivative litigation for STF's shareholders, in February 2009,
Plaintiffs' counsel advised the staff of the SEC's Division of Investment Management and
STF's new counsel that the derivative claims could be a significant asset of the liquidating
Fund and should be protected. Plaintiffs' counsel requested, among other things, that STF's
shares not be cancelled upon liquidation and that a constructive trust be established for the
benefit of all shareholders in the event that the derivative litigation should be successful.

In April 2009, HBAM proposed that all three Funds be liquidated. The April 2009
prospectus supplement and the following May 1, 2009 definitive proxy statement discussed
the derivative litigation and, in a manner that responded to Plaintiffs' counsel's earlier re-
quests, the proxy statement disclosed that the proposed plan of liquidation would preserve
the derivative claims and that the *derivative claims would be pursued on their merits*. The
Funds' shareholders approved the Funds' liquidation on May 29, 2009, based on the repre-
sentations in the May 1, 2009 proxy statement.

Having publicly stated in a filing with the SEC that the New Board would preserve
and pursue the derivative claims, the demand issue should now be moot. Alternatively, a
demand on the Old Board to bring this action either was not required because it was irrele-
vant, or demand was excused as futile with respect to the Old Board, or demand was made
on the New Board and has been refused. Whether demand is excused, or was made and re-

4

fused, is intensely fact specific; Defendants cite no case that addresses the unique facts and circumstances herein.

The RMK Defendants, in the Funds' proxy statement soliciting approval of Funds' shareholders of a new investment adviser for the Funds and new directors, represented the damages being sought in this action as "unspecified." ¶ 626. The statement was patently false because the initial complaint contained a calculation of $937 million in estimated damages. *Id.*; Dkt. No. 1-3, pp. 198- 200 ¶¶ 474-76. Attempting to explain away this egregious misrepresentation, the RMK Defendants say Plaintiffs "quibble with the proxy statement's characterization of the damages request in plaintiffs' prior pleading as 'unspecified'" and actually going so far as to label the allegation "*trivial*," contending "'*unspecified' was an apt adjective for the damages request* in plaintiffs' original complaint." To support this thoroughly disingenuous argument, these Defendants cite, "among other *amorphous* items," Plaintiffs' prayer for 'compensatory damages in an amount to be proven at trial" and "pre-judgment interest in the manner and at the maximum rate where permitted by law." [5] In doing so, the RMK Defendants inexcusably neglect the preceding three pages and the almost $1 billion calculation of damages.

## STATEMENT OF FACTS

**I.   FACTS RELATING TO DEMAND**

The FADC's allegations and events subsequent to the filing of this action establish that a demand was excused. In March 2008, the Company did not have a majority of non-conflicted directors capable of making a decision on the question of whether to sue Defendants. Additionally, there was no choice to be made that could be protected by the business judgment presumption because the Company/Funds had no interests that were separate and

---

[5]      Memorandum of Law in Support of Motion of Defendants Jack R. Blair, Albert C. Johnson, James Stillman R. McFadden, W. Randall Pittman, Mary S. Stone, and Archie W. Willis, III to Dismiss Plaintiffs' First Amended Derivative Complaint (Dkt. No. 59), p. 5 (emphasis supplied), in which Defendants Morgan Asset Management, Inc., MK Holding, Inc., and Morgan Keegan & Co., Inc. join (Dkt. No. 69 at 17 n. 10) (emphasis supplied).

apart from the interests of the Funds' shareholders with respect to whether this action should be pursued against the Defendants. Further, delay would have resulted in irreparable harm to the Funds in light of the applicable short statute of limitations to some claims. The Funds were insolvent and now have been liquidated, obviating demand. Demand and the business judgment rule are also inapt as to *ultra vires* conduct.

### A.    Delay in Making a Demand Risked Irreparable Harm.

Defendant PricewaterhouseCoopers ("PwC") asserts that, because Plaintiffs' allegations show that all Defendants had full knowledge by August 2006 of the Funds' claims against it based on the faulty audit of the Funds' 2006 financial statements, this action is barred because it was not commenced by August 2007. PwC Br. at 13-15. MAM/MK try to suggest that Plaintiffs deliberately waited out the short-term statute of limitations to avoid making a demand. MAM/MK Br. at 12.[6]

That delay risked irreparable harm is demonstrated by PwC's and the former directors' previous assertions. The initial action seeking recovery for the Funds' losses was brought by a plaintiff represented by counsel herein in December 2007.[7] A First Amended Complaint was filed in that action in February 2008.[8] This action was filed in March 2008. While Plaintiffs proceeded diligently in bringing this action, the Old Board did nothing to preserve or pursue the Funds' claims against Defendants, including themselves; instead, during this time the directors and MAM/MK were seeking to extricate themselves from the Funds' collapse.

### B.    The Old Board's Conduct during 2006 - 2008 Is Not Entitled to the Protection of the Business Judgment Rule.

#### 1.    The Old Board failed to address their    and the other RMK

---

[6]     The Old Board is no longer accusing Plaintiffs of not being diligent in bringing this action until March 2008. *See* Dkt. No. 29-2 at 13 n 5.

[7]     *Richard A. Atkinson, M.D., Patricia B. Atkinson, et al.  v. Morgan Asset Management, Inc. et al.*, United States District Court, Western District of Tennessee, No. 2.07-cv-2784.

[8]     *Id.*, Dkt. No. 53.

**Defendants' mismanagement of the Funds.[9]**

Plaintiffs allege that the mismanagement complained of herein was not an exercise of good faith business judgment by the Old Board. ¶¶ 598-603.[10] Plaintiffs allege that, having failed to fulfill their fiduciary duties of loyalty and good faith in allowing the complained of waste and mismanagement to occur, the Old Board could not and would not in good faith have considered a demand to commence this action. *Id.*

Plaintiffs allege the conditions that existed in the Funds' portfolios by at least mid-2006 that caused the Funds to collapse over one year later. *See, generally,* ¶¶ 67-344. These allegations, asserts PwC, demonstrate the RMK Defendants' knowledge of the Funds' claims against PwC for a deficient 2006 audit.  PwC Br. at 13-15. These same facts support the claims against the RMK Defendants for mismanagement. ¶¶ 130-51, 189, 311-44. Notwithstanding their knowledge, the Old Board did nothing to either require MAM and the Funds' officers to take corrective action, while there was adequate time to do so, or to bring an action when the Funds suffered catastrophic losses in fall 2007.[11]

The Old Board had numerous opportunities to consider the Funds' mismanagement. Besides the knowledge they had by August 2006 of the Funds' violations of their respective investment objectives, policies and restrictions, the Old Board learned no later than August 2007 that the Funds were having great difficulty valuing their securities to satisfy PwC and that the Funds would be unable to timely issue their June 30, 2007 annual report. ¶¶ 172-74. The directors also learned that, because MAM and MK were unable to value a large portion

---

[9]      "RMK Defendants" collectively refers to the Funds' individual officers and directors, MAM, MK, Holding, and Regions. ¶ 38.

[10]      Unless otherwise noted, all paragraph ("¶") references are to the FADC and all exhibit ("Ex.") references are to the Declaration of Jerome A. Broadhurst.

[11]      As discussed in Plaintiffs' opposition to PwC's motion to dismiss, while correctly asserting Plaintiffs have adequately alleged that the MK Defendants had the requisite knowledge for claims against themselves and PwC in August 2006, PwC is incorrect that this action had to have been initiated by August 2007.  ¶¶ 431-32, 465-66, 477-79; PwC Br. at 13-15.

of the Funds' portfolios, MAM engaged an "independent valuation consultant to assist in determining the fair value of certain of the Fund's portfolio securities." ¶ 175. Notwithstanding their 2006 knowledge and the valuation problems in 2007 necessitating outside assistance to determine the Funds' values, the Old Board did nothing. Even after the Funds disclosed the severe liquidity issues afflicting the Funds' portfolios (¶ 176), the Old Board did nothing.

In October 2007, while conceding, in a remarkable understatement, that the Funds had "significantly underperformed" their respective benchmarks, the directors nevertheless renewed the advisory agreement between the Funds and MAM. ¶ 593. In agreeing to the renewal, the directors did not consider whether the "significant underperformance" warranted a careful examination of whether the Funds had claims against the RMK Defendants, including themselves, despite the directors' previous accusation that Plaintiffs were dilatory in bringing this action.[12]

---

[12]    The Funds disclosed in their December 31, 2007 semi-annual report what the former directors considered in deciding to renew the Funds' investment advisory agreement with MAM:

> With respect to the performance of the Funds, the Board considered the performance of each Fund relative to its benchmark index and a peer group of investment companies pursuing broadly similar strategies. The Board also considered *performance in relation to the degree of risk undertaken* by the portfolio manager. The Board noted that during the past year Short Term Bond Fund underperformed its benchmark, while Intermediate Bond Fund and High Income Fund *significantly underperformed* their respective benchmarks. The Board also noted the extraordinary market developments in 2007 and the high level of net redemptions experienced by Intermediate Bond Fund and High Income Fund. The Board discussed each Fund's performance with the Adviser and discussed steps that the Adviser had taken, or intended to take, to improve each Fund's performance. The Board also determined to *monitor closely the performance of Intermediate Bond Fund and High Income Fund on an ongoing basis.*

¶ 594 (emphasis supplied). There is nothing here about whether consideration was given to the Funds' claims. The board's determination "to monitor closely the performance of [the Intermediate and High Income Funds] on an ongoing basis" suggests the board was not previously performing this basic responsibility.

Soon after renewing the MAM advisory agreement, the directors did an abrupt about-face and, after purportedly engaging in a "careful consideration" of the matter, approved a new adviser for the Funds. Ex. A. This process, which began on January 16, 2008, was not publicly disclosed. On April 21, 2008, the Old Board approved a new advisory agreement with HBAM and agreed to recommend that the Funds' shareholders approve the new advisory agreement, which they did in July 2008. *Id.* at pp. 7-8; ¶¶ 595-96.

In three densely packed pages, the proxy statement describes what the Funds' directors purportedly considered in reaching their conclusions about replacing MAM with HBAM. *Id.* at 7-9. However, nowhere do the directors address this action or the potential effect that engaging a new investment adviser and electing new directors might have on this action or the Funds' claims. *See id.* This omission led Plaintiffs in June 2008 to inquire of the New Board as to whether this issue had been addressed. ¶ 637, FADC Ex. B. In particular, counsel notified the New Board of errors in the proxy statement and requested information:

> We believe that there are many material omissions in the proxy statement, which are the basis for the requests for information contained in the letter. Among other material omissions, the statement in the proxy statement that the *Landers* derivative "complaint seeks unspecified damages" is patently misleading; the *Landers* complaint, at paragraphs 475-76, estimates the damages to the three Funds at $937.5 million. In order to advise the *Landers* plaintiffs in connection with the proposed transfer of the Funds' advisory agreements to HBAM and the election of new directors, we request that you provide the following information, in view of the absence of this and other material information in the proxy statement:
>
> . . .
>
> 4. Describe any informal or unwritten, and provide any formal or written, agreements, understanding or undertakings into which you entered with the Funds' present directors and/or Morgan Asset Management, Inc., the Funds' current investment adviser, or any of its affiliates (including Regions Financial Corporation), or any discussions with the foregoing, regarding the *Landers* derivative action.
>
> 5. Describe any assurances that the Funds' current directors or Morgan Asset Management, Inc. requested, or that you provided to the Funds' current

directors or Morgan Asset Management, Inc., that you would pursue the claims asserted in the *Landers* derivative action.

*Id.* This letter was forwarded to MAM and the Old Board. ¶ 638, FADC Ex. C. Counsel received no response; the proxy statement was not amended. ¶¶ 639-42, FADC  Ex. D.[13]

Certain of the class actions filed in late 2007 and early 2008 asserted claims against the Funds themselves under the Securities Act of 1933 § 11). ¶¶ 4, 5, 308-10, 599, 617. These actions further threatened the Funds' assets. *Id.* Nevertheless, the Old Board took no corrective action. *Id.*

In the face of knowledge they acquired by August 2006 of claims against the RMK Defendants (including themselves) and PwC, the Old Board did nothing. In the face of the 2006 knowledge and the losses suffered by the Funds in 2007 and the Funds' inability to value their portfolios, resulting in a delay in the issuance of the Funds' financial statements, they did nothing. To the contrary, they renewed the management agreement with MAM in 2007. After *Atkinson* was filed in December 2007, at the behest of MAM, these "independent directors" resolved to unload the Funds, approved a false and misleading proxy statement and refused to correct it even after being so informed, and remained steadfast in their determination to do nothing to preserve or pursue claims.

> **2.    The Old Board had actual knowledge in 2006 of the Funds' substantial investments in illiquid securities of uncertain value in violation of the Funds' investment objectives, policies and**

---

[13]       It is reasonable to infer that the refusal to make these disclosures was purposeful. HBAM paid nothing for the Funds' advisory agreement and was willing to take them over to get the advisory agreements for the closed-end funds, which had not suffered the loss in managed assets that the open-end funds had. Because the Funds were of insufficient size to profitably manage, HBAM did not want to discourage redemptions, so that it could formally liquidate the Funds and be rid of the expense of managing them. Disclosing information about a potentially valuable asset might interfere with those plans because it might lead existing shareholders to refrain from redeeming or it might lead to buying by those who perceived the Funds to be vastly undervalued (the derivative claims were not given any value). In any event, the failure to make the requested disclosures and to misrepresent the lack of information about the estimated damages misled existing shareholders as to the potential value of their shares in the Funds as they continued to redeem. ¶¶ 641, 874.

restrictions.

"Restricted" and "fair valued" securities are illiquid. ¶¶ 123-27. The SEC requires that open-end registered investment companies limit their investments in illiquid securities to no more than 15% of their portfolios. ¶ 112. At June 30, 2007, fair valued and restricted securities constituted 70%, 74% and 41%, respectively, of the IBF, HIF, and STF portfolios. ¶ 132.[14]

IBF and HIF were subject to an investment restriction that prohibited them from investing in "any security if, as a result, more than 15% of its net assets would be invested in securities that are illiquid because they are subject to legal or contractual restrictions on resale or because they cannot be sold or disposed of in the ordinary course of business at approximately the prices at which they are valued." ¶ 113. STF was subject to an even stricter restriction.[15] ¶ 114. Completely ignoring these restrictions, the RMK Defendants invested the Funds' assets in illiquid securities significantly in excess of such limitations from June 2004 through December 2007, exposing them to substantial liquidity risk. ¶¶ 115-63. The asset- and mortgage-backed securities purchased by the Funds made up a large portion of these illiquid securities. ¶ 129, 131, 147.

While the fair valued securities held by the Funds were identified for the first time in the Funds' June 30, 2007 financial statements, which were issued on October 3, 2007, the Old Board and other RMK Defendants were informed of the quantity of fair valued securities over one year earlier at the time the Funds' June 30, 2006 financial statements were issued and knew or recklessly disregarded the huge liquidity and valuation risks in the Funds' heavy investments in such securities. ¶¶ 132, 136-53, 162-71. The Funds' *2007* financial

---

[14]   These June 30, 2007 percentages combine fair valued and restricted securities. Based on the information available to Plaintiffs, percentages for fair valued and restricted securities combined cannot be calculated for any prior period. ¶ 132(a), 136-38.

[15]   The Short Term Fund was prohibited from investing more than 10% of its net assets in "(a) restricted securities, . . .and (c) securities that are not readily marketable" and represented it would not invest in any restricted securities in 2006. *Id.*

statements reported the percentages of their respective portfolios that were fair valued on June 30, *2006* as follows: IBF: 55.8%; HIF: 49.5%; and STF: 18.2%. ¶¶ 132, 136-38. From June 30, 2006 through September 30, 2007, restricted and/or fair valued or otherwise illiquid securities accounted for 57% to 87% of the IBF and HIF portfolios. ¶¶ 132, 133. From June 30, 2006 through 2007, 35% to 56% of STF's portfolio consisted of such securities, even though during that period STF could not invest more than 10% of net assets in securities "for which there is no readily available market." ¶¶ 116, 134.

Recognizing the need to maintain "liquidity and flexibility" as a "defensive tactic" in "unusual market conditions," IBF was supposed to invest in investment-grade short-term securities. Contrary to this representation, IBF failed to invest in sufficient amounts of liquid investment-grade short-term securities to maintain the Fund's requisite liquidity. ¶ 152. It was essential for the Funds, as bond funds, to maintain relatively stable NAVs to enable the Funds' shareholders to redeem their shares on demand. This was necessary to avoid precipitous changes in their NAVs, which would cause shareholders to panic and seek to redeem shares, creating a run on the Funds and forcing the Funds to sell assets at what might be disadvantageous prices. ¶ 161. Defendants now admit this is what happened. ¶ 594.

**3.      There was no decision to which the business judgment rule applied.**

There was no choice to be made in 2008 that could be protected by the business judgment presumption because the Company/Funds had no interests that were separate and apart from the interests of the Funds' shareholders with respect to whether this action should be pursued against the MK Defendants. ¶ 567.

An open-end fund is entirely different from a conventional business corporation. For example, the open-end fund has no business interests that compete or conflict with the interests of the fund's shareholders. ¶ 610. While a conventional business corporation has multiple constituencies whose interests are to be considered in deciding whether to pursue litigation against persons affiliated with the corporation, open-end funds have only one constituency—their shareholders. *Id.* While a conventional business corporation has customers

whose interests may be considered separate and apart from the shareholders' interests, an open-end fund's shareholders are also its only customers, and the fund's only function is to invest its shareholders' savings in accordance with its investment objectives, policies and restrictions. *Id.* While a conventional business corporation has its own management, the Company/Funds did not have their own officers or other employees but were managed by Defendants MAM and MK; in addition, the Funds' officers, employed by MAM or MK, were also officers of other mutual funds managed by MAM. ¶¶ 155-60, 610. Some of those other funds' interests conflicted with the Funds' interests. *Id.*   While a conventional business corporation actively carries on its business, the Funds were only passive vehicles that served solely to gather and hold assets that were managed by Defendants MAM/MK, pursuant to contracts between the Company and Defendants MAM/MK. ¶ 610.

While a conventional business corporation retains earnings and pays dividends only as the corporation's board of directors determines to pay, open-end funds pay out to their shareholders all, or virtually all, interest and dividends received on securities held by the funds, and likewise pay out all capital gains realized upon the sale of securities held by the fund. *Id.* An open-end fund does not even control its capital; while a conventional corporation's assets are not subject to being liquidated and the proceeds paid out to the corporation's shareholders upon their demand, the assets of an open-end fund are always subject to being sold, and the fund being liquidated, upon the fund's shareholders demanding redemption of their fund shares. *Id.* Any recovery herein by the Company/Funds would have, prior to the Funds' liquidation, inured directly to the benefit of the Funds' shareholders. *Id.*

Regarding whether to bring this action, the Funds had no interests in March 2008 that were counter to, or conflicted with, their shareholders' interests; whatever was in the Funds' interest was without exception also in the shareholders' interests. ¶ 611. The only conflicting interests are between the Funds and their shareholders on the one hand and the RMK Defendants on the other hand. ¶ 570. A demand would have conceded that the Old Board had a choice between suit and non-suit; in reality, there absolutely was no such choice. ¶

13

569.

### 4. The Funds are insolvent and were in a liquidating mode throughout 2008 and have since liquidated.

In March 2008, it was apparent that, as Plaintiffs alleged at that time, because of their massive losses and gross mismanagement, the Funds were no longer economically viable. Dkt. No. 1-4 ¶ 477. During the entire period after March 2008 through liquidation, the Funds did not have sufficient assets, and did not reserve sufficient assets, to satisfy their potential liabilities arising from the class actions against them. ¶¶ 5, 309-10, 616-17.[16]

The fact that HBAM paid nothing for the Funds' management contracts is compelling evidence that those contracts had become worthless, that managing the Funds could not be profitable, and that the Funds were in liquidation mode following those losses, as redemptions vastly exceeded purchases. Dkt. No. 1-4 ¶ 475; ¶¶ 2, 59, 597, 626(b)(1), 632, 641, 872.

The Company/Funds are insolvent. The Company/Funds' liabilities in the PSLRA action will substantially exceed $1.6 million. Of the aggregate decline in the Funds' aggregate net assets of approximately $1.8 billion from December 31, 2006, about half is attributable to the loss in value of the Funds' assets. ¶¶ 2, 871-75.[17]

The Funds have since been liquidated, are no longer pursuing an active business, and are on the brink of dissolution. ¶¶ 616-18; Exs. B, FADC Ex. J at  4("Following resolution of claims and liabilities and the distribution of any recovery, . . . the Board will seek to dissolve the Company under Maryland law."). The Company now exists for the sole purpose of pursuing these claims for the benefit of its potential judgment creditors in the PSLRA action. ¶ 567(c); Md. Code Ann. Corps. & Ass'ns § 3-408(b) (upon dissolution, the "corporation continues to exist for the purpose of paying, satisfying, and discharging any existing

---

[16]     The Funds were in a liquidating mode because of the substantial net redemptions. ¶ 872.

[17]     *See*, the complaint in *Atkinson v. Morgan Asset Management*, No. 2:08-cv-02694-SHM-dkv ("*Atkinson* state case"), Dkt. No. 4-3 at ¶ 541. The potential damages in the PSLRA action in Count I ¶¶ 698-706 and Count V are similar.

debts or obligations, collecting and distributing its assets, and doing all other acts required to liquidate and wind up its business and affairs"); Ex. B, Item 25 (Funds are "not engaged, or intending to engage, in any business activities other than those necessary for winding up its affairs"); ¶ 11

### C.    Plaintiffs' Efforts to Obtain Action by the Funds' Old and New Boards.

Plaintiffs repeatedly requested the New Board to preserve and pursue the derivative claims. In June 2008, Plaintiffs pointed out a misrepresentation in the proxy statement soliciting shareholder approval of the Funds' new adviser and directors and sought assurance that the derivative claims would be pursued in view of the prospective new adviser and directors. This communication was forwarded to the Old Board and MAM, but no response was received, and the proxy statement was not corrected. ¶¶ 636-44, FADC Exs. B-E; Ex. A. Remarkably, HBAM's counsel argued to the SEC staff that the disclosures requested by Plaintiffs in the proxy statement would be moot following the shareholders' meeting because the basis for Plaintiffs' questions was to obtain information to be used in deciding how to vote at the meeting, thus conceding that the requested information was omitted and also was material. ¶ 644, FADC Ex. E.

Thereafter, Plaintiffs pointed out that Regions Bank had a conflict of interest in voting Fund shares held by its trust accounts on the question of approving new directors and a new adviser. ¶ 642, FADC Exs. A, D. Counsel also noted that the Old Board was subject to the same conflict of interest as Regions Bank was later found by the Alabama probate court to have. *Id.*[18] Plaintiffs' counsel received no response to this letter. ¶ 643.

---

[18]    Plaintiffs' counsel stated: "Clearly, if Regions Bank has a conflict with respect to evaluating and pursuing the class actions in light of the claims asserted against Regions Bank and its affiliates, MAM and Morgan Keegan Select Fund's current directors likewise have such a conflict with respect to both the class and derivative actions, in light of the claims asserted against them. Further, such a conflict extends to the proposed transaction with HBAM and the election of the new directors, since these are matters that are being recommended by MAM and the current directors. However, this conflict was not disclosed in the proxy statement. This conflict should preclude RMK Trust from voting its trust account

Upon learning in February 2009 that HBAM had filed a preliminary proxy statement to seek approval of the Short Term Fund's shareholders to liquidate that fund, Plaintiffs' counsel wrote the SEC to point out that the proxy statement omitted any reference to the pendency of this action or the effect the proposed liquidation would have on the maintenance thereof and that any liquidation should be structured so as to preserve and pursue the derivative claims. ¶ 646. In the course of discussing these points with the Funds' counsel, the Funds' counsel advised Plaintiffs' counsel that he did not have the complaint, and a copy thereof was furnished to him on February 25, 2009. ¶¶ 647-49.

In April 2009, Plaintiffs' counsel spoke with and wrote to the Funds' counsel about a new proposal to liquidate all three Funds. The proposal was disclosed in a prospectus supplement dated April 1, 2009 and included disclosures responsive to the February comments by Plaintiffs' counsel, including measures to be taken to preserve the derivative claims following the liquidation. Ex. CC. As a result, the proxy statement and plan of liquidation addressed the key issues raised by Plaintiffs' counsel regarding preserving the derivative claims and providing a mechanism for collecting and distributing any recovery from this derivative action. ¶¶ 651-52, FADC Ex. J at 2, 4.

**D.     The Funds' Conflicted Board.**

At the time this action was commenced, the Company's Board did not have a majority of non-conflicted directors capable of disinterestedly deciding whether to pursue this litigation against themselves and the other Defendants. ¶¶ 566-76.

**1.     The entire board was disabled by its conflicting interests.**

In March 2008, the Company/Funds' entire board was not disinterested because of conflicting fiduciary loyalties and an inability to fairly and objectively discharge their fiduciary responsibilities to the Company/Funds. ¶¶ 571-604. Regions Bank, which is not a defendant herein but is a defendant in the shareholders' class actions referenced above, recog-

---

shares at the July 11 shareholder meetings." *Id*. at pp. 1-2.

nized a conflict between its interests as a defendant, or an affiliate of the MK Defendants, in those actions and its duties as a fiduciary for its trust and other fiduciary accounts that purchased the Funds' shares. Regions Bank petitioned an Alabama probate court for an order appointing a trustee *ad litem* for its trusts to participate in the class actions and take any appropriate actions on behalf of those accounts. That probate court granted Regions Bank's petition, finding that "Regions Bank has an apparent or actual conflict of interest in the evaluation and pursuit of the Class Actions and the possible assertion of other claims concerning the Funds against Morgan Keegan & Co., Morgan Asset Management, Inc., and other affiliates of Regions Bank." ¶¶ 581-85; FADC Ex. A. Just as Regions Bank understood it could not discharge its fiduciary responsibilities to its beneficiaries, so too the Funds' former directors were not able in March 2008 to discharge their fiduciary duties to the Funds in connection with any demand that might have been made. ¶¶ 586-88.

The Old Board's members are also defendants in the PSLRA class actions pending in this Court. Defendants are liable for omissions and misrepresentations to the shareholders in the Funds. ¶¶ 308-44. Directors facing liability in a related class action cannot be disinterested where bringing a derivative action against themselves is likely to aid the plaintiffs in the class action in establishing the directors' liability therein.[19]

The Funds' directors in March 2008 faced conflicting loyalties between the Funds and the 15 other RMK funds of which they were also directors and which had MAM as

---

[19] *See In Re: UnitedHealth Group Incorporated Shareholder Derivative Litig.*, United States District Court, District of Minnesota, Master File No. 06-1216 JMR/FLN, Affidavit of the Honorable Kathleen A. Blatz and Report of the Special Litigation Committee, December 6, 2007 ("The SLC has determined that it would be contrary to the Company's best interests to set forth detailed factual findings regarding the claims asserted in the Derivative Actions, as the Company is subject to ongoing federal securities fraud actions involving similar allegations."), Ex. Q (Dkt. No. 350 at pp.15, ¶ 31; 39). That a special litigation committee with no personal exposure declined to make findings out of a concern that such findings would aid plaintiffs in their class action against the company is evidence of the inability of directors who do have personal liability to fairly consider a demand that they sue themselves.

their adviser. As directors of those funds, they also owed them a fiduciary duty to act solely in the best interests of those funds and their shareholders. ¶ 580. The Funds' officers were also officers of the other 15 funds. *Id.* All 15 of those funds were also managed by MAM/MK and were audited by PwC. *Id.* It would not have been in the best interests of those funds and their shareholders for their investment adviser, distributor and auditor to be sued by the Funds. *Id.* In determining whether to bring this action, the Old Board was faced with an irreconcilable conflict between the interests of the Company/Funds and their share-holders and the interests of the other RMK funds and their shareholders. *Id.*

The Funds' directors were selected by MAM. *Id.* The Funds' directors were entirely insulated from shareholder influence. *Id.* The Funds had no annual shareholder meetings at which the shareholders could remove directors. *Id.* The Funds' directors selected their re-placements and filled any board vacancies. *Id.*[20] All but one of the Funds' five purportedly "independent" directors owned none to insignificant dollar amounts of the Funds' shares but held significantly greater investments in the other Funds in which they were directors. In addi-tion, their significant compensation substantially exceeded their investments in the Funds. ¶¶ 55-58, 570, 572. Thus, a minimal to non-existent portion of these purportedly independent di-rectors' personal assets was at risk in the Funds, and their preoccupation with the other RMK funds led them to fail to devote the attention to the Funds that was required in view of the Funds' unique risks and uncertainties , as compared with the other RMK funds. ¶ 573.

### 2.   A majority of directors was conflicted in March 2008.

---

[20]    The Old Board's liability herein likely substantially exceeds the amounts for which they are insured. The Funds' directors and officers liability insurance coverage likely pro-hibits directors from bringing suits against each other. Thus, if the Old Board caused the Company to sue themselves, they would not be insured for that liability. They could not rea-sonably be expected to do this to themselves. The Company's officers and directors liability insurance was purchased and paid for with funds belonging to the Funds for the protection of the Funds. However, this derivative action does not trigger the "insured versus insured" exclusion; therefore, only this derivative action can obtain a recovery from the Funds' offi-cers and directors insurance. ¶ 580.

Of the Company/Funds' six directors in March 2008, one (Alderman) is admittedly not independent or disinterested. ¶¶ 30, 574. Of the remaining five, two were personally conflicted. Defendant McFadden had a significant banking and business relationship with Regions, which, *prima facie*, precludes him from being viewed as independent. McFadden Communications, of which McFadden is a majority owner, had borrowed approximately $2.3 million from Regions Bank and financed its equipment with Regions Bank; from January 1, 2005 through June 30, 2007, it derived $2.46 million from sales of its services to Regions, which represented 5.0% of its revenue. ¶¶ 33, 575(a).

Defendant Stone, a Certified Public Accountant, was conflicted and not disinterested because of her need to protect her professional and academic reputation. She holds prestigious academic positions in accounting at the University of Alabama. One of her fellow professors holds a position contributed by PwC. She held or holds significant professional positions and is widely published in accounting journals. Because Stone's professional stature is dependent upon maintaining a distinguished reputation and because accounting and auditing issues are key to this case, she risks serious harm to her professional and academic reputation if the allegations are proven. Because of her expertise, she cannot hide behind a good faith defense or reliance on experts and thus is deprived of a defense typically asserted by directors. ¶¶ 35, 346-529, 575(b).

## II.   FACTS RELATING TO FAILURE TO STATE A CLAIM

### A.   The Derivative Claims against the Old Board and Officers Are Supported by Detailed Factual Allegations.

Defendants bizarrely suggest the FADC consists of nothing but "conclusory allegations." It does not.[21]

---

[21]   Directors' Br. at 9-10; Officers' Br. at 6. Plaintiffs allege, "*By their conduct*, the Individual Fiduciary Defendants did not act in good faith but intentionally, in bad faith, with gross negligence or reckless disregard of their duties and of the *information readily available to them regarding the manner in which the Funds were being managed*, engaged in the waste of the Funds' assets and, in so doing, breached their fiduciary duties, as alleged herein." ¶ 730 (emphasis supplied). This allegation, which Defendants label conclusory, is

From June 2004 through 2007, the RMK Defendants, including the Old Board, all of whom had knowledge of these matters, mismanaged the Funds and wasted their assets by ignoring the liquidity, valuation, credit, concentration and leverage risks inherent in the thinly traded structured financial instruments in which they invested. ¶¶ 198-231, 250-310. As a result, the RMK Defendants failed to maintain the Funds' liquidity and NAV stability, as they represented they would and as they were required to do. ¶¶ 132-71, 191-97. The RMK Defendants also misled the Funds' shareholders about the risks embedded in the Funds. ¶¶ 311-44. Notwithstanding their knowledge of the Funds' violations of their respective investment objectives, policies and restrictions, Defendants did nothing to correct the RMK Defendants' (including the Old Board) mismanagement; nor did they do anything to preserve and pursue these claims.[22]

The Funds' risks resulting from Defendants' gross mismanagement materialized in the fall of 2007 and caused enormous losses: the three Funds' total net assets dropped from $2.2 billion at December 31, 2006, to $372.5 million at December 31, 2007, approximately half of which decline is attributable to the loss in the values of the Funds' investments; the balance was attributable to net redemptions. The net asset value per share of STF, IBF and HIF dropped 23%, 70% and 72% respectively during 2007. The direct cause of these losses was these Funds' exposure to vastly higher credit, concentration, liquidity and valuation risks than their respective peers. ¶¶ 2, 3, 67-111, 232-49, 872.

Plaintiffs allege a multitude of specific facts supporting the Funds' claims against the Old Board and officers relating to the Funds' stated investment policies and restrictions (¶¶ 67-95), the Funds' NAV losses and estimated damages (¶¶ 67-77, 872-74), their performance compared to their respective peers (¶¶ 71, 96-111), the RMK Defendants failure to limit the Funds' investments in illiquid securities (¶¶ 112-63), the Funds' speculative net

---

preceded by 713 paragraphs of detailed allegations.

[22]     ¶¶ 4(c), 40-43, 61-66, 132-63, 167-71, 179-90, 390-92, 401-07, 431-36, 465-66, 476-81, 599-603, 812; PwC Br. at 13-15.

asset values (¶¶ 164-90), the RMK Defendants failure to maintain stable net asset values for the Funds (¶¶ 191-97), the RMK Defendants failure to limit the Funds investments in a single industry, avoid risky concentrations, and misrepresented asset types (¶¶ 198-218), the undisclosed use of risky leverage (¶¶ 219-31), how the Funds' extraordinary concentration, liquidity and valuation risks caused the Funds' losses  (¶¶ 232-49), the extraordinary credit risks inherent in the asset- and mortgage-backed securities purchased by the Funds (¶¶ 260-78), Kelsoe's understanding that these securities were illiquid (¶¶ 291-96), the concern of certain MK officials about Kelsoe's management of the Funds, which was quashed by MK's chief executive officer (¶¶ 279-88), and Regions' foreseeing the subprime debacle (¶¶ 250-59).

The Old Board owed the Funds and their shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were required to use their utmost ability to manage the Company/Funds in a fair, honest, and equitable manner and to protect and preserve the Funds' assets. ¶¶ 531-32. The Old Board's responsibilities are alleged in detail. ¶¶ 534-36.[23]

---

[23]     The Old Board was required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company/Funds and the management thereof by MAM/MK and the Funds' officers. ¶ 534. This included the exercise of good faith and due care (i) in ensuring that the Funds' assets were managed by the Funds' officers and MAM/MK in a manner that complied with the Funds' investment objectives, policies, restrictions, and representations to the Funds' shareholders and with all applicable federal and state laws and regulations; (ii) in ensuring that the Funds were not managed in a manner that exposed them to risks not contemplated by their respective investment objectives, policies, restrictions, and representations to the Funds' shareholders; (iii) in supervising the preparation, filing and dissemination of financial statements, press releases, audits, reports or other information required by law, (iv) in evaluating any reports of examinations, audits, or other financial information concerning the Funds' financial condition; and (v) in ensuring that the Company's financial statements were prepared in accordance with generally accepted accounting principles ("GAAP"). *Id.* Plaintiffs further allege that the Old Board was responsible for maintaining and establishing an internal accounting control structure to ensure that the Funds' financial statements were based on accurate financial information, as required by GAAP. ¶¶ 535-36. They were also responsible for maintaining and establishing adequate risk management for the Company/Funds to ensure that the risks being assumed by

From at least August 2006, Defendant officers and directors knew (i) the nature of the risks being assumed by an investment in the Funds, (ii) the extent to which the Funds' portfolios contained securities that were illiquid or exhibited the characteristics of illiquid securities that were at great risk of suddenly becoming unsalable at their estimated values, (iii) the extent to which the Funds' portfolios were subject to fair value procedures, (iv) the extent to which the values of such securities, and, consequently, the net asset values of the Funds, were based on speculative estimates of value and the uncertainty inherent in such speculative values, and (v) the concentration of investments in a single industry. ¶¶ 124-51, 167-231. PwC acknowledges these matters have been adequately alleged.[24]

**B.    The Derivative Claims against the MK Defendants Are Permitted by the Funds' Articles of Incorporation and Advisory Agreement.**

The claims against the RMK Defendants are based on their knowledge of their mismanagement, gross negligence, or reckless disregard. ¶¶ 41-43, 61-66, 151, 167-71, 189-90, 244(c), 248, 730-31, 744-45, 804-08. Neither the Funds' Articles of Incorporation nor the Advisory Agreement between the Company and MAM precludes the claims asserted against the RMK Defendants. ¶¶ 691-704, 749-58. MK no longer asserts exculpation as a defense.

## ARGUMENT

Amidst the plethora of Defendants' irrelevant arguments and mischaracterizations of the FADC, three things stand out that strongly support Plaintiffs regarding both demand and Defendants' motion to dismiss for failure to state a claim: (i) MK's apparent conclusion that it is not entitled to dismissal of the breach of contract claim and its abandonment of the exculpatory defense that it previously asserted regarding all of the claims against it; (ii)

---

the Funds as a result of how their assets were managed by MAM were consistent with the Funds' respective stated investment objectives, policies, restrictions and representations made to the Funds' investors. *Id*

[24]    According to PwC, Plaintiffs sufficiently allege the Funds' officers and directors had actual knowledge of these matters sufficient to inform them of the Funds' mismanagement and the Funds' potential claims therefor as of August 2006. PwC Br. at 13-15.

PwC's assertions that Plaintiffs have adequately alleged RMK Defendants had knowledge in August 2006 of their mismanagement of the Funds as a result of their violations of the Funds' investment objectives and restrictions, PwC's deficient 2006 audit, the Funds' defective 2006 financial statement disclosures, the Funds' resulting injury, and that the Funds' portfolios were so illiquid as of June 30, 2006 that they were overvalued; and (iii) MAM/MK, and the individual Defendants join in PwC's assertion that the FADC alleges their knowledge of their mismanagement of the Funds.

The fact that Defendants' demand arguments consist of little more than formulaic recitals of broad general legal principles (e.g., demand is required; demand is rarely excused) is telling; none of the cases cited by Defendants singly or altogether addresses the aggregate of these "*particular*" facts and circumstances: the abandonment of the nominal corporate defendant by its directors and management and its subsequent liquidation, leaving as the only persons with interests in the corporation its former shareholders as potential judgment creditors in a parallel class action, allegations deemed by a Defendant to adequately allege knowing and actionable misconduct by its co-Defendants, and, during the almost two years the action has been pending, the only demonstrable investigation has been that done by Plaintiffs. Nor do Defendants' cases involve the magnitude of gross mismanagement and wrongful conduct alleged herein. The magnitude of these very particular facts clearly demonstrates demand was excused. *See Werbowsky v. Collomb,* 766 A.2d 123, 144 (Md. 2001) (where a plaintiff alleges facts that "clearly demonstrate, in a very particular manner" that a demand would have caused irreparable harm or the directors could not have reasonably been expected to respond to a demand in good faith and within the ambit of the business judgment rule, demand is excused).

I.   **DEMAND IS IRRELEVANT IN THIS CASE.**

   A.   **Purpose and Use of the Derivative Action; the Limits of the Business Judgment Rule**

As the Supreme Court recognized in *Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 95-

96 (1991), "the purpose of the derivative action [is] to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers.'" "This remedy, born of stockholder help-lessness, was long the chief regulator of corporate management and has afforded no small incentive to avoid at least grosser forms of betrayal of stockholders' interests. It is argued, and not without reason, that without it there would be little practical check on such abuses." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 548 (1949).

The shareholders' derivative action is an equitable device that enables shareholders to enforce a corporate right that the corporation fails to assert on its own behalf, including the recovery of losses occasioned by grossly negligent misconduct on the part of the corporate directors or officers. *Werbowsky,* 766 A.2d at 133. The derivative action serves as a check on the power of the directors and permits an individual shareholder to bring "'suit to enforce a corporate cause of action against officers, directors, and third parties'" where those in control of the company refuse to assert a claim belonging to it. *Bender v. Schwartz*, 917 A.2d 142, 152 (Md. Ct. App. 2007) (citations omitted).

Restrictions on derivative actions are intended to protect the board's prerogatives and discourage frivolous "strike suits" "to coerce nuisance settlements." *Werbowsky,* 766 A.2d at 133-34, 138, 144. Because MK does not seek to dismiss the breach of contract claim against it and Plaintiffs allege that the Funds collectively lost almost one billion dollars as a result of the RMK Defendants' mismanagement of the Funds, this is not a meritless "nuisance strike suit," and the purposes sought to be achieved by such restrictions are not relevant here.[25]

---

[25] Plaintiffs, unlike those in *Werbowsky*, are not holders of a mere handful of shares and are not "professional" plaintiffs. 766 A.2d at 144 n.11. Plaintiffs herein collectively invested $2.3 million in the Funds and held 150,000 shares at the commencement of this action. ¶¶ 12-15. That these are matters of substance is evidenced by the SEC's interest in this litigation. The SEC staff has requested information related to the class action lawsuits filed in late 2007 and early 2008 alleging that investors were misled about the Funds' investment activities. Regions Financial Co., Form 10-K (Feb. 27, 2008) at 17. Ex. R. On July 9, 2009, Re-

The demand requirement is a corollary to the business judgment rule, which is predicated on "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Werbowsky,* 766 A.2d at 138 (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)). The business judgment rule has limits. The rule is only a presumption that the decisions of corporate directors were properly made, but liability exists for gross negligence, waste of corporate assets, or culpable negligence. *Edge Partners, L.P. v. Dockser*, 944 F. Supp. 438, 442 (D. Md. 1996); *Billman v. State Deposit Ins. Fund Corp*., 593 A.2d 684, 698  (Md. Ct. Spec. App. 1991) ("There is liability for gross negligence in exercising business judgment," citing *Parish v. Maryland and Virginia Milk Producers Assn*., 242 A.2d 512 (Md. Ct. App. 1968),cert. denied, 404 U.S. 940 (1971)).

Before bringing a derivative suit under Maryland law, a shareholder must either make a demand on the board of directors that the corporation bring the suit or show that demand should be excused as futile. *Werbowsk*y, 766 A.2d at 133. A demand is futile when the allegations demonstrate that (1) delay in waiting for a response to the demand "would cause irreparable harm to the corporation;" or (2) "a majority of the directors are so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule." *Id.* at 144.

---

gions received a "Wells notice" relating to a possible SEC enforcement action related to certain mutual funds formerly managed by MAM. Ex. S. Directors in a substantially similar situation have been sanctioned by the SEC. In *Heartland Advisors, Inc., et al.*, Release Nos. 33-8884, 34-57206, IC-28136 (Jan. 25, 2008) (Ex. T), the SEC found that the Heartland Funds' independent directors violated the Securities Act of 1933 because they (1) failed both to monitor adequately the liquidity of bonds in the funds' portfolios and to assure the continued liquidity of the bonds to meet shareholder redemption requests; and (2) failed in their responsibility to participate meaningfully in the valuation of the funds and ensure that the funds' securities were priced at fair value. PwC was the Heartland Funds' auditor.

Although *Werbowsky* declined to adopt the *Aronson* two-prong test[26] for demand futility, the *Werbowsky* test resembles *Aronson* in that the second part has two prongs, the first focusing on conflicted interests (*Aronson* uses the term "disinterested") and the second on how committed the directors are to the decision in dispute. *Werbowsky* differs from *Aronson* in that *Werbowsky* incorporates good faith and the business judgment rule into both prongs. As formulated, the *Werbowsky* test addresses an affirmative decision by the board, which is what the *Werbowsky* court was addressing, not, as here, board inaction in the face of actionable knowledge of its own and management's wrongful conduct.

Maryland law requires a "practical" and "common sense" inquiry into the issue of whether a demand upon directors would be futile. *Grill v. Hoblitzell*, 771 F. Supp. 709, 711-12 (D. Md. 1991). In determining futility, *Werbowsky* held that a court may consider the allegations (i.e., facts known to the plaintiff at the time the derivative action is brought) *or* evidence (facts learned by plaintiff that are relevant to demand, regardless of when those facts arose) offered by plaintiff.[27] *Werbowsky*, 766 A.2d at 620; *see also Danielewicz v. Arnold*, 769 A.2d 274, 292 (Md. Ct. App. 2001). *Werbowsky* makes clear the Court can hold an evidentiary hearing to determine the demand futility issue, taking into account both alleged facts and evidence. 766 A.2d at 145.

**B.      Demand Is Not Required as to either the Old or New Boards.[28]**

---

[26]      *Aronson v. Lewis*, 473 A.2d at 814.

[27]      Contrary to MAM/MK (Br. at 8 n. 6, citing cases that do not apply Maryland law), there is nothing in *Werbowsky* that precludes evidence beyond the facts alleged to determine whether demand is excused.

[28]      With reference to MAM/MK's assertion that "the "balance of Plaintiffs' demand futility allegations [that] have been rejected by courts considering demand futility under Maryland law" and the following text (MAM/MK Br. at 4-12), none of the cases cited by MAM/MK applying Maryland law found demand was not futile on these facts (an insolvent corporation whose board and management abandoned it after the derivative action was brought and that has since been liquidated, *ultra vires* conduct, the business judgment factors pertinent to an open-end fund, and the applicability of business judgment to conduct that is fraudulent, incompetent or in bad faith).

26

**1.     Demand is not required where the challenged conduct was fraudulent, incompetent or in bad faith, as the business judgment rule does not apply**.

Maryland justifies the business judgment rule on the notion that "courts will not interfere in the internal affairs of a corporation." *Black v. Fox Hills North Community Ass'n*, 599 A.2d 1228, 1231 (Md. Ct. Spec. App. 1992). However, this deference does not extend to cases "of fraud, dishonesty or incompetence." *Id.* (citation omitted); *see also Froelich v. Erickson*, 96 F. Supp. 2d 507, 520 (D. Md. 2000) (same); *Wittman v. Crooke*, 707 A.2d 422, 425 (Md. Ct. Spec. App. 1998) (same); *Yost v. Early*, 589 A.2d 1291, 1298 (Md. 1991); *Werbowsky*, 766 A.2d at 144 (directors presumed to act properly, and their control of corporate affairs should not be impinged upon based only on non-specific or speculative allegations of wrongdoing). In this case, however, the FADC is replete with allegations of fraud (including material omissions[29]), bad faith and incompetence. ¶¶ 146, 149, 152, 167-72, 176-78, 181, 191-97, 208-09, 213-17, 219-29, 270-74, 279-88, 311-44, 626.[30]

In the May 20, 2008 proxy statement soliciting shareholder proxies for the election of the Funds' new directors and adviser, the Old Board misrepresented the damages being sought in this action; thus, the Old Board cannot be said to have acted on an informed basis. ¶ 626(a); *Werbowsky*, 766 A.2d at 138-39 (to avail themselves of the business judgment rule, directors have a duty to inform themselves of all material information reasonably available to them). The Old Board obdurately ignored Plaintiffs' demand that the proxy statement be corrected to disclose the estimated damages herein.

**2.     Demand is not required where the challenged conduct is *ultra vires***.

---

[29]     "It is well established that actionable fraud may result from the concealment of material facts as well as from the false statement of material facts." *Parish*, 242 A.2d at 539.

[30]     This Court has held, in a related action against the same Defendants and based on similar allegations and claims, that "allegations of omissions or other deceitful activity are irreparably interwoven throughout Plaintiffs' causes of action." *Atkinson* state action, Dkt. No. 29 at 20. Plaintiffs have appealed the Court's decision in the *Atkinson* state action, contending the Court's conclusion that allegations of misrepresentation and omission do not result in SLUSA preclusion of claims (e.g., breach of contract) not dependent upon deceit.

Like fraud and bad faith, *ultra vires* conduct is also not protected by the business judgment rule. *Moran v. Household Int'l, Inc*., 500 A.2d 1346, 1350 (Del. 1985) (transactions beyond the powers explicitly conferred by the articles of incorporation do not constitute an exercise of valid business judgment). "A decision by directors that a violation of law or fraudulent or ultra vires conduct would serve the best interests of the corporation is not protected by the business judgment rule." *Goldstein v. Lincoln Nat'l Convertible Secs. Fund, Inc*., 140 F. Supp. 2d 424, 437 (E.D. Pa. 2001).

Maryland law is the same. *Sadler v. Dimensions Healthcare Corp.*, 836 A.2d 655, 665 (Md. 2003) (a corporation's management is subject to judicial scrutiny in cases of fraud or *ultra vires* activity); *Murray-Baumgartner Surgical Instr. Co. v. Requardt*, 23 A.2d 697, 699-700 (Md. 1942) (same regarding cases of illegal conduct); *Williams v. Salisbury Ice Co*., 176 Md. 13, 26 (Md. 1939) (same). *See also Swanson v. Traer*, 354 U.S. 114, 116 (1957); *Gearhart Industries, Inc. v. Smith International*, 741 F.2d 707, 721 (5th Cir. 1984); *see* 7A Fletcher Cyc. Corporations § 3399 (*ultra vires* contracts are those outside the express or implied powers of the corporation as fixed in its charter, statutes, or common law).

Where the challenged conduct is *ultra vires*, demand is excused. *In re Nuveen Fund Litig.,* 1996 U.S. Dist. LEXIS 8062, at *17 (N.D. Ill. June 11, 1996) ("if a plaintiff pleads particularized facts that raise a reasonable doubt that the challenged conduct was *ultra vires,* then he or she has satisfactorily pled futility") (Ex. C).[31] The Old Board lacked and the New Boards lacks the ability to ratify or otherwise approve the *ultra vires* actions of the former board and consequently the power to dismiss or control this derivative action. "[I]t would be inappropriate to rely upon directors to determine whether the corporation should pursue an action that challenges their conduct as ultra vires." *Id.*, at *16. *See Cal. Pub. Emples. Ret. Sys. v. Coulter*, 2002 Del. Ch. LEXIS 144 (Del. Ch. Dec. 18, 2002) (demand excused relat-

---

[31]   In *Nuveen*, the plaintiffs challenged the issuance of rights to purchase shares of two closed-end funds' new stock at a price below the funds' net asset value per share in violation of the funds' articles of incorporation. 1996 U.S. Dist. LEXIS 8062, at *4-*5.

ing to the repricing of outside directors' options; any action of the board that falls outside the broad scope of its authority is not entitled to the protection of the business judgment rule, excusing demand) (Ex. D); *Lewis v. Hett*, 1984 Del. Ch. LEXIS 546, at *9-11 (Del. Ch. September 4, 1984) (demand excused where complaint alleged adoption of severance package was *ultra vires* and could not be the product of valid business judgment) (Ex. E); *Ryan v. Gifford*, 918 A.2d 341, 354-55 (Del. Ch. 2007) (where director defendants were alleged to have violated a shareholder-approved option plan, demand on the board would have been futile and thus was excused where the allegations showed a reason to doubt whether the challenged transactions were a valid exercise of business judgment).

The RMK Defendants' conduct was *ultra vires*. ¶¶ 613-15. While the Old Board failed to act in the face of actionable knowledge that the Funds were being mismanaged, the directors also participated directly in the fair valuation of the illiquid exotic securities in which the Funds invested.[32] These investments violated the Funds' respective investment objectives, policies and restrictions.[33]

The Advisory Agreement required that MAM manage each Fund "in accordance with each [Fund's] investment objective, policies and limitations as provided in its Prospectus and Statement of Additional Information." [34] ¶¶ 16, 691. The Advisory Agreement bound MAM and the Funds' directors to adhere to the restrictions on the Funds' investments described in the prospectuses and statements of additional information. Thus, in failing to adhere to the Funds' investment objectives and restrictions, the Funds' directors and management both breached the Advisory Agreement (¶¶ 698-99) and failed to adhere to limits im-

---

[32]    ¶¶ 126, 165-65, 324, 368 (2.36, 2.38), 371, 386, 406-09, 414-18. The illiquidity of a security and the need to fair value such security are interrelated. ¶¶ 123-90, 399-402.

[33]    ¶¶ 112-231, 244, 313, 316, 318, 323, 326, 456, 489-90, 516, 520, 698-99, 729, 742.

[34]    The ICA requires that registered investment companies be managed in accordance with their investment objectives, which, along with the Advisory Agreement, cannot be changed without shareholder approval. 15 U.S.C. §§ 80a-13, 15.

posed on their authority by the Funds' shareholders. Thus, the Funds' shareholders are able to challenge this *ultra vires* conduct in a shareholders representative action.[35]

> ### 3. Demand was not required because the Funds were defendants in a class action brought on behalf of the Funds' former shareholders, were not economically viable and have since been liquidated.

In March 2008, because of their catastrophic losses and gross mismanagement, the Funds were no longer economically viable. The Funds were in liquidation mode following those losses. The New Board owes a fiduciary duty to the Funds' prospective judgment creditors, and its members risk personal liability if they should fail to pursue these derivative claims. The Old Board likewise owed a fiduciary duty to pursue these claims, and its members risked personal liability if they sought to dismiss them. Accordingly, the business judgment rule does not apply.

> #### a. Under Maryland law, the Old and New Board's members were and are trustees for the Funds' creditors.

The New Board has no authority to seek the dismissal of this action. When a Maryland corporation is voluntarily dissolved, and until a court appoints a receiver, "Directors become trustees" and "the business and affairs of the corporation shall be managed under the direction of the board of directors solely for the purpose set forth in § 3-408(b)." Md. Code Ann. Corps. & Ass'ns § 3-410(a). The New Board must "[c]ollect and distribute the assets, applying them to the payment, satisfaction, and discharge of existing debts and obligations of the corporation." *Id.* at § 3-410(b)(1). When a corporation becomes insolvent, or is in a failing condition, the officers and directors no longer represent the stockholders, but by the fact of insolvency, become trustees for the creditors. *Federal Deposit Ins. Corp. v.*

---

[35]  Maryland Code, Corporations and Associations, § 1-403(a) provides that a corporation's act is not invalid or unenforceable *solely because* the corporation lacked the power or capacity to take the action, unless the lack of power or capacity is asserted in an action described in this section. Section 1-403(c) provides that *ultra vires* can be raised in a representative suit brought by a stockholder against the corporation's present or former officers or directors. ¶ 846.

*Sea Pines Co.*, 692 F.2d 973, 977 (4th Cir., 1982) (citing *Alexander, et al v. Hillman*, 296 U.S. 222, 56 S. Ct. 204 (1935)); *see also Pritchard v. Myers*, 197 A. 620, 625 (Md. 1938) (insolvent corporation contemplating the liquidation of its affairs, its directors become bound as trustees for all the creditors and stockholders, and must so use, conserve, and apply the corporate property). If the corporation or its receiver refuses to enforce the liability of the directors or managers for their negligence or wrongful conduct, the stockholders or creditors may institute the suit. *Id.* at 626.

The Funds have distributed to their shareholders the proceeds from the sale of all of their investment assets that could be liquidated, without reserving any significant cash for any judgments that may be obtained against the Company/Funds in the PSLRA action. ¶ 309; Ex. B, Item 20(a) (less than $1.6 million was reserved for all three Funds).[36] The Funds' only assets with which to satisfy a judgment against them in the PSLRA action under the Securities Act, under which the liability of the Funds is absolute, are the assets represented by the Funds' derivative claims asserted herein. ¶¶ 309, 617; 15 U.S.C. § 77k(b), *Herman & MacLean v. Huddleston,* 459 U.S. 375, 381-82 (1983) (a plaintiff need only show a material misstatement or omission in the registration statement to establish his prima facie case; liability against the issuer of a security is virtually absolute, even for innocent misstatements.).

The Maryland Uniform Fraudulent Conveyance Act provides: "Every conveyance made and every obligation incurred by a person who is or will be rendered insolvent by it is fraudulent as to creditors without regard to his actual intent, if the conveyance is made or

---

[36]   Given the clear duty owed by the New Board's members to the Funds' creditors, they risk personal liability if they are spending this $1.6 million trying to decide whether to pursue claims they have a duty to pursue under Maryland law for the benefit of the creditors, especially in view of the fact that claims are wasting assets as memories fade and documents disappear. How would a court view a bankruptcy trustee that for almost two years did nothing to pursue the bankrupt estate's claims?

the obligation is incurred without a fair consideration." Md. Commercial Law § 15-204.[37]
The Fourth Circuit has held that when a corporation becomes insolvent, the fiduciary duty
of the directors shifts from the stockholders to the creditors. *Federal Deposit Ins. Corp. v.
Sea Pines Co*., 692 F.2d 973, 976-77 (4th Cir. 1982).

A conveyance by virtue of which a debtor is left with liabilities only renders the
debtor insolvent and is fraudulent as to creditors. *Damazo v. Wahby*, 305 A.2d 138, 143
(Md. 1973). The legal effect of a debtor's voluntary transfer of property is that, without ref-
erence to the actual intent of the debtor, it is a *prima facie* fraud on creditors, and any such
conveyance is *prima facie* invalid as against existing creditors of a debtor that has no suffi-
cient means to pay its debts. *Lacey v. Van Royen*, 267 A.2d 91, 97 (Md. 1970); *Lutherville
Supply & Equip. Co. v. Dimon*, 192 A.2d 496, 498 (Md. 1963) (same).

The interests of the Funds' creditors are superior to those of other persons, if any, who
may have an interest in the Funds. *See In re Bowman*, 181 B.R. 836, 843 (Bankr. D. Md.
1995) (debtor had fiduciary duty to act in creditors' best interests where debtor's and credi-
tors' interests were in direct conflict regarding whether to accept a settlement or to wait and
gamble on a potential to receive a greater recovery through litigation); *see also In re Tel-Net
Hawaii, Inc*., 105 Bankr. 594, 595 (Bankr. D. Hawaii 1989).

The New Board previously represented that the derivative claims would be pursued.[38]
The New Board's equivocation about whether that is really what they meant is grounds for

---

[37]      "Fair consideration is given for property or an obligation, if: (1) in exchange for the
property or obligation, as a fair equivalent for it and in good faith, property is conveyed or
an antecedent debt is satisfied . . . ." *Id.* § 15-203; *Kingsville Dodge, LLC v. Almy*, 2007 U.S.
Dist. LEXIS 59131 (D. Md. July 30, 2007) (Ex. U).

[38]      "In the event that claims held by the Company or the Funds *are found to have merit
and the Funds receive a recovery*, such recovery will be retained as an asset of the Funds
pending the resolution of other claims and liabilities." FADC Ex. J (May 1, 2009 proxy
statement) at 4 (emphasis supplied). The emphasized text is reasonably interpreted to mean
"found *by a court* to have merit" as a result of which the Funds would "receive a recovery."
Only courts produce recoveries, not directors.

seeking attachment.[39]

### b. The New Board owes, and the Old Board owed, a fiduciary duty to the Funds' shareholders as creditors.

Interpreting a Texas statute similar to Maryland. Code Corporations & Associations § 3-410, the Fifth Circuit Court held directors/trustees "have the right and are charged with the duty of defending and maintaining suits in the protection of the assets of the corporation" without regard to whether the corporation continues. *Oklahoma Contracting Co. v. Commissioner*, 153 F.2d 770, 772 (5th Cir. 1946). When a corporation is insolvent or is in declining circumstances verging on insolvency, or where a corporation's circumstances are such as to practically amount to dissolution, the corporation's directors owe a fiduciary duty to the corporation's creditors. *Angell v. Kelly*, 336 F. Supp. 2d 540, 551 (M.D.N.C. 2004).[40]

---

[39]    Pursuant to Fed. R. Civ. P. 64, the PSLRA plaintiffs action can seek to attach the Funds' assets. Under Tennessee law, a plaintiff may attach a defendant's property before judgment where the debtor or defendant has fraudulently disposed of, or is about to fraudulently dispose of, the property. Tenn. Code Ann. § 29-6-101. *See Wilson v. Bryant*, 67 S.W.2d 133 (Tenn. 1933) (defendant's statement that he was going to sell everything and leave town, so that if plaintiff got a judgment he would be able to collect nothing, was sufficient to sustain a verdict for plaintiff based on concealment of property.).

[40]    *See also Mechanics Universal Joint Co. v. Culhane*, 299 U.S. 51, 57 (1936) (knowing that the bank was in imminent danger of closing, it was a director's duty to conserve the assets for the benefit of all unsecured creditors); *Davis v. Woolf*, 147 F.2d 629, 633 (4th Cir. 1945) (applying the principle that an insolvent corporation's directors become trustees holding the corporation's property for the benefit of all creditors, the court said: "any attempt by them to divert this property so as to deprive a creditor of his equitable part thereof, and relieve themselves of liability, will be held to be fraudulent."); *Mercedes-Benz Credit Corp. v. Carretta (In re Carretta)*, 219 B.R. 66, 72 (Bankr. D.N.J. 1998) (same under Pennsylvania law); *Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d 206, 209 & 217 n. 25 (3d Cir. 1990) (same); *Berg & Berg Enterprises, LLC v. Boyle*, 178 Cal. App. 4th 1020, 1041 (Cal. App. 6th Dist. 2009) (under California law, the fiduciary duty owed by corporate directors to the insolvent corporation's creditors includes the avoidance of actions that divert or dissipate corporate assets that might otherwise be used to pay creditors claims); Under Delaware law, "upon insolvency directors owe fiduciary duties to creditors or, stated differently, to the corporation and to all of its interested constituencies, including creditors and shareholders." *RSL COM Primecall, Inc. v. Beckoff (In re RSL COM Primecall, Inc.)*, 2003 Bankr. LEXIS 1635, 25 (Bankr. S.D.N.Y. Dec. 11, 2003) (citing *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784 (Del. Ch. 1992)). The rationale behind the "insolvency exception" is that

This fiduciary duty requires a dissolving corporation to distribute corporate assets first to the corporation's creditors and not to existing shareholders. *Bagel v. Bagel*, 1992 Bankr. LEXIS 2501, 42-44 (Bankr. E.D. Pa. Dec. 17, 1992) (Ex. F). This raises a serious question regarding whether the Funds' distribution of the proceeds from the sale of their securities to their existing shareholders, with the PSLRA action pending against the Funds, violated the obligation to distribute assets to creditors and not shareholders.[41]

The business judgment rule also does not protect an insolvent corporation's directors who divert corporate assets for the benefit of insiders. *Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.*, 1991 Del. Ch. LEXIS 215, at *34 (Del. Ch., December 30, 1991) (Ex. G). The Funds' current investment adviser paid nothing for the management contract for the Funds. Plaintiffs unsuccessfully sought information regarding whether there was an understanding between MAM and HBAM that the new management and directors would not pursue the derivative action. ¶¶ 626(b). 637-42. Obviously, a dismissal of the Funds' derivative claims would hugely benefit Defendants, constituting the diversion of the Funds' remaining assets for the benefit of the Funds' former affiliated persons. *See In re RSL COM Primecall, Inc.*, 2003 Bankr. LEXIS 1635, at *33 n. 11) (courts have permitted creditors to recover for breach of fiduciary duty where directors have "permitted the company to engage in transactions, usually without fair consideration to the company, for the benefit of its parent corporation or related entities") (citation omitted) (Ex. H).

---

the fiduciary duties held ordinarily for the benefit of shareholders should shift to creditors who "now occupy the position of residual owners." *Geyer*, 621 A.2d at 787.

[41]     This duty establishes a fiduciary relationship for purposes of 11 U.S.C. § 523(a)(4). *Id.* at 44-45 (citations omitted); *In re Thorsen and Co.*, 98 B.R. 527, 529-30 (Bankr. D. Colo. 1989) (same); *In re Jones*, 114 B.R 917, 922-23 (Bankr. N.D. Ohio 1990) (same); *In re Wines*, 112 B.R. 44, 46 (Bankr. S.D. Fla. 1990) (same). 11 U.S.C. § 523(a)(4) provides that a debt arising from "fraud or defalcation while acting in a fiduciary capacity" is not dischargeable in bankruptcy. "Defalcation does not require proof of dishonest conduct, but may arise from negligence or ignorance. Defalcation has been defined as failure by a trustee to properly account for the funds entrusted to him." *Bagel*, 1992 Bankr. LEXIS 2501, at 55 (citation omitted).

Both the Old Board and the New Board were selected by entities affiliated with the Funds. The New Board, which had no investments in the Funds and whose members were directors of other HBAM funds, were selected by the Funds' new adviser upon the RMK Defendants' decision to dump the Funds for no cash. ¶¶ 627-30. Neither Defendants nor the Funds can seriously contend that the New Board, having succeeded directors who wasted the Funds' assets through their mismanagement, would decide to abandon the Funds' claims against their former management. Because the Funds were insolvent and defendants in the class actions, the Old Board had no choice in March 2008 but to pursue these claims; thus, no demand was necessary in March 2008.

### c.  Neither the Old nor the New Board had discretion not to pursue these claims.

The Funds' potential judgment creditors have an interest in, and a claim on, the claims asserted herein. The Company and the New Board do not have the authority to deplete or waste these assets by not pursuing these claims. The Company/Funds and the New Board are obligated to marshal and preserve the Company/Funds' assets for the benefit of the potential judgment creditors. Accordingly, there is nothing on which the Company/Funds' New Board can exercise their business judgment, and a demand on the Company/Funds is irrelevant. ¶ 618.

### 4.  Demand is irrelevant because in view of the identity of interests of a fund and its shareholders.

The factors relevant to the usual business corporation whose directors are compelled to consider a derivative action against themselves and others are not present here. As open-end mutual funds, the interests of the Funds and their shareholders are entirely co-extensive; there are no other stakeholders whose interests can be deemed to be separate from the interests of the Funds and their shareholders that would take priority over the Funds and their shareholders' interests – i.e., there is no choice to be made between the interests of the Funds in pursuing these claims and the interests of anyone else that could be protected by

35

the business judgment presumption.[42] ¶¶ 566-69, 610-12, 616-18.

Two recognized constituencies of any corporation are the shareholders and creditors. *See In re RSL COM Primecall, Inc.*, 2003 Bankr. LEXIS 1635, 25). The corporate constituencies whose interests a board of directors may take into account in considering a corporate action include creditors, employees, customers, suppliers, state and national economy, community, societal considerations, and the long-term as well as short-term interests of the corporation and its shareholders. Here, the shareholders' and creditors' interests are identical, and the Funds' shareholders were also their customers. ¶ 610(b). Because Defendants include the former suppliers to the Funds, their interests are not relevant. Because the Funds have ended their business, employees' and the community's interests and the Company's long-term interests are also not relevant. Societal interests are relevant and weigh in favor of this action. 15 U.S.C. § 80a-1(b). Since it cannot be disputed that the only interests that remain are those of the Funds' shareholders and former shareholders, as creditors, there is nothing for the New Board to make a business judgment about. ¶¶ 560, 610-12.

---

[42]    The identity of the Funds' and their shareholders' interests is recognized by the ICA, which provides that the interests of shareholders of a registered investment company clearly have primacy over the interests of all affiliates and others. The ICA provides that the interests of mutual fund investors are adversely affected:

> (1) when investors purchase, . . . receive dividends upon, . . . sell, or surrender securities issued by investment companies *without adequate, accurate, and explicit information, fairly presented*, concerning the character of such securities and the *circumstances, policies*, and financial responsibility *of such companies* and their managements;

> (2) when investment companies are organized, operated, *managed*, or their portfolio securities are selected, *in the interest of directors, officers, investment advisers*, depositors, or other affiliated persons thereof,. . .

> (5) when investment companies, in keeping their accounts, in maintaining reserves, and *in computing* their earnings and the *asset value* of their outstanding securities, *employ unsound or misleading methods, or are not subject to adequate independent scrutiny*.

15 U.S.C. §§ 80a-1(b)(1), (5) (emphasis supplied).

Besides protecting the Funds' creditors, the Company/Funds and the Old Board were duty-bound to pursue this action for other reasons.[43] ¶¶ 619-20. STF's investment objective was preservation of capital. *Id.* Because STF undertook to preserve the capital of those who invested in it, pursuit of this litigation to recover STF's losses is nothing more than carrying out its functions and purposes, as to which there can be no discretion. This is entirely consistent with STF's stated purpose and objective, which could not be changed without shareholder approval. *Id.*

IBF's investment objective was to invest primarily in intermediate-term investment-grade securities, the types of investments widely understood as not risking capital, a view encouraged by the RMK Defendants in advertising IBF as being appropriate for investors seeking to preserve their capital. *Id.* Pursuit of this litigation to recover losses incurred by IBF as a result of RMK Defendants' mismanagement is required by IBF's functions and purposes. Again, there is no discretion, as it is consistent with IBF's stated purpose and objective, which could not be changed without shareholder approval. *Id.*

While HIF's investment objective permitted investments in below investment-grade securities, it was not those investments that primarily caused its losses; instead it was its heavy concentration in asset- and mortgage-backed securities. ¶¶ 241-49, 620(c). The RMK Defendants represented HIF would be managed to shield it from the kinds of NAV fluctuations experienced by other high-yield funds, but the RMK Defendants failed to do so. *Id.* Seeking to recover the losses incurred by HIF is entirely consistent with how the Company's directors allowed the Fund to be held out to investors, and they are estopped from

---

[43]    Failing to pursue the Funds' claims against the RMK Defendants amounts to forfeiting the Funds' remaining assets, which would be "a plain breach of trust." *See Werbowsky,* 766 A.2d at 136, citing *Davis v. Gemmell,* 17 A. 259, 265 (Md. 1889) (allowing an affiliated person to profit at the expense of the corporation was "a plain breach of trust," recognizing that where "the directors, or officers of a corporation having the authority to direct its litigation, are themselves guilty of the wrong complained of, . . . a demand upon them would . . . be useless, and further that it would be against the plainest principles of justice to permit the perpetrators of the wrong to conduct a litigation against themselves.").

taking any different course of action that is contrary to how they and the other RMK Defendants encouraged investors to perceive the Fund. *Id.*

There is no business purpose to be served by not pursuing these claims as the pursuit thereof could not be considered a distraction and the claims are not against current management or directors. Defendants have not articulated the business judgment factors that should be considered in this matter and offer no relevant response to this argument. *See* MAM/MK Br. at 6; PwC Br. at 11.[44] Defendants cite no case that addresses Plaintiffs' arguments.

## II.   PLAINTIFFS WERE EXCUSED FROM MAKING A DEMAND OR DEMAND WAS MADE AND EFFECTIVELY REFUSED.

### A.   Demand on the Old Board in March 2008 Was Excused as Futile.

#### 1.   The Old Board could not reasonably have been expected to respond to a demand in good faith and within the ambit of the business judgment rule.

In view of their conduct, the Old Board could not reasonably have been expected to respond to a demand in good faith and within the ambit of the business judgment rule. Their conduct did not offer a reasonable prospect of "*meaningful* pre-litigation alternative dispute resolution."[45] In March 2008, the Old Board, having already failed to take corrective action in the face of actionable knowledge of the Funds' gross mismanagement and then having renewed the Funds' advisory agreement with MAM were about to acquiesce in MAM/MK's decision to unload the Funds and quit the Funds' board. Although Plaintiffs requested such information, there is no evidence The Old Board considered what effect that transaction might have on the Funds' claims or that they did anything to ensure these claims would be

---

[44]   *In re Franklin Mutual Fund Fee Litig.*, 388 F. Supp. 2d 451 (D.N.J. 2005), cited by MAM/MK and PwC for the proposition that a mutual fund's structure does not change the nature of a derivative claim (Br. at 6, 11), addressed whether claims arising from an investment in a mutual fund are direct or derivative. Plaintiffs agree these are derivative claims and simply say there is nothing for business judgment to address; *Franklin* did not address these factors. ¶¶ 566-69, 610-21.

[45]   *See Werbowsky*, 766 A.2d at 619 (the demand requirement represents a "chance at meaningful pre-litigation alternative dispute resolution").

preserved and pursued. This affirmative indifference demonstrates that demand was futile.

On repeated occasions from at least August 2006 through April 2008, the Old Board considered matters that directly implicated the RMK Defendants' mismanagement of the Funds. Yet, the Old Board never considered whether they should either direct MAM/MK to correct the violations of the Funds' investment objectives, policies and restrictions or bring an action against the RMK Defendants, including themselves. Nor did the Old Board respond to Plaintiffs' request that the proxy statement soliciting shareholder approval of a new adviser and directors be corrected to not misrepresent the Funds' estimated damages and disclose material information about this action.

Directors are required to perform their duties in good faith, in a manner they reasonably believe to be in the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances. *Werbowsky,* 766 A.2d at 133 (citing Maryland Code § 2-405.1(a)). The Funds' Articles of Incorporation imposed upon the Old Board the duty to ensure that the Company fulfilled its purpose: "to do any and all acts and things for the preservation, protection, . . . in value of" the Funds' portfolios. ¶ 692.

The Old Board ignored their duty to act with the care of an ordinarily prudent person to preserve and protect the Funds' assets by taking corrective action. Even after the Funds were sued in the class actions, and even after inquiry was made regarding what measures were being taken to preserve the Funds' claims upon the advent of new management and directors, the Old Board did nothing. There could hardly be a more dramatic instance of directors doing their non-shareholder masters' bidding than the Old Board, which first approved a renewal of the Funds' Advisory Agreement with MAM notwithstanding the manifest evidence of MAM's mismanagement of the Funds and then, when the RMK organization decided to dump the Funds because they had become a marketing nightmare for their financial services business, obediently reversed themselves and agreed to recommend to the Funds' shareholders that they approve a new adviser, while they resigned.

Plaintiffs have found no case applying *Werbowsky* where the challenged conduct consists of inaction in the face of actionable knowledge, as distinguished from the transaction extensively considered by the board in *Werbowsky*.[46] In cases in which the board is charged with a failure of oversight or failing to act, Delaware law provides a separate test that determines "whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993). *See also McCall v. Scott*, 239 F.3d 808, 816 (6th Cir. 2001) (using *Rales* instead of *Aronson* where there is no conscious decision by the directors); *In re InfoUSA, Inc. Shareholders Litig.,* 953 A.2d 963, 986 (Del. Ch. 2007) (when there is no board action, it is proper to use *Rales* test because the "court cannot address the business judgment of an action not taken"); *Conrad v. Black*, 940 A.2d 28, 36 n.17 (Del. Ch. 2007) (same); *In re Veeco Instruments, Inc. Sec. Litig.,* 434 F. Supp. 2d 267, 274 (S.D.N.Y. 2006) (citing *Rales* as proper test in a "*Caremark*" case where loss is the result of "considered inaction" and not from a "decision")*; In re Mut. Funds Inv. Litig*., 384 F. Supp. 2d 873, 878 (D. Md. 2005) (*Rales* test is "a well considered and useful means for deciding the demand futility issue in a failure of oversight context."); *In re Caremark Int'l, Inc.,* 698 A.2d 959, 967 (Del. Ch. 1996) (director liability may arise from an unconsidered failure of the board to act in circumstances in which due attention would have prevented the loss).

Such a "'sustained and systematic failure of the board to exercise oversight,'" subjects the Old Board to a substantial likelihood of liability for breach of the "the duty of care, the

---

[46]     In that case, the transaction challenged by the derivative plaintiffs was carefully considered by a committee, consisting of directors found by the court to be independent, with the assistance of outside expert advisers. *Werbowsky*, 766 A.2d at 126-28. Here, the challenged conduct consists of the Old Board's failure to address the Funds' mismanagement despite knowledge thereof, even after the Funds' suffered catastrophic losses as a result of that mismanagement.

duty of loyalty, and the duty of good faith," excusing demand. *See In re Abbott Labs. Derivative Shareholders Litig.*, 325 F.3d 795, 808-809 (7th Cir. 2003); *In re Caremark Int'l, Inc.,* 698 A.2d at 972 (bad faith in "permit[ting] a known violation of law by the corporation to occur."); *In re Oxford Health Plans, Inc.*, 192 F.R.D. 111, 114 (S.D.N.Y. 2000) (demand excused where complaint alleged a generalized failure or neglect to monitor the activities of management); *Stone v Ritter*, 911 A.2d 362, 369 (Del. 2006) (failure to act in good faith included failing to act in the face of a known duty to act or demonstrating a conscious disregard for duties); *see also Mountain Manor Realty, Inc. v. Buccheri*, 461 A.2d 45, 51 (Md. Ct. Spec. App. 1983) (business judgment rule not applicable and directors may be held liable "if they permit the funds of the corporation or the corporate property to be lost or wasted by their gross or culpable negligence," citing *Parish*, *supra*, at 74). Given the Old Board's knowledge and repeated failures and inaction, demand was futile.[47]

> ### 2. The Old Board's efforts to quit and refusal to include proxy statement disclosures about the derivative action is evidence of demand futility.

Upon being informed that the May 2008 proxy statement seeking shareholder approval of new directors and a new adviser misrepresented the derivative action's estimated damages and omitted critical information regarding what, if any, measures were taken to preserve and pursue the action, the Old and the New Boards did nothing. Upon inquiring whether Regions Bank intended to vote the Funds' shares held by its trust accounts and pointing out Regions Bank's admitted conflict of interest, as well as that of the Old Board for the same reason as Regions Bank's, there was no response.

These proxy statement disclosures assume added significance because, under the Maryland corporate statute, the Funds' board could not select a special litigation committee

---

[47]    The RMK Defendants ignore Plaintiffs' allegations that the Old Board failed to act in a good faith exercise of reasonable business judgment. ¶¶ 598-604. Indeed, the Old Board inferentially confirmed the truth of these allegations by previously asserting that the Plaintiffs were dilatory in not bringing this action until March 2008. Dkt. No. 29-2 at 13 n.5.

that was not approved by shareholders. While the Funds' bylaws allow the board to expand the number of directors,[48] thereby creating vacancies, and then filling them, the Maryland Code § 2-407(c)(1) requires that a person selected by a board to fill a vacancy arising from increasing the number of directors must face election at the next annual shareholders meeting. ¶¶ 623-24, 632.[49] A proxy statement soliciting shareholders to elect a special litigation committee would necessarily require extensive disclosures about the derivative action, an obviously awkward prospect for the Old Board and the other RMK Defendants when they were seeking to shed their fiduciary obligations. This was avoided by the Old Board quitting *en masse* to be replaced with new directors in the guise of transferring the advisory agreements and electing a new board, along with  materially misrepresenting the derivative action.[50]

Because both the Old and New Boards were obviously ignorant about the derivative action complaint, and thus made a material decision regarding the content of the proxy statement without informing themselves of the damages set out in the complaint, the business judgment rule does not apply, thus excusing demand. *See Werbowsky*, 766 A.2d at 138-39 (to avail themselves of the business judgment rule, directors have a duty to inform themselves of all material information reasonably available to them); *RSL COM Primecall, Inc.*, 2003 Bankr. LEXIS 1635 ) (business judgment rule does not protect directors where material decisions are made in the absence of information and deliberation).

### 3.   The Funds' Old Board in March 2008 lacked a majority of directors who were not directly conflicted.

---

[48]     Morgan Keegan Select Fund, Inc. Bylaws Section 3.05. Ex. I.

[49]     Using Delaware law to refute requirements of Maryland law, the Old Board totally distorts these allegations, ignoring the first sentence of ¶ 623; Plaintiffs *do not allege an SLC was required* but instead allege that *if* one was to be appointed by the Old Board, it had to be elected. Notably, this allegation is not refuted. Directors' Br. at 3 n. 1, 4. No Defendant has disputed that an SLC would have had to have been elected by the Funds' shareholders.

[50]     *See* footnote 13 *supra* regarding why HBAM and the New Board did not want to disclose the potential value of the Funds' claims.

### a. The entire Old Board was personally and directly conflicted.

That a fiduciary being named a defendant in an action disables that fiduciary from fairly considering an action against him or her is evidenced by Regions Bank's actions in the PSLRA action. Just as Regions Bank owed a fiduciary duty to its trust accounts, the Old Board owed a fiduciary duty to the Funds. Regions Bank, recognizing the obvious conflict of interest that precluded it from both defending itself in the PSLRA action and carrying out its fiduciary responsibilities to its trust accounts, properly sought the appointment of a trustee *ad litem* to represent the interests of the Regions Bank trust accounts in the class actions. ¶¶ 581-89. The Old Board's position is no different than that of Regions Bank; it too could not be expected to carry out its fiduciary responsibilities to the Funds in the face of the allegations and claims against it.[51] As is apparent from PwC's arguments, any claims brought by the Funds against PwC carry a substantial risk to the Old Board of being blamed by PwC. *See* PwC Br. at 13-15. Like Regions Bank, the Old Board's members are defendants in the PSLRA action.

The Company/Fund's bylaws equate being named a party in an action with being interested in the action. The Funds' board of directors may determine whether a director or officer of the Funds is entitled to indemnification in connection with being a party to an action, if a quorum consisting of directors who are not parties to the proceeding so determines. Funds' Bylaws, section 10.01(b): "The Corporation shall not indemnify any such person unless:...(2) a reasonable determination is made, based upon a review of the facts, by (a) the vote of a majority of a quorum of the directors of the Corporation who are neither "interested persons" of the Corporation as defined in the 1940 Act, *nor parties to the Proceeding .. .*." Ex. I. If directors who are defendants cannot determine their own eligibility for indemnification, they should not be able to pass on whether claims asserted against them on behalf

---

[51]   Because Regions Bank had previously delegated the responsibility of managing the trusts' investments to the Funds' investment adviser and distributor, MAM and MK also face the same conflict of interest between defending themselves in this litigation and the fiduciary responsibilities owed by them to the trust accounts.

of the Funds should be pursued.

Under Maryland law, a complaint that sufficiently states a cause of action against a board for fraud, concealment, illegality, gross negligence, waste of corporate assets, or adequately alleges that a majority of the board has taken part in the asserted wrongdoing, has established demand futility. *Edge Partners*, 944 F. Supp. at 442. In *Felker v. Anderson*, 2005 WL 602974 (W.D. Mo. February 11, 2005) (Ex. J)  the plaintiff alleged that defendants permitted and/or approved the dissemination of false or misleading press releases, violated state law and fiduciary duties, had not sought to recover any part of the damages suffered, and had concealed information from the public. The court, applying *Werbowsky*, held demand was excused as being futile. *Id.*, at * 3.  Similarly, courts have held that a board's misrepresentations to shareholders is not a valid exercise of business judgment and excuses demand. *See Ryan*, 918 A.2d at 355-56 ("It is difficult to conceive of a context in which a director may simultaneously lie to his shareholders [] and yet satisfy his duty of loyalty.").

A board's exposure to a substantial likelihood of liability prevents it from "exercise[ing] its independent and disinterested business judgment in responding to a demand." *In re Mut. Funds Inv. Litig.*, 384 F. Supp. 2d at 879 (citing *Rales,* 634 A.2d at 934; *McCall*, 239 F.3d at 817; and *Aronson*, 473 A.2d at 805); *see also In re Cendant Corp. Derivative Action Litig.*, 189 F.R.D. 117, 129 (D.N.J. 1999) (director is sufficiently interested to render demand futile where "he is a defendant in other pending class action suits" and "faces significant personal liability for the wrongdoing alleged in the complaint"); *see also Rales*, 634 A.2d at 936; *In re SFBC International, Inc. Securities & Derivative Litig.*, 495 F. Supp. 2d 477, 483-84 (D.N.J. 2007).

Allegations that directors knew of the wrongdoing in the corporations for which they were responsible subject them to the substantial likelihood of liability that renders demand futile.  *In re Mut. Funds Inv. Litig.*, 384 F. Supp. 2d at 880. PwC correctly states that Plaintiffs have alleged that the Funds' directors and management possessed actionable knowledge of the Funds' violations of their investment objectives and restrictions by August 2006.

44

PwC Br. at 13-15.[52]

In *McCall*, the Sixth Circuit held demand was excused as futile where plaintiffs alleged that the board had been given audit information showing "unmistakable signs that improper practices were being employed throughout the corporation." The court ruled:

> A director is considered interested . . . when a corporate decision will have a "materially detrimental impact" on a director but not the corporation or its stockholders. *Rales*, 634 A.2d at 936.  While the mere threat of personal liability is not sufficient, *reasonable doubt as to the disinterestedness of a director is created when the particularized allegations in the complaint present "a substantial likelihood" of liability on the part of a director.*

*McCall*, 239 F.3d at 817 (emphasis added) (citations omitted).

Directors who face a substantial likelihood of liability for the issuance of false and misleading financial statements are unable to impartially consider a demand due to their potential liabilitytherefor. *See Cendant*, 189 F.R.D. at 128-29 (demand excused where complaint alleged overstated financial results which were publicly disseminated); *Oxford Health*, 192 F.R.D. at 118 (demand excused where defendants violated fiduciary duties by allowing others to make materially false or misleading statements concerning the company's financial matters); *In re Lernout & Hauspie Sec. Litig.*, 286 B.R. 33, 38-39 (D. Mass. 2002) (denying motion to dismiss securities fraud claims against three members of an audit committee because they failed in their "duty to oversee the auditors, that is, to guard the guardians"); *Greenfield v. Prof'l Care, Inc.*, 677 F. Supp. 110, 114 (E.D.N.Y. 1987) (same).

In *Parish*, the Maryland court ruled that, where the complaint alleged acts of fraud,

---

[52]    A demand futility test predicated on allegations of a board's actual knowledge of wrongdoing that subjects the board to a substantial likelihood of liability is consistent with *Werbowsky*. 766 A.2d at 143 (generalized or speculative allegations that directors are conflicted insufficient to excuse demand), 144 (demand excused "when the allegations or evidence clearly demonstrate, in a very particular manner" that a majority of the directors are so "personally and directly conflicted" that they cannot render an impartial judgment). As to the possibility that the Old Board might, upon a demand, have sought the advice of a special litigation committee (*see id.*), any such committee was subject to shareholder approval. *See* discussion *supra* at 42.

concealment, gross negligence, and waste of corporate assets and averred that a majority of the current board participated in some of those acts, "it would be futile for the plaintiffs to make demand upon those directors to cause the Association to sue them to recover for their own wrongful injuries to the Association." 242 A.2d 512 at 545. In *Werbowsky*, the same court explained *Parish* as based on two somewhat different precepts: (1) it was not likely that the culpable directors would, in fact, agree to permit the company to sue them, deemed by the court to be "pragmatic futility"; and (2) even if they would so agree, because of their conflicted status, a court should not permit them to do so, which the court viewed as "policy-oriented." 766 A.2d at 137. *See also*, *Storetrax.com, Inc. v. Gurland*, 915 A.2d 991, 1002 (Md. 2007) (recognizing conflict of interest that exists when a director is in litigation with the corporation and the need to ensure that the financial interests of the corporation are protected by a majority of the remaining disinterested shareholders or directors); *Indurated Concrete Corp. v. Abbott*, 74 A.2d 17, 20 (Md. 1950) (Where a director's stewardship of the corporation comes into question, "he, of course, cannot act, in regard to those matters, both for himself and the corporation.").

The Old Board previously implicitly acknowledged its inability to consider a demand if its members are exposed to personal liability in this litigation. ". . . the Independent Directors were *able* to consider a demand *because the sole substantive claim against them is barred* by the unambiguous provisions in the funds' articles of incorporation." Dkt. No. 29-2 at 7 (emphasis supplied). Having asserted they were "able to consider a demand" because, as they contended, the claim against them is barred by the articles of incorporation, the Old Board conceded that their potential liability is a disabling factor if the claims are not so barred. However, the "substantive claim[s] against them" are *not barred* by the Funds' articles of incorporation; the claims against them are based on knowledge, gross negligence, and reckless disregard and are *expressly allowed* by the articles of incorporation and bylaws, which the Old Board previously conceded. *Id.* at 8. The Old Board no longer make this ar-

gument.[53]

It is widely recognized, including in Maryland, that a director against whom a corporation has a claim has a conflict of interest that disables that director from considering whether to bring such action "because these individuals can hardly be expected to sue themselves or to 'initiate any action contrary to their own interests.'" *Hecht v. Resolution Trust Corp.*, 635 A.2d 394, 402, 405 (Md. 1994) (citations omitted); *Federal Sav. and Loan Ins. Corp. v. Williams*, 599 F. Supp. 1184, 1193 (D. Md. 1984) (directors are unlikely to initiate action which could reveal their own wrongdoing); *Resolution Trust Corp. v. Gardner*, 798 F.Supp. 790, 795 (D.D.C.1992) (same); *Federal Deposit Ins. Corp. v. Howse*, 736 F. Supp. 1437, 1441 (S.D. Tex. 1990) (same).

"Although there exists a possibility that a board of directors could decide to bring suit against itself, we consider the possibility to be minute at best," and "'the court would not permit [directors] to conduct litigation against themselves even if they were willing to do so.'" *Hecht*, 635 A.2d at 407 (citing *Parish*, 242 A.2d 512). "Simply put, *Hecht* recognizes the *practical reality* that an adversely dominated board will not sue itself." *Martin Marietta Corp. v. Gould, Inc.*, 70 F.3d 768, 772 (4th Cir. 1995) (emphasis supplied); *Resolution Trust Corp. v. Scaletty*, 891 P.2d 1110, 1113-14 (Kan. 1995) ("it would deny logic to assume that the same individuals who allegedly committed a wrong would bring suit against themselves." These cases recognize the "more modern" view of the "realities" of the shareholder-director-corporation relationship. *Federal Deposit Ins. Corp. v. Hudson*, 673 F.Supp. 1039, 1042 (D. Kan. 1987).[54] In other words, it is "common sense" that directors will not sue

---

[53]     Plaintiffs made this argument in their prior opposition, and the Old Board has now conceded the relevance of the merits to a determination of their independence and, therefore, demand futility. Significantly, the Old Board no longer contends that merits are not relevant to a determination of demand futility. MAM/MK's argument that merits are irrelevant (MAM/MK Br. at 8-9) is negated by the concession on this issue by the Old Board, whose independence and disinterestedness is what is at issue, not that of MAM/MK.

[54]     *See also Federal Deposit Ins. Corp. v. Appling*, 992 F.2d 1109, 1115 (10th Cir. 1993); *Resolution Trust Corp. v. Scaletty*, 810 F. Supp. 1505, 1510 (D.Kan. 1992); *Federal*

themselves, even when asked. *Cf. Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009) (determining "plausibility" on a motion to dismiss "requires the reviewing court to draw on its judicial experience and common sense").

The Old Board was also afflicted by its conflicting fiduciary obligations arising from the interests of the Funds, in whose interest this litigation clearly was, and the opposing interests of the other RMK Funds of which the Old Board's members were also directors, whose interests would be adversely affected by an action against their adviser, distributor and auditor. ¶ 580(a), (b). Also, the Old Board, most of whom had no investment in the Funds but had significant investments in the other RMK Funds, were motivated by self-interest to devote a greater amount of their attention to the affairs of those funds in which they had substantially greater investments.[55] ¶¶ 55-58, 571-73.[56]

---

*Deposit Ins. Corp. v. Ashley*, 754 F. Supp. 179, 183 (D. Kan. 1990); *Federal Deposit Ins. Corp. v. Greenwood*, 739 F. Supp. 450, 452 (C.D. Ill. 1989). Although the cases cited in this and the preceding paragraph (except *Iqbal*) relate to the "adverse domination" doctrine (*see* Derivative Plaintiffs Memorandum in Opposition to PwC's Motion to Dismiss at 9-11), the "logic" is the same as that supporting demand futility. *See Hecht*, 635 A.2d at 407 (adverse domination doctrine applicable to determining when a statute of limitations "accrues" is consistent with demand futility, citing *Parish* 242 A.2d 512, 545.

[55]    Contrary to MAM/MK, this statement of the Old Board's conflicting interests arising from their disparate investments in the Funds versus in the other RMK Funds is not inconsistent. *See* MAM/MK Br. at 10 n. 9. Defendants cite no case that addresses these specific conflicting interests arising from the Old Board's disparate fund investments and conflicting fiduciary obligations owed to the RMK Funds with divergent interests in this litigation. These conflicting interests go far beyond simply being appointed by a Defendant to serve on several fund boards for compensation, which is all that is addressed by the cases cited by MAM/MK. *See* MAM/MK Br. at 10.

[56]    MAM/MK erroneously contends that ICA § 2(a)(19) controls whether a director is not independent or disinterested for purposes of demand futility, citing *Scalisi v. Fund Asset Management, LP,* 380 F.3d 133 (2d. Cir. 2004) and *In re Franklin Mutual Funds Fee Litigation*. MAM/MK Br. at 7. However, addressing Maryland Code § 2-405.3 and its incorporation of ICA § 2(a)(19), *Scalisi*, which involved an investment company, makes clear that the *Werbowsky* standard controls: "*Werbowsky* sets forth at length Maryland's standards for determining whether demand on a corporation's directors is excused. *We see no reason to believe that Maryland would depart from those standards in the case of a registered invest-*

### b.     At least half of the  Old Board was personally and directly conflicted.

At least three of the six directors were conflicted.[57] One director (Alderman) is admittedly not independent or disinterested.  ¶¶ 30, 574.  Of the remaining five, two were not independent or disinterested based on business and professional relationships.

McFadden had a substantial banking and business relationship with Regions. ¶¶ 33, 575(a). Courts have recognized that a director is deemed interested if he personally has, or is affiliated with an entity that has, a business relationship with the subject corporation.  *See*, *e.g.*, *U.S. Int'l Associates v. Steiner*, 1995 Conn. Super. LEXIS 2202, at **9-10 (Conn. Super. July 31, 1995) (director who is employed by a law firm having business relationship with subject corporation is not disinterested) (Ex. K); *Eichenholtz v. Brennan*, 1989 U.S. Dist. LEXIS 8778, at *36 (D.N.J. July 27, 1989) (directors who were employees of the advertising and law firms used by the corporation were not disinterested and demand was, therefore, excused) (Ex. L); *In re New Valley Corp.*, No. 17649, 2001 WL 50212, at *7 (Del. Ch. Jan. 11, 2001) (a "long-standing pattern of mutually advantageous business relations" is sufficient to raise a reasonable doubt regarding independence). Ex. M.[58]

---

ment company.  …. We accordingly view the *Werbowsky* framework as governing and will use it to review the district court's determination that the complaint fails to plead adequately that demand was excused by reason of futility." 380 F.3d at 140 (emphasis supplied). *Franklin* is not to the contrary.

[57]     Defendants no longer contend that Plaintiffs must show that four of the six directors were conflicted. *See* Dkt. No. 29-2 at 14 n. 6. Establishing that three of six were not disinterested is sufficient to show that the board lacked a majority of independent and disinterested directors. *See, e.g., Beneville v. York*, 769 A.2d 80, 82 (Del. Ch. 2000).

[58]     Defendant McFadden was an "interested" director under the ICA, and this Court may so determine in this action. ICA § 2(a)(19) includes as an "interested person" someone who has "had at any time since the beginning of the last two completed fiscal years of such investment company a *material business* or professional *relationship* with [a registered investment company's] investment adviser or principal underwriter or . . . any *controlling person of such investment adviser or principal underwriter*." ICA § 2(a)(19)(B)(vii) (emphasis supplied). Regions Bank was controlled by Regions Financial, and Regions Financial controlled MAM, the Funds' investment adviser, and MK, the Funds' distributor. ¶¶ 14-18. A shareholder of an investment company may challenge a director's presumed disinterested-

49

Similarly, Stone was not independent or disinterested with respect to suing PWC. Plaintiffs allege her business and academic relationships and how her position is dependent upon maintaining a distinguished reputation in the areas of accounting and auditing. *See* ¶¶ 35, 346-529, 575(b).  PWC is a significant benefactor of the University of Alabama accounting school, of which she is a prominent faculty member. ¶¶ 35, 575(b).  Courts have found individuals in similar situations to not be independent.  In *In re Oracle Corp. Derivative Litig.*, *supra,* the court held that two Stanford University professors who comprised a "special litigation committee" were not independent because the corporate officers and directors had made large financial contributions to Stanford.  824 A.2d at 921.  The Court held that the Stanford professors were not independent even though the professors were renowned experts in their fields, even though the contributions "constitute a very small proportion of Stanford's endowment and annual donations," and even though the professors were unaware of the CEO's relationship with Stanford at the time. *Id.* at 923-924, 945,

---

ness by asking a court to find that the director is interested as part of the court's evaluation of a substantive claim under the ICA or state law or to excuse demand. *See Strougo v. Scudder, Stevens & Clark, Inc.*, 964 F. Supp. 783, 795 (S.D.N.Y. 1997)(excusing a demand on the board of directors as futile under Maryland law where three directors were interested because they sat on between four and fifteen boards), *reh'g denied*, 1997 U.S. Dist. LEXIS 12243, No. 96- CIV-2136, 1997 WL 473566, at *5 (S.D.N.Y. Aug. 18, 1997)(reiterating that "well-compensated service on multiple boards of funds managed by a single fund adviser can, in some circumstances, be indistinguishable in all relevant respects from employment by the fund manager which, admittedly renders a director interested"); *accord Strougo v. Bassini*, 1 F. Supp. 2d 268, 273-75 (S.D.N.Y. 1998) (refusing to dismiss for refusal to make a demand where all the directors sat on between 5 and 9 boards and made $ 42,000); *Olesh v. Dreyfus Corp.*, 1995 WL 500491, at *15 (E.D.N.Y. Aug. 8, 1995) ("The court is free to adjudicate facts that might underlie a claim that an individual falls within the per se categories [of 'interested persons'], and the court may then apply the appropriate remedy . . . .") (Ex. V); *Scalisi*, 380 F.3d at 139. A court's determination of a director's interestedness will be governed by federal law under the ICA, and not the particular state law governing the requirements for determining demand futility for a derivative action. *First Australia Fund, Inc., SEC No-Action Letter*, 1987 WL 108483 (S.E.C.), at *7 (Oct. 8, 1987) (delineating criteria relevant to a determination of control over directors) (Ex. W).

947.[59]

**B     Demand Is Excused because Delay in Bringing This Action Would Have Resulted in Irreparable Harm.**

In order to demonstrate futility under Maryland law, Plaintiffs may show evidence supporting their allegation that delay in waiting for a response would cause irreparable harm to the Company. *Werbowsky*, 766 A.2d at 144; *In re Key Energy Services, Inc. Derivative Litig.*, 2006 WL 5979882, at *3 (W.D. Tex. July 10, 2006) (Ex. N). Here, the Funds' claims against PwC are subject to Tennessee's one-year statute of limitations. PwC Br. at 13-15. While Plaintiffs timely brought this action under Tennessee law, relying on the Old Board or even the New Board would have resulted in the loss of those claims.

Events of which Plaintiffs were unaware at the time they brought this action, and events since March 2008 consisting of communications by Plaintiffs to both the New and Old Board to which no response was made establish that the inaction by the Old Board and the New Board would have allowed this statute of limitations to run. Indeed, the New Board is still purportedly investigating the derivative claims. Funds' Br. at 2.[60]

The statute of limitations in question relates only to the Funds' claims against PwC. Given PwC's apparent willingness to blame the RMK Defendants, a possibility that likely would not have eluded the Old Board in considering any demand to sue PwC, the Old Board understandably might have found it in their best interests to not rush into any decision to bring a suit against PwC within the very short one-year period.[61]

---

[59]     *See also In re The Limited, Inc. Shareholders Litig.*, 2002 WL 537692, at *6-7 (Del. Ch. Mar. 27, 2002) (Georgetown University president who had solicited a $25 million contribution from CEO was not independent of that corporate official in light of the sense of "owingness" that the university president might harbor to the CEO) (Ex. BB); *Lewis v. Fuqua*, 502 A.2d 962, 966-67 (Del. Ch. 1985) (Duke University president was not independent where the university received a $10 million charitable pledge from the CEO and the CEO was a trustee of the university).

[60]     See Plaintiffs' Memorandum in Opposition to PwC's Motion to Dismiss at 4 n. 6.

[61]     The Old Board's newly found candor regarding their inability to have objectively considered bringing these claims is refreshing (*see* discussion *supra* at 46-47). No one can

51

C.   **Alternatively, Demand Was Made on the New Board and Was Refused; Its Motion Contradicts Its Representations to the Funds' Shareholders, and the Old and New Boards Are Estopped from Asserting Demand Was Not Excused.**

   1.   **Demand was made on the New Board and has been effectively refused.[62]**

Plaintiffs contend that the demand issue is to be resolved on the basis of the Funds' board at the time suit was initiated in March 2008. *See Harris v. Carter*, 582 A.2d 222, 231 (Del. Ch. 1990) (change in control of a board of directors does not require a demand on the new board or require alleging facts that would excuse demand at that time); *Braddock v. Zimmerman*, 906 A.2d 776, 786 (Del. 2006) (same). Without waiving that argument, Plaintiffs, alternatively, assert that demand was made on the New Board.[63]

_____

seriously contend that Plaintiffs should have awaited their consideration when they were busy planning their departure and then blatantly misrepresented the derivative action in the proxy statement. Curiously, however, this is what MAM/MK argues. MAM/MK Br. at 12. It is ludicrous to suggest, as MAM/MK do, that a plaintiff would deliberately delay filing a complaint to take advantage of a statute of limitations that is triggered by discovery, which is inherently uncertain.

[62]   Defendants are confused about whether Plaintiffs have alleged demand was made on the New Board and refused. *Compare* MAM/MK Br. at 3, 15 *with* Officers' Br. at 3. Plaintiffs did so allege. FADC VI.C. and ¶¶ 636-77. MAM/MK's statement that the "FADC does not contain a single allegation that Plaintiffs ever requested that the New Board pursue litigation on behalf of the Funds at any time" is wrong. *See* MAM/MK Br. at 15. Plaintiffs alleged they requested that the New Board "pursue" the derivative action. ¶¶ 609, 637 and FADC Ex. B (in letter addressed to the New Board, Plaintiffs asked for "assurances" that "you would pursue the claims in the *Landers* derivative action"), 646, 647, 651, 653, 666. In their letters Plaintiffs asked to be advised of the timetable of the New Board's investigation but received no response. ¶¶ 664, 666. Nor is it inconsistent to contend that demand was made on the New Board but, because no response has been received that the action will be or will not be prosecuted, it has been refused, in view of the lengthy lapse of time. *See* MAM/MK Br. at 13-15. The New Board believes a demand was made. This is clearly evidenced by their purported investigation of the derivative claims; whether or not the other Defendants think a demand was made on the New Board is irrelevant.

[63]   Defendants' reliance on *In re Sapient Corp. Derivative Litig.*, 555 F. Supp. 2d 259 (D. Mass. 2008), is misplaced. That case involved a demand on the board while motions to dismiss for failure to make a demand were pending; there was no change in boards. *Id.* at 261. Unlike *Sapient*, here the demand was made on a board that was not in place at the time

The question of the adequacy of a shareholders' pre-suit demand must be determined on a case by case basis. *Allison v. General Motors Corp.*, 604 F. Supp. 1106, 1117 (D. Del. 1985). Demand does not have to be in any particular form or recite any particular language. *Syracuse Television, Inc. v. Channel 9, Syracuse, Inc.*, 273 N.Y.S.2d 16, 24-25 (N.Y. 1966). In fact, a pre-suit demand may even be inferred from discussions taking place during conferences. *Id*. All that is required is that "[a]t a minimum, a demand must identify the alleged wrongdoers, describe the factual basis of the wrongful acts and the harm caused to the corporation, and request remedial relief." *Allison*, 604 F. Supp. at 1117; *see Bender*, 917 A.2d at 154. In determining the sufficiency of a demand, the board's prior knowledge is relevant. *Lewis v. Sporck*, 646 F. Supp. 574, 578 (N.D. Cal. 1986).

Although the New Board took office in July 2008, the new adviser had been a consultant to MAM since August 2007, and the New Board first became familiar with the issues in this litigation when it considered whether to seek election to the Funds' board in early 2008, after the first class action was filed and before this action was initiated. ¶¶ 165(l), 175-76, 670, 674. By July 2008, the New Board had available to it three increasingly comprehensive complaints, providing the New Board with "full notice" of the claims against Defendants.[64] Dkt. No. 72 at 7.

In June 2008, after learning of the proposed change in investment advisers, Plaintiffs

---

this action was brought, because Plaintiffs considered the circumstances different, although Plaintiffs have been careful to preserve their arguments regarding the legitimacy of this board and other arguments, and Plaintiffs are allowed to argue in the alternative. Fed. R. Civ. P. 8(d).

[64]     Contrary to MAM/'K's arguments, Plaintiffs made a "proper" demand that described the "factual basis of the putatively wrongful acts and the harm to the [Funds]." *See* MAM/MK Br. at 15-16. As PwC previously contended, in their initial complaint, to which the letter refers, Plaintiffs alleged the factual basis of wrongful conduct, injury to the Funds, and the RMK Defendants' knowledge thereof. Dkt. No. 27-2 at 16-18, 23. The letter also clearly stated it was being sent by counsel in their representative capacity in this litigation. ¶ 637, FADC Ex. B. MAM/MK's suggestion to the contrary is baseless. *See* MAM/MK Br. at 16 n. 12.

wrote to the New Board seeking assurances that the derivative action would be maintained.[65] The New Board forwarded Plaintiffs' letter to the Old Board but made no further response. After the New Board proposed the liquidation of STF in February 2009 but said nothing about that Fund's claims herein or the effect of the proposed liquidation on the preservation of these claims, Plaintiffs again contacted the New Board to state the need to address these matters. This resulted in the New Board making provision for preserving the derivative claims and representing their intention to pursue them in connection with the liquidation of the three Funds.[66]

This action began in March 2008, and the first letter to the new adviser and directors was sent in July 2008. Since no response was received to this inquiry and since instead a proposal was made to liquidate STF in February 2009 without making any provision for preserving these derivative claims, and without having even obtained a copy of the complaint, far more than enough time has passed for the New Board to respond to this demand. *See Werbowsky,* 766 A.2d at 140 (90 days under Model Business Corporation Act § 7.42; "reasonable time" under the American Law Institute's *Principles of Corporate Governance* § 7.03); *see also Albers v. Edelson Tech. Partners, L.P.*, 31 P.3d 821, 828-29 (Ariz. Ct. App. 2001) (under Arizona statute, corporation allowed 90 days to respond to demand); *Bender*, 917 A.2d at 150 (two separate special litigation committees issued their reports within 11 and 13 months after their appointment in response to a demand); *Lewis v. Sporck*, 646 F. Supp. 574, 578 (N. D. Cal. 1986) (board's familiarity with the underlying factual circumstances and board's first response to plaintiff's demand "indicated that the investigation *had not yet even begun*" supported the conclusion that three months was sufficient time for a response to

---

[65]     The former officers argue that Plaintiffs fail to allege "demand was made prior to the filing of the Initial Complaint." Br. at 4. Of course, demand could not be made on the New Board before the filing of the initial complaint because its members were not directors then. As to the Funds' then directors, demand was excused.

[66]     *See* footnote 38 *supra*. The Funds' claims cannot be adversely affected by the change in investment advisers. 15 U.S.C. § 80a-15(f)(1)(B).

plaintiff's demand) (emphasis in original); *Mills v. Esmark, Inc.*, 91 F.R.D. 70, 73 (N.D. Ill. 1981) (waiting for response to demand will be deemed futile if board of directors does not provide a definitive and final response within three months of demand; "[a] response indicating that review and investigation of plaintiffs' demand is continuing will not suffice"). If after investigation, the corporation, through its directors, fails to bring the requested litigation, the shareholder(s) may bring a "demand refused" derivative action. *Mona v. Mona Elec. Group, Inc.*, 934 A.2d 450, 465-466 (Md. Ct. Spec. App. 2007);; *Zimmerman v. Bell*, 101 F.R.D. 329, 331 (D. Md. 1984) (demand futility re-enforced by the fact that plaintiff's own attempt to have the directors bring an action on behalf of the corporation against themselves was unsuccessful); *Bender*, 917 A.2d at 152. The ALI's *Principles* provide that a court should not dismiss a derivative action commenced prior to the board's response if the board does not respond within a reasonable time. *Werbowsky*, 766 A.2d at 140.

Here, although the New Board became familiar with the issues in this litigation when they considered whether to seek election to the Funds' board in early 2008, and although a demand was made on them in July 2008 to assure Plaintiffs that they would pursue this action, by February 2009, the New Board had not even bothered to obtain the initial complaint and engaged counsel to represent them herein who represented persons against whom derivative claims were asserted. The New Board first informed Plaintiffs of their "investigation" in July 2009. ¶ 661. Since then the New Board has provided no further information.[67] Far more than a reasonable time having elapsed since demand was made, and considering the New Board's familiarity with these matters even before demand was made, demand has effec-

---

[67]    There is little to do in the way of interviewing MAM/MK officials who were involved with the management of the Funds, because they are refusing to cooperate in other cases, and HBAM personnel could certainly have been interviewed long before now. ¶¶ 671-73; MAM/MK Br. at 17. Neither the New Board nor any Defendant offers any information about the "investigation." While MAM/MK cagily labels Plaintiffs' allegation that "adequate discovery is unavailable to the New Board" as "conclusory," it also does not deny it. MAM/MK Br. at 17.

tively been refused.[68]

Defendants argue that, rather than the New Board "just saying no," Plaintiffs' pursuit of the Funds' claims can be frustrated by the New Board by just saying nothing, and no matter how much time goes by, demand cannot be deemed to have been refused. The unwillingness of the New Board and the Defendants to provide any information about the investigation strongly suggests that the purported "investigation" is nothing but a smoke screen; this suspicion can be readily dispelled if the New Board and Defendants inform the Court whether Defendants have provided documents and made themselves available for the investigation. Failing that, the Court should consider whether, in view of the New Board's recalcitrance, they are simply inviting the Court to terminate their role, thereby enabling them to avoid having to make a decision they clearly appear loathe to do

Plaintiffs have done their best to "prod" the Funds' directors into action. *See McCall*, 239 F.3d at 824 (board must be given the opportunity to be "prodded into action"). In the face of directors' inaction, the vigor with which plaintiff prosecutes a derivative case is relevant to resolving demand. *See Zimmerman*, 101 F.R.D. at 331 (demand futile where plaintiff unsuccessfully sought to have the directors bring an action on behalf of the corporation against themselves and where the plaintiffs appear to have been competent and vigorous in their prosecution of the case).[69] The first set of the Funds' directors abandoned the Funds

---

[68]     In *In re Sapient Corp. Derivative Litig.*, 555 F. Supp. 2d 259 (D. Mass. 2008), the court held that a demand on the board while motions to dismiss for failure to make a demand were pending mooted the demand futility argument as to the same board and dismissed the action. However, the court expressly allowed plaintiffs to bring a "demand refused" action. *Id.* at 261.

[69]     While the New Board is still purportedly "investigating" (FADC Ex. M), Plaintiffs are pursuing the Funds' claims and defending against Defendants' motions to dismiss, including motions to dismiss for failure to state a claim. Claiming that an "investigation" is underway is hardly an adequate response to motions to dismiss. Given the short statute of limitations applicable to claims against PwC, the Funds were fortunate that Plaintiffs acted with dispatch in bringing this action and did not have to await continuing inaction by the Old Board or the outcome of the New Board's "investigation."

soon after this action was brought; the second set of directors dithers; and, meanwhile, evidence atrophies.[70]

### 2. Alternatively, the demand issue is moot because the New Board has represented to Fund shareholders its intention to pursue the derivative claims.

Without waiving the argument that demand excused is to be determined on the basis of the Funds' board in March 2008, alternatively, demand is now moot in light of the events transpiring since this action was begun. The New Board has represented to the Funds' shareholders that a plan for liquidating the Funds includes provisions to preserve the Plaintiffs' standing as derivative plaintiffs and the Funds will pursue the derivative claims on their merits; in response to these representations, the shareholders approved the liquidation of the Funds. ¶ 675, FADC Ex. J; Ex. B.

In the definitive Proxy Statement, filed with the SEC on May 1, 2009, soliciting the approval of the Funds' shareholders for the liquidation of the Funds, the Funds (i.e., their New Board and management) made the following representations:

> … With respect to the derivative lawsuit, the Board noted that the complaint alleges claims that belong to the Company and the Funds, and considered that the Plan was structured *in order to **preserve** any such claims* for appropriate action by the Board. …

> The Plan provides that *shareholders' shares in the Funds will remain outstanding after payment of the Liquidation Distribution*. Although shares will remain outstanding, it is expected that the Funds' shares will have no net asset value after payment of the Liquidation Distribution and the right of shareholders to redeem their shares will be indefinitely suspended. *In the event that claims held by the Company or the Funds are found to have merit* and the Funds *receive a recovery*, such recovery will be retained as an asset of the Funds pending the resolution of other claims and liabilities. Any amounts remaining after such resolution will be distributed to such shareholders of the Funds at such time as is determined by the Board and in a manner that com-

---

[70]    MAM/MK ineffectually seek to justify the delay on the ground of complexity, citing the FADC. MAM/MK Br. at 16-17. But Plaintiffs have produced six increasingly comprehensive detailed complaints in this and related litigation, while the New Board has produced nothing.

> plies with applicable law. There can be no assurance that there will be any
> such recovery.

FADC Ex. J at pp. 2, 4 (emphasis supplied).

By this disclosure, the New Board states two things: First, the Liquidation Plan was designed to preserve the derivative standing of the Plaintiffs to enable them to pursue this action. This was done in response to Plaintiffs' request that the Plan do so. ¶ 651. If the New Board intended to seek dismissal for failure to make a demand, they should have said so in the proxy statement, rather than mislead the Funds' shareholders into believing the *derivative* claims would be *preserved*. Second, the New Board represented their determination to pursue the derivative claims *on their merits* to obtain a recovery,[71] thus foreclosing any possibility that they would determine, on the grounds of business judgment, that pursuit of such claims is not in the Funds' best interests.

### 3. The New Board's representations to the Funds' shareholders and the inequitable conduct of the Old and New Boards estop them from asserting demand was not excused.

Contrary to representations made to the Funds' shareholders just two months ago, the Funds' New Board has now moved to dismiss for failure to make a demand on the Old Board.[72] While previously representing their intention to pursue the Funds' derivative claims to a recovery, and even though these directors have had a year to consider this matter, the New Board now says it needs to think about it further. Its delay in pursuing these claims is inexcusable, is not an exercise of reasonable business judgment, and is inconsistent with the prudent-man standard by which their conduct is to be judged. ¶¶ 531-35, 727; *see*

---

[71]    *See* footnote 38 *supra*.

[72]    Following the Funds' motion, Plaintiffs inquired of the New Board, through the Funds' new counsel, about the New Board's intentions. FADC Ex. K. In this same letter, Plaintiffs inquired of the New Board regarding its intentions in opposing Defendants' motions to dismiss for failure to state a claim. *Id.* As to this request, Plaintiffs were not informed until July 31, 2009 that the New Board had begun "investigating" these claims. FADC Ex. M..

Maryland Code § 2-405.1.[73] As between the New Board and Plaintiffs, it is abundantly clear that it is the latter, and not the former, who have satisfied the requirements of Maryland law regarding the stewardship of the Funds' assets.

Nor was the New Board's decision to be represented by counsel who are representing parties with conflicting interests consistent with the prudent-man, good faith, reasonable business judgment required of them. In *Werbowsky,* the directors were careful to engage advisers and counsel who were free of conflicts. In this action, the New Board chose to be represented by counsel who are also representing the  Old Board against which claims have been asserted on behalf of the Funds, a clear conflict of interest. *Tydings v. Berk*, 565 A.2d 391 (Ct. Sp. App. Md. 1989). Plaintiffs notified the New Board of this issue. ¶ 658. Only after Plaintiffs raised the issue did the New Board procure new counsel for the Funds in this action. ¶¶ 658, 661; Dkt. No. 34. The New Board's initial choice of counsel lacked a good faith reasonable business judgment, and the initial motion to dismiss brought by the Funds with conflicted counsel is not consistent with the May 2009 proxy statement or § 2-405.1.[74]

Because the New Board represented their intentions to preserve the derivative claims and to pursue the derivative claims on their merits and because the Funds' shareholders approved the Funds' liquidation, the New Board is now equitably estopped from failing to do so. *See Knill v. Knill*, 510 A.2d 546, 549 (Md. 1986) (equitable estoppel is the effect of a

---

[73]      Pursuant to § 2-405.1, a director must perform his duties as a director, including his duties as a member of a committee of the board on which he serves: (1) in good faith; (2) in a manner he reasonably believes to be in the best interests of the corporation; and (3) with the care that an ordinarily prudent person in a like position would use under similar circumstances.

[74]      Courts have placed special emphasis on whether board committees engaged independent counsel to "guide its deliberations and to advise it" when considering a demand. *Bender*, 917 A.2d at 155-156 (plaintiffs created reasonable doubt as to the reasonableness of directors' investigation of a demand where directors were not represented by independent counsel but rather by an attorney who had represented the corporation in connection with the challenged transaction). ). The Funds' and New Board's initial counsel herein represented certain of the Defendants and previously  represented the Funds.

party's voluntary conduct that absolutely precludes him from asserting rights that might perhaps have otherwise existed as against another person, who has in good faith relied upon such conduct); *Dousman v. Kobus*, 2002 Del. Ch. LEXIS 67 (Del. Ch. June 6, 2002) (board of directors estopped from relying on the supermajority provision in corporation's bylaws where corporation previously misrepresented in its communications that only a simple majority was required for shareholder action) (Ex. O).

The New Board was elected on the basis of a false and misleading proxy statement that misrepresented the damages sought herein and failed to disclose material facts about the Funds' claims. Accordingly, their election may be set aside. *See Goldstein v. Lincoln Nat'l Convertible Secs. Fund, Inc*., 140 F. Supp. 2d 424, 440-41 (E.D. Pa. 2001) (court, having determined that the board omitted material information from its proxy statement, held that the election must be set aside and a new election ordered); *Justin Indus., Inc*., *v. Choctaw Securities*, 920 F.2d 262, 266 (5th Cir. 1990) (where misleading proxy disclosures result in the election of directors, a court may set aside the election ); *Bertoglio v. Texas Int'l Co*., 488 F. Supp. 630, 662-63 (D. Del. 1980)  (concluding that it is within the court's equitable powers to void the results of an election where there has been a violation of the proxy rules); *Reschini v First Federal Sav and Loan Ass'n of Indiana,* 46 F.3d 246, 249-50 (3d Cir. 1995) (nullifying corporate action taken on the basis of fraudulent proxies is a traditional form of relief).

The derivative action, recognized as an equitable device, and the demand requirement in Maryland are the creature of common law. *Werbowsky,* 766 A.2d at 135. Accordingly, the court is free to shape both the remedy and limitations thereon to do justice in light of the facts. Demand is a defense to an equitable remedy. To defeat an equitable remedy, defendants must do equity. *See Post v. Bregman*, 707 A.2d 806 828 (Md. 1998) [75]

The New Board and the Old Board stonewalled Plaintiffs' effort to get an honest proxy statement in 2008 asking shareholders to approve new directors and the new investment ad-

---

60

viser, one that corrected errors identified by Plaintiffs and informed shareholders of the derivative action and the effect thereon of the proposed new adviser and a new board. The New Board ignored this action from July 2008 through February 2009 (they did not even have the complaint). The New Board, only at Plaintiffs' insistence, adopted measures to preserve the Funds' claims. Now, after representing to shareholders the Funds' claims would be pursued on their merits to a recovery, the New Board allowed counsel who had a clear conflict of interest to advise and represent them in connection with the Funds' motion to dismiss and have informed this Court they have not yet determined whether to pursue the Funds' claims. ¶ 661. This conduct is not equitable. *Ross v. State Bd. of Elections*, 876 A.2d 692, 704 (Md. 2005) (the clean hands doctrine is intended to protect the courts from having to endorse or reward inequitable conduct that is related to the subject of the action). Nor, have the New Board acted in accordance with the reasonably prudent man standard demanded of them pursuant to the Funds' articles of incorporation and the Maryland corporate code.

D.    **Demand on the Funds' Shareholders Was Excused.**

Demand upon shareholders is excused where it would be futile. *Zimmerman v. Bell*, 585 F. Supp. 512, 515 (D. Md. 1984); *Parish*, 242 A.2d at 544; *Eisler v. Eastern States Corp.*, 35 A.2d 118, 119-120 (Md. Ct. App. 1943). No shareholder demand is necessary if "it would be unreasonable or useless to require it." *Parish*, 242 A.2d at 546. Such futility exists when the shareholders have no adequate power or authority to remedy the wrong asserted by the individual shareholders. *Id*. Thus, the *Parish* court noted that "if a stockholder's derivative action is based upon an alleged wrong committed by directors against the corporation, of such a nature as to be beyond ratification by a majority of the stockholders, as in the case of fraud, it is not necessary to make a demand upon the stockholders before bringing the action." *Id*. Demand is futile if the shareholder could only bring a suit against the defendants by demanding that the directors bring an action against themselves. *Zimmerman*, 585 F. Supp. at 516 (citing *Parish*). *See also Edge Partners, L.P.*, 944 F. Supp. at 442 (pre-suit demand on shareholders would have been futile because plaintiff has alleged

61

that the entire board committed the wrongful conduct).

As of March 28, 2008, the date on which this action was initiated, on information and belief, the shareholders of the Funds numbered in the thousands. ¶ 678.[76] As of December 31, 2007, the outstanding shares for all three classes of the Short Term, Intermediate and High Income Funds were, respectively, 5,929,627, 37,574,227, and 45,563,290.[77] Demand on shareholders is excused "when it is not feasible because of the large number of shares outstanding." *Weiss v. Sunasco Inc.*, 316 F. Supp. 1197, 1206 (E.D. Pa. 1970); *Levitt v. Johnson*, 334 F.2d 815, 817 (1st Cir. 1964) (shareholder demand excused in corporation with 48,000 shareholders). A court also must consider "the extent of the effort and the expense in making such a demand." *New Crawford Valley, Ltd. v. Benedict*, 847 P.2d 642, 646 (Colo. Ct. App. 1993). Given the large number of shareholders in the Funds in March 2008, such an undertaking would be prohibitively expensive and likely would involve making a communication that would have to comply with the proxy solicitation requirements of the Securities Exchange Act of 1934. *Id.*; *Harhen v. Brown*, 730 N.E.2d 859, 868 (Mass. Sup. Ct. 2000) (shareholder demand is excused when such a demand "would place a tremendous financial and administrative burden on plaintiffs").

"No Maryland case has based a dismissal solely on failure to make demand on shareholders, and the shareholder demand rule has been widely criticized." *Strougo v. Scudder, Stevens & Clark, Inc.*, 964 F. Supp. 783, 795-96 (S.D.N.Y. 1997). Because shareholders are poorly equipped to make a determination whether to sue, "demand on shareholders is rarely necessary." *Id.* (citing *Kamen*). Additionally, a substantial portion of the Funds' shares were controlled by the RMK Defendants or their affiliates; therefore, demand would have

---

[76]   MAM/MK incorrectly states "Plaintiffs have pleaded no allegations regarding the ownership of the Funds' shares at the time of the filing of the initial complaint in March 2008…" MAM/MK Br. at 13. *See* ¶ 678.

[77]   Ex. X at 40. As of April 9, 2009, the outstanding shares for all three classes of the Short Term, Intermediate and High Income Funds were, respectively, 658,249, 23,085,165, and 22,008,056. ¶ 681.

been futile. ¶¶ 682-86.

Each case cited by Defendants in support of their argument on this point clearly states that shareholder demand is excused if it would be futile.  Given the thousands of shareholders in the Funds on March 28, 2008 and the burden that would be placed on plaintiffs, shareholder demand would have been futile and should be excused. Further, demand on the Funds' shareholders in March 2008 was moot for the reasons set forth regarding demand on the directors. ¶ 687.

## II.   PLAINTIFFS STATE CLAIMS ON WHICH RELIEF CAN BE GRANTED.

This Court has determined that Plaintiffs' factual allegations supporting Plaintiffs' negligence and breach of fiduciary duty claims presented a substantial federal question and that the FADC gives Defendants "full notice" of the claims against them. Dkt. Nos. 21 and 72. In denying Defendants' motions to strike the FADC, this Court concluded "the prolixity with which Plaintiffs have pled allows the Defendants to have *full notice of all possible claims the Plaintiffs can bring*" and went on to observe that "[I]f the court underst[ands] the allegations *sufficiently to determine that they could state a claim for relief*, the complaint has satisfied Rule 8." Dkt. No. 72 at 7 (emphasis supplied). Noting that Defendants did not contend that the FADC's multitude of factual allegations "could not possibly be material to [each] specific count" (citation omitted), the Court reasoned that "Plaintiffs were correct to err on the side of prolixity" so as to provide "'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged,' to survive a motion to dismiss." *Id.* at 6 (citing *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009)).

### A.   Adequacy of Allegations regarding MK Holding and MK.

MK does not seek to dismiss Count II, the breach of contract claim against MK, which is based on both the Underwriting Agreement and the Fund Accounting Service Agreement. *See* MAM/MK Br. at 21-22; ¶¶ 705-16.[78] MK seeks to dismiss Plaintiffs' negli-

---

[78]   The MAM/MK motion to dismiss does not identify specific counts, and the conclusion in the MAM/MK brief says all claims against MK are insufficient as a matter of law,

gence-based claims on the ground that Plaintiffs do not allege "a duty or obligation imposed by law independent of that arising out of the contract itself," contending that MK's conduct can be tortious "only when it also violates a duty, independent of the contract, arising from wider principles of social responsibility." MK Br. at 25. This Court addressed, on the basis of Plaintiffs' initial complaint, that Plaintiffs allege federal securities laws violations, and in particular the ICA, as the basis for the duty owed by Defendants, including MK. Order Denying Plaintiffs' Motion to Remand, Dkt. No.  21 at 5 (reciting allegations of how MK breached its duty of care), 16 ("Plaintiffs have asserted no source of Defendants' duty of care other than federal securities laws. Thus, a court could not find that Defendants were negligent without deciding that they had violated the standard of care imposed by federal law."), 18 ("Plaintiffs . . . have pleaded violations of federal law as grounds for finding that Defendants were negligent and breached their fiduciary duty."), 19 ("Plaintiffs plead breach of fiduciary duty and negligence based on Defendants' breach of *duties imposed by federal securities laws*.")(emphasis supplied); 21 ("Resolution of a federal question is necessary to establish the standard of care and, therefore, to resolve Plaintiffs' state law negligence claims."), 28. This Court also held Plaintiffs are not basing the Funds' breach of contract claim on these federal laws. *Id.* and 19 n. 10 ("Counts I, II, and X for breach of contract do not raise federal questions.") (citations omitted).

Having persuaded this Court that Plaintiffs' allegations regarding the applicability of the ICA to Defendants' conduct "raise disputed federal issues so substantial as to give rise to federal jurisdiction" (*Id.* at 28; *see also id.* at 16 ["Defendants argue that 'Plaintiffs explicitly ask the Court to evaluate Defendants' conduct on the basis of federal statutes, regulations and standards.'"]), MK now says there are no such allegations. Their assertion is frivolous.

---

without identifying specific counts, but nowhere is Count II addressed as to why it should be dismissed.

MK's argument that the FADC "is entirely devoid of any facts demonstrating that Morgan Keegan is a fiduciary with respect to the Funds or MK Select" (MK Br. at 22) is likewise entirely without merit and contrary to this Court's earlier ruling denying remand. Plaintiffs have alleged MK performed investment advisory functions for the Funds and, as a result, MK assumed a fiduciary responsibility.[79] ¶¶ 20, 25 (Regions Bank delegated the investment of trust assets to MK), 48, 49 (portfolio management), 280-84 (MK supervised the Funds' investment management and appointed the Funds' portfolio managers; MK's investment committee reviewed and approved the Funds' investment strategy, which included investments in securities that MK deemed impermissible for itself), 543-44 (Fund Accounting Service Agreement pursuant to which MK provided accounting, valuation, financial reporting, and compliance control services for the Funds), 549-50 (according to Regions, MK, which Regions says is a registered investment adviser, managed the Funds and provided Regions Bank's trust services), 555 (showing MK's "asset management" revenues), 736-40 (Funds' shareholders had not elected a board since June 2003, and MK effectively controlled the Funds); *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191 (1963) (Investment Advisers Act of 1940 reflects a congressional recognition of the "delicate fiduciary nature of an investment advisory relationship" with its client); *Migdal v. Rowe Price-Fleming Int'l*, 248 F.3d 321, 328 (4th Cir. 2001) (ICA § 36(a), 15 U.S.C. § 80a-35(a), imposes a general fiduciary duty upon both the directors and investment advisers of a fund.). On the basis of the initial complaint, this Court has determined that Plaintiffs' allegations that Defendants violated the Funds' investment objective, policies and restrictions and, therefore, the ICA and their fiduciary duty were sufficient to determine that the Funds' breach of fiduciary duty claims present a substantial federal question. Referencing Plain-

---

[79]   Defendants MAM and MK do not argue that Plaintiffs did not allege sufficient facts supporting a fiduciary duty on MAM's part, conceding MAM's fiduciary responsibility. MAM/MK Br. at 19-21. If MAM owed a fiduciary duty because it was the Funds' investment adviser, because MK also performed investment advisory functions, it too owed a fiduciary duty to the Funds.

tiffs' assertion that the facts necessary to support a violation of ICA § 13 coincide with the facts supporting the Funds' breach of fiduciary duty claims, this Court concluded that "[t]herefore, a finding that Defendants violated the ICA will also determine whether Defendants breached their fiduciary duty" and that "[a] fiduciary who knowingly violates federal law also breaches his fiduciary duty under state law." Dkt. No. 21 at 21. Plaintiffs have clearly alleged MK's fiduciary duty and breach thereof.[80]

MK Holding is the parent of, and controlled, MAM and is a subsidiary of Regions Financial. ¶¶ 16-19. Plaintiffs allege that Regions Financial and its subsidiaries, which include MAM and MK Holding, were an integrated and intertwined organization. ¶¶ 22-24, 62, 537-59, 702, 735.

### B.    The Exculpatory Provisions of the Funds' Articles of Incorporation and Advisory Agreement Do Not Bar Plaintiffs' Claims.

There are two sources for the exculpatory provisions that the Individual Defendants and MAM argue bar Plaintiffs' claims against them: the Funds' Articles of Incorporation and the Advisory Agreement between the Funds and MAM. The Articles of Incorporation cover only the Funds' officers and directors, and the Advisory Agreement relates only to MAM. Significantly, having apparently now read its own contracts, MK no longer contends that any of the claims against it are barred by an exculpatory provision. *See* MAM/MK Br. at 21-22; *Cf.* Dkt. # 24-2 at 25-26.

The complaint should not be dismissed on grounds of exculpatory provisions, as these are affirmative defenses. *Sanders v. Wang*, 1999 Del. Ch. LEXIS 203, at *35 (Del. Ch. Nov. 8, 1999) (Ex. P):

> Because the nature of the defendants' breach of fiduciary duty remains unclear at this time, I may not now properly consider exculpatory provisions. The de-

---

[80]    MAM/MK argue the claims under the Maryland Securities Act and for contribution should be dismissed but provide no authority. The Funds, as investors, are entitled to the protection of the same state and federal laws as are all other investors. The dismissal in the *Atkinson* state action based on SLUSA is wholly irrelevant hereto, as this case is not a class action.

fendants will have the opportunity to present their affirmative defense as the case progresses.  At this stage of the proceedings, I can not conclude as a matter of law that the Board acted in good faith and that their actions constituted no more than mere carelessness.

Plaintiffs have adequately alleged that the RMK Defendants were knowledgeable of the manner in which the Funds were being mismanaged. *See* PwC Br. at 13-15.

**1.   The MAM Advisory Agreement exculpatory provision does not apply to breach of contract claims.**

Section 7.A. of the Advisory Agreement limits the liability of MAM (but not the Funds' officers and directors) to "willful misfeasance, bad faith, gross negligence, or reckless disregard of obligations or duties" thereunder – i.e., MAM is protected from liability for negligence. This is the language of tort; there is no such thing as a negligent breach of contract. "Insofar as a breach of contract action is concerned, it matters not a whit whether the breach was an intentional one or an unintentional one caused by negligence in attempting to perform. The action still remains in contract." *Harvest Corp. v. Ernst & Whinney*, 610 S.W.2d 727, 728 (Tenn. Ct. App. 1980). The exculpatory provision of the Advisory Agreement does not apply to Plaintiffs' breach of contract claim against MAM. The cases cited by MAM do not say otherwise. These cases generally hold that a breach of contract claim is not subject to exculpatory provisions unless said provisions expressly apply to breach of contract actions.[81] Here, the exculpatory language does not include breach of contract.

---

[81]    *Trumball Inv..Ltd., v. Wachovia Bank, N.A.,* 2005 U.S. Dist. LEXIS 7195 (E.D Va., Apr. 15, 2005) (breach of contract action dismissed because plaintiffs had no cause of action for breach of contract under their discretionary brokerage investment account agreements, *not* because an otherwise meritorious breach of contract action was excused by the exculpatory provision; an  exculpatory provision must "clearly and unequivocally release the defendant from precisely the type of liability alleged by Plaintiff") (Ex. Y); *CompuSpa, Inc. v. I.B.M. Corp.,* 228 F. Supp. 2d 613 (D. Md. 2002) (exculpatory clause expressly stated that "in no event will either party be liable to the other *in contract* or tort or otherwise for any lost revenues, lost profits") (emphasis supplied); *Champion Home Builders Co. v. ADT Security Servs. Inc.,* 179 F. Supp. 2d 16 (N.D.N.Y. 2001) (exculpatory language that included a clause stating that there would be no liability for losses "from performance or non-performance of obligations imposed by this contract" was held to cover plaintiff's tort and UCC breach of warranty claims but not his breach of contract claim).

Plaintiffs claim that MAM breached the Advisory Agreement. ¶¶ 691-99. This claim is not precluded by any exculpatory provision. The obligation imposed by the Company's Articles of Incorporation to comply with generally accepted accounting principles, including the financial statement disclosures required by GAAP, which obligation was delegated to MAM, is just one of the ways MAM breached these agreements. ¶¶ 693, 696-98. These GAAP failures are spelled out in detail in the FADC. ¶¶ 482-91. MAM also breached the Advisory Agreement and the Funds' Articles of Incorporation because it failed to determine the Funds' NAVs in accordance therewith and with the ICA. ¶¶ 691, 698(b).

> ### 2. The Company's Articles of Incorporation and Advisory Agreement do not bar Plaintiffs' gross negligence and knowing misconduct claims against the MK Defendants.

The Company's Articles of Incorporation, which are the source of the officers and directors purported exculpation, was adopted by a single person.[82] Ex. P-1. The Articles were adopted before there was a board of directors; they were not the product of any negotiation, arm's-length or otherwise. Under Maryland law, a contract that is the product of "grossly unequal bargaining power" and that limits liability is unenforceable. *Wolf v. Ford*, 644 A.2d 522, 526 (Md. 1994); *see also* ¶ 703 (lack of arm's-length relationship between Funds and MAM). Since the Articles were the product of no bargaining at all, the exculpatory provision therein for the benefit of the Individual Defendants is unenforceable.

Section 11.1 of the Company/Funds' Articles of Incorporation provides, "To the maximum extent permitted by applicable law (including Maryland law and the 1940 Act) as currently in effect or as it may hereafter be amended, no director or officer of the Corporation shall be liable to the Corporation or its stockholders for money damages." ¶ 726. Although Maryland Code §§ 2-405.2 and 5-418 provide that officers and directors can be liable for

---

[82]   The former officers say the FADC is devoid of any allegations that Kelsoe and Tannehill acted with gross negligence. Officers' Br. at 4 n. 4. This is untrue. ¶¶ 49, 50, 53, 717, 730, 744. As portfolio managers, both were officers and, therefore, "Individual Fiduciary Defendants" for purposes of Count III.

money damages to the corporation only for active and deliberate dishonesty, pursuant to the ICA § 17(h), 15 U.S.C. § 80a-17(h), section 11.1's exculpation is limited: the Company's officers and directors can be held liable to the Company for willful misfeasance, bad faith, gross negligence, or reckless disregard of their duties. *Id.*

The breach of fiduciary duty claim against the Funds' officers and directors, and the claims against MAM, are based on their knowledge of the Funds' mismanagement, gross negligence, or reckless disregard for the truth. ¶¶ 66(c), 130-51 (Funds' management's knowledge of illiquid securities and their risk), 168-71 (knowledge of Funds' valuation uncertainty), 189, 190, 244(c), 248, 250-59 (Regions' 2006 foresight regarding the subprime debacle),[83] 271-74 (knowledge of Funds' investments' high credit risk), 279-88 (MK's knowledge of Funds' speculative investments), 296 (Kelsoe's acknowledgment that securities Funds were purchasing were illiquid); 308-26 (knowledge of deficient disclosures), 403-06, 626 (false proxy statement),[84] 744, 804, 805.[85] Accordingly, the claim is based on a permissible standard of liability. ¶¶ 717-32.[86] This Court has determined, in denying remand,

---

[83]   In a nearly identical situation, the statements of a bank's top executive regarding the credit risk of subprime mortgage-backed securities was deemed to "facially show" the bank's knowledge of the risks of such securities when it sold them to its clients while avoiding such securities for its own account. *Workers Compensation Reinsurance Association v. Wells Fargo Bank*, Ramsey County (Minnesota) District Court, 62 civ 08-10825, Amended Report/Order of Master: August 29, 2009 at Memorandum p. 5 (Ex. Z).

[84]   In *SEC v. Bank of America*, 653 F. Supp. 2d 507 (S.D.N.Y. 2009), in rejecting the proposed settlement, the court questioned how bank executives could not be deemed to possess the requisite knowledge of a false proxy statement when the SEC alleged those executives "expressly approved Merrill's making year-end bonuses before they issued the proxy statement denying such approval." *Id.* at 510.

[85]   In another baseless statement, MAM says Plaintiffs' allegations of knowing misconduct are "[w]ithout any supporting facts." MAM/MK Br. at 20-21.

[86]   MK previously conceded that a claim for "gross negligence" or "reckless disregard" is allowed notwithstanding an exculpatory provision such as that MAM/MK argue applies to Plaintiffs' claims against MAM. Dkt. No. 24-2 25 Plaintiffs have expressly alleged gross negligence and reckless disregard. ¶¶ 804, 805.

that Plaintiffs' allegations of Defendants' knowing breaches of their fiduciary duties because of their violations of the Funds' investment objectives, policies and restrictions were so extensive as to constitute a "substantial" federal question. This Court observed that a finding that Defendants violated the ICA will also determine whether Defendants breached their fiduciary duty and that a fiduciary who knowingly violates federal law also breaches his fiduciary duty under state law. Dkt. No. 21 at 21.

An exculpation clause in a corporation's  certificate of incorporation that eliminates directors' liability for all claims of breach of duty founded upon negligence, including gross negligence, but does not eliminate claims based on breach of loyalty or "acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law" does not bar directors' liability; plaintiffs' allegation that challenged the defendants' good faith is enough at the pleading stage to overcome the exculpation clause. *In re RSL COM Primecall, Inc*., 2003 Bankr. LEXIS 1635, 40-41); *see also In re Walt Disney Co. Derivative Litig*., 825 A.2d 275, 286 (Del. Ch. 2003) (same).

Particularly pertinent to the purportedly applicable exculpatory provisions, PwC has twice asserted Plaintiffs have adequately alleged RMK Defendants had knowledge of their mismanagement of the Funds, PwC's deficient 2006 audit, the Fund's defective 2006 financial statement disclosures, and the injury suffered by the Funds. Prior PwC Br. (Dkt. No. 27-2) at 9, 11-13, 18; new PwC Br. (Dkt. No. 61-1) at 13-15. The Individual Defendants (including officers, directors and employees) and MAM say they agree.[87]

### 3.    The Advisory Agreement exculpatory provision is invalid.

The sole source of MAM's exculpation defense is the Advisory Agreement.[88] Public

---

[87]     Dkt. No. 62-1 at 4 n. 1 (MAM); Dkt. No. 59 at 2 (Old Board); Dkt. No. 65-1 at 1 n. 1 (Defendant officers and employees). While MAM and the Defendant officers and employees say they incorporate PwC's arguments "to the extent applicable," PwC's arguments regarding the sufficiency of Plaintiffs' allegations regarding these Defendants' scienter are clearly "applicable" to these Defendants' exculpation arguments. These Defendants presumably knew PwC would make this assertion because it did so before.

[88]     MAM does not dispute ¶ 743: "proscription in Section 11.1 of the Company/Funds

policy does not permit exculpatory agreements in transactions affecting the public interest. *Wolf,* 644 A.2d at 531, 532. Transactions affecting the public interest include "those transactions, not readily susceptible to definition or broad categorization, that are so important to the public good that an exculpatory clause would be 'patently offensive,' such that "the common sense of the entire community would pronounce it 'invalid." *Id.* at 532. Congress has determined that investment companies are "affected with a national public interest" because, *inter alia* "such companies are media for the investment in the national economy of a substantial part of the national savings and may have a vital effect upon the flow of such savings into the capital markets." 15 U.S.C. § 80a-1.

The Advisory Agreement provided, "The Adviser shall direct the investments of each Portfolio, subject to and in accordance with each Portfolio's investment objective, policies and limitations as provided in its Prospectus and Statement of Additional Information. . ." ¶ 691. The Advisory Agreement also provided that the Funds' NAVs were to be determined in accordance with the Funds' Articles of Incorporation and the ICA.[89] *Id.* These provisions contractually obligated MAM to adhere to the ICA, which requires registered investment companies to comply with their investment objective. ICA § 13. Assuming the Advisory Agreement's exculpatory provision does apply to a breach of contract claim, it amounts to a waiver of compliance with the ICA and is, therefore, invalid pursuant to ICA § 47(a). ¶ 704.

---

Articles of Incorporation against money damages *relates only to officers and directors who are natural persons and not to corporations* that act as the functional equivalent of a board of directors and management." (Emphasis supplied).

[89]   According to its Articles of Incorporation, the Company's purpose was to "hold, invest and reinvest the funds of the Corporation, . . . and . . . to hold for investment or otherwise . . . securities of any corporation,. . .and to do any and all acts and things for the preservation, protection, improvement and enhancement in value of any and all such securities." ¶ 692. The Articles, section 6.7, required the Company's board "to determine, in accordance with generally accepted accounting principles. . . the net asset value per Share . . . at such times and by such methods as it shall determine subject to any restrictions or requirements under the 1940 Act and the rules, regulations and interpretations thereof promulgated or issued by the [SEC]." ¶ 693. The Company's board delegated this function to MAM/MK pursuant to the Articles, section 10. ¶¶ 693-94, 712.

The exculpatory provision of the Advisory Agreement is invalid for an additional reason. Neither Section 6.7, nor Section 10.1, nor any other provision of the Company/Funds' Articles of Incorporation contain a provision exculpating any entity from liability for failing to perform the duties, obligations, and requirements set out in Article FOURTH and Section 6.7 in form or in substance akin to that found in paragraph 7.A. of the Advisory Agreement. Furthermore, the Company/Funds' Articles of Incorporation do not contain a provision authorizing the Company/Funds' Board on behalf of the Company/Funds to enter into an agreement that proposes to allow any such exculpation. The inclusion of any such provision would have violated, and been prohibited by, Section 10.2 as not being "reasonable and fair and not inconsistent with the provisions of [Section 10.1]." ¶¶ 695-97.

In entering into the Advisory Agreement, the Company/Funds' directors were not authorized under the Articles of Incorporation to agree to such an exculpatory provision because such a provision is neither "reasonable [nor] fair." Such a provision is a product of the type of non-arm's-length self-dealing recognized by Article 10.2 of the Articles of Incorporation, which is inherent in the fund-adviser relationship, and its potential for ignoring the best interests of the Funds and their shareholders.[90] Accordingly, the Advisory Agreement excul-

---

[90]   Articles of Incorporation Section 10.2 provides (emphasis supplied): "Any contract of the character described in Section 10.1 or for services as administrator . . . may be entered into with any corporation, firm, trust or association, although any one or more of the directors or officers of the Corporation may be an officer, director, trustee, stockholder or member of such other party to the contract, and no such contract shall be invalidated or rendered voidable by reason of the existence of any such relationship, nor shall any person holding such relationship be liable merely by reason of such relationship for any loss or expense to the Corporation under or by reason of said contract or accountable for any profit realized directly or indirectly therefrom, *provided that the contract when entered into was reasonable and fair* and not inconsistent with the provisions of this Article TENTH." One way to determine the reasonableness and fairness of the exculpatory provisions is to inquire whether such provisions were included in MAM's advisory agreements with its institutional and individual accounts—e.g., the Investment Advisory Service Agreement between MAM and Regions Bank, which has no such provision. Ex. AA. *See Gallus v. Ameriprise Fin., Inc.*, 561 F.3d 816 (8th Cir. 2009) (recognizing studies documenting the absence of arm's-length negotiations between funds and their advisors, court held that district court erred in

patory provision should be set aside as *ultra vires*.[91]

**C.      The ICA § 47 Provides Relief for Violations of the ICA; Defendants Contracted to Give the Funds a Private Cause of Action for Violating the ICA.**

Section 47 of the ICA provides a direct procedural remedy where a contract subject to the ICA is affected, or involves, by a violation of a provision of the ICA, or any rule, regulation, or order thereunder. This remedy is enforceable directly by a party to the contract, and the dual remedies provided are for rescission and damages for unjust enrichment, as the statute plainly states.[92]

Courts have recognized that the remedies provided by § 47 may be pursued by a party to the contract through court proceedings. *Mathers Fund, Inc. v. Colwell Company,*

---

rejecting a comparison between the fees charged to the advisors' institutional clients and its mutual fund clients and dismissing breach of fiduciary duty claim).

[91]      *See* discussion *supra* regarding *ultra vires* actions. Defendants only perfunctorily address Plaintiffs' arguments regarding the invalidity of the exculpatory provisions, including ICA § 47. ¶¶ 691-97. *See* MAM/MK Br. at 18-21.

[92]      Pertinent parts of Sec. 47 of the ICA, 15 USC § 80a-46  (emphasis supplied), are as follows:

> (a) Any condition, stipulation, or provision binding any person to waive compliance with any provision of this subchapter or with any rule, regulation, or order thereunder shall be void.

> (b)(1) A contract that is made, or whose performance involves, a violation of this subchapter, or any rule, regulation, or order thereunder, is unenforceable *by either party ... unless a court* finds that under the circumstances enforcement would produce a more equitable result than non-enforcement and would not be inconsistent with the purposes of this subchapter.

> (b)(2) To the extent that a contract described in paragraph (1) has been performed, *a court may not deny rescission at the instance of any party* unless such court finds that under the circumstances the denial of rescission would produce a more equitable result than its grant and would not be inconsistent with the purposes of this subchapter. .

> (b)(3) This subsection shall not apply  ... (B) to preclude recovery *against any person for unjust enrichment.*

564 F. 2d 780, 783 (7th Cir. 1977) ("Section 47(b) of the Act contemplates civil suits for relief  by way of rescission and  for damages."); *Lessler v. Little,* 857 F. 2d 866, 874 (1st Cir. 1988) (recognizing that § 47 could be enforced in a derivative case on behalf of a mutual fund).

In neither *Mathers* nor *Lessler* did the court indicate that a § 47 cause of action was an implied cause of action, or that a proceeding under § 47 needed to be predicated on a separate, implied right of action for a violation of another section of the ICA. Accordingly, Defendants' argument that § 47 is purely remedial in nature and does not give rise to a separate cause of action, citing *Stegall v. Ladner,* 394 F. Supp. 2d 358 (D. Mass. 2005), and *Mutchka v. Harris,* 373 F. Supp. 2d 1021 (C.D. Cal. 2005), is without merit. *Lessler* was a putative *class actions* rather than a derivative case, and the class representatives were not parties to the contract, a distinction recognized in both cases. *Lessler*, 857 F. 2d at 871, 874. In *Mathers*, the court declined to allow the fund to rescind under § 47 because it would be inequitable to do so and inconsistent with the purposes of the ICA. *Mathers*, 564 F. 2d at 784; Accordingly, it is not necessary that the Court recognize an implied cause of action under § 47 for a derivative action brought on behalf of the mutual fund that is a party to the contract.

Defendants' additional argument that § 47 requires that the ICA provision violated be one that provides a private right of action is also without merit. Nothing in § 47 states or implies that it is other than a direct action, or that it must be predicated on a section of the ICA that constitutes an implied right of action. Section 47 simply states that its remedies apply to " … a violation of this subchapter, or any rule, regulation, or order thereunder."  The fact that § 47 applies not only to a violation of the statute, but also to the violation of any rule, regulation, or order thereunder (there are usually no implied causes of action for violations of rules, regulations, and most particularly, orders under the federal securities laws) conclusively establishes that there is no need for the cause of action under § 47 to be predi-

cated on a violation of a section of the ICA that has been classified as a separate, implied right of action.

Here, as the predicate for seeking rescission and damages in a direct action under § 47, Plaintiffs have alleged violations of § 13 of the ICA, relating to an unauthorized deviation from an investment policy, and § 34(b) of the ICA, relating to untrue disclosures. Assuming, *arguendo*, that neither of these sections supports a separate, implied right of action in a class action, Defendants cite no authority that these ICA provisions cannot be used as a predicate for § 47 in this derivative action. In seeking rescission and damages on behalf of the Funds, Plaintiffs need only show violations of these provisions in the manner pleaded, and if violations are established the court is authorized pursuant to § 47 to impose the remedies contemplated thereby. Thus, the cases cited by Defendants for the proposition that there are no implied causes of action under Sections 13 and 34(b) for plaintiffs in class actions are not applicable in this case.

Finally, the Funds' articles of incorporation and Advisory Agreement incorporated the ICA with respect to determining the Funds' NAV per share, and the Advisory Agreement between the Funds and MAM provided that the Funds would be managed in accordance with their respective investment objective, policies and restrictions. ¶¶ 691-93, 698. Accordingly, by contract, Defendants agreed to provide to the Funds the protection of the ICA and, therefore, a remedy for the violation thereof.[93]

## CONCLUSION

For the reasons stated herein, Defendants' motions to dismiss should be denied in their entirety.

---

[93]    Defendants seek to avail themselves of the ICA because they incorporated it into the Funds' articles of incorporation. Directors' Br. at 10. Plaintiffs should be able to do so also.

DATED:  February 15, 2010          Respectfully submitted,

**APPERSON  PLC**

*/s/ Jerome A. Broadhurst*
Jerome A. Broadhurst, TN BPR 12529
Charles D. Reaves, TN BPR 22550
6070 Poplar Avenue, Sixth Floor
Memphis, TN 38119-3954
Tel : 901-260-5133
Fax : 901-435-5133
jbroadhurst@appersoncrump.com

**HEAD, SEIFERT & VANDER WEIDE, P.A.**
Vernon J. Vander Weide
Thomas V. Seifert
333 South Seventh Street, Suite 1140
Minneapolis, MN 55402-2422
Tel: 612-339-1601
Fax: 612-339-3372
vvanderweide@hsvwlaw.com

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
Richard A. Lockridge
Gregg M. Fishbein
Matthew R.Salzwedel
100 Washington Avenue South
Suite 2200
Minneapolis, MN  55401
Tel:  (612) 339-6900
Fax:  (612) 339-0981
gmfishbein@locklaw.com

**ZIMMERMAN REED P.L.L.P.**
Carolyn G. Anderson
Timothy J. Becker
Kirsten D. Hedberg
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
Tel: 612-341-0400
Fax: 612-341-0844
cga@zimmreed.com

***Attorneys for Derivative Plaintiffs***

76

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that this 15th day of February, 2010, a true and correct copy of the foregoing is being served by electronic means via e-mail transmission (including the Court's ECF System) to the following:

Shepherd D. Tate, Esq.
Michael A. Brady, Esq.
**Bass, Berry, & Sims, PLC**
100 Peabody Place, Suite 900
Memphis, TN 38103-3672

Matthew M. Curley, Esq.
Michael L. Dagley, Esq.
W. Brantley Phillips, Jr.
**Bass, Berry, & Sims, PLC**
100 Peabody Place, Suite 900
Memphis, TN 38103-3672

David B. Tulchin
D. Andrew Pietro
David E. Swarts
**Sullivan & Cromwell, LLP**
125 Broad Street
New York, NY 10004

Peter J. Anderson, Esq.
S. Lawrence Polk, Esq.
**Sutherland Asbill & Brennan LLP**
999 Peachtree Street, NE
Atlanta, GA 30309-3996

Jeffrey Maletta, Esq.
Nicole A. Baker
**K & L Gates**
1601 K Street NW
Washington, DC 20006

Emily Nicklin, Esq.
Timothy A. Duffy
**Kirkland & Ellis**
200 East Randolph Dr., Ste. 5400
Chicago, IL 60601-6636

Leo Maurice Bearman, Jr.
Eugene J. Podesta, Jr.
**Baker Donelson Bearman Caldwell
& Berkowitz**
165 Madison Avenue, Suite 2000
Memphis, TN 38103

Kevin C. Logue
Asa R. Danes
**Paul, Hastings, Janofsky & Walker LLP**
Park Avenue Tower
75 East 55th Street
First Floor
New York, NY 10022

s/Jerome A. Broadhurst
Jerome A. Broadhurst